**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
ST. JOSEPH DIVISION**

BRENDA DAVIS, *et al.*,       )
                             )
                 Plaintiffs,   )
                             )
v.                           )    Case No. 5:17-cv-06058-NKL
                             )
BUCHANAN COUNTY MISSOURI, *et*   )
*al.*,                           )
                             )
                 Defendants.  )
                             )

## ORDER

Pending before the Court is a motion for summary judgment by defendants Mike Strong (former Buchanan County Sheriff), Captain Jody Hovey (Buchanan County Jail Administrator), Buchanan County Sheriff's Deputies Brian Gross and Dustin Nauman, and Buchanan County (collectively, the "Buchanan County Defendants"). Doc. 350. Also pending is a motion for summary judgment by Defendants April Helsel, Catherine Van Voorn, M.D., Ann Slagle, and Advanced Correctional Healthcare ("ACH") (with Helsel, Dr. Van Voorn, and Slagle, the "ACH Defendants"). Doc. 370. The Buchanan County Defendants and ACH Defendants seek summary judgment on Count IV of Plaintiffs' complaint, which asserts civil rights claims against them in their individual capacities and, insofar as the Buchanan County employees are concerned, in their official capacities as well.[1]

For the reasons discussed below, the Court (1) grants the individual Buchanan County

---

[1] The Buchanan County Defendants and ACH Defendants also seek summary judgment on Plaintiffs' wrongful-death claims (Count I against the Buchanan County Defendants, and Count II against the ACH Defendants), and the ACH Defendants seek summary judgment on Plaintiffs' claims for punitive damages. Plaintiffs' wrongful-death claims against these Defendants and punitive damages claims against the ACH Defendants will be addressed in a separate order.

Defendants' motions for summary judgment on the official-capacity claims against them; (2) grants Defendant Nauman's motion for summary judgment on Count IV on the basis of qualified immunity, (3) grants the motion by Defendant Van Voorn for summary judgment on Count IV, (4) denies the motions by Gross, Strong, Hovey, and Buchanan County for summary judgment on Count IV, and (5) denies in part the motions by Slagle, Helsel, and ACH for summary judgment on Count IV.

## I.      Background

### a.   Stufflebean's Medical Conditions

Justin Stufflebean ("Stufflebean"), the son of plaintiffs Brenda Davis and Frederick Stufflebean, had two endocrine disorders: Addison's disease and hypoparathyroidism. Addison's disease is a disorder that occurs when the adrenal glands fail to produce sufficient amounts of cortisol, an essential hormone that helps the body cope with stress and is critical to maintaining blood pressure and cardiovascular function. Adrenal insufficiency is life-threatening. Stress can trigger Addisonian crises. However, progression into adrenal crisis is not instantaneous, but gradual.

Stufflebean's longtime treating physician, who canceled a trip in order to testify at Stufflebean's sentencing hearing regarding Stufflebean's fragile condition, explained that "Mr. Stufflebean suffers from one of the lowest calcium levels that any of us doctors have ever seen in the hospital and that can make him quite – makes him quite ill and very badly damaging to a body and can be life-threatening in and of itself also and has to be controlled." Doc. 447-18 (Transcript from Stufflebean's October 26, 2015 sentencing hearing, Testimony of Dr. Alan Brewer), 8:2-9:16. Dr. Brewer explained that when Stufflebean's Addison's disease—which is exacerbated by stress—flares up, Stufflebean experiences "[f]atigue, malaise that's followed by severe nausea,

vomiting, dehydration" and that, "if not intervened upon in the hospital, in a hospital setting, it can be death within 24 to 48 hours." *Id.*, 9:17-24. The doctor noted that Stufflebean's Addison's was "light years worse" in the prior year than it had been in the years past, perhaps because of the stress from his having been charged with the crime at issue. *Id.*, 11:1-18. Stufflebean had been hospitalized 16 times in the prior year, not counting all of the out-patient emergency room visits that didn't involve in-patient care, and that he had been hospitalized just the prior week. *Id.*, 9:23-10:9. The doctor emphasized that "to someone with Addison's who is as brittle as he is and with his electrolyte disturbances, not being able to have access to the hospital would be—or delayed access could—it kills people." *Id.*, 10:20-25.

On October 26, 2015 (the same day that his treating physician testified), Stufflebean was sentenced to a term in prison and transferred to the Buchanan County Jail. Although Stufflebean's mother brought several of his prescription drugs to the jail on the day that he was booked in, Stufflebean did not receive any medications the next day or the day after (October 27 and 28, 2015).[2] On October 29, 2015, Stufflebean was transferred from the Buchanan County Jail to the Western Reception Diagnostic and Correctional Center ("WRDCC"). The nurse performing intake at the prison noted that Stufflebean complained of vomiting, weakness, and tachycardia (elevated heart rate). ACH AF,[3] ¶ 69. She observed that Stufflebean appeared "lethargic" and had

---

[2] Insofar as any facts are in dispute, the Court views the evidence in the light most favorable to Plaintiffs. *See, e.g., Johnson v. McCarver*, 942 F.3d 405, 2019 U.S. App. LEXIS 32772, at *1 (8th Cir. 2019) ("Because this appeal arises from the denial of a motion for summary judgment, we recite any disputed facts in the light most favorable to the [non-movant].").

[3] "ACH AF" refers to Plaintiffs' Statement of Additional Material Facts in Doc. 474 (Plaintiffs' Suggestions in Opposition to the ACH Defendants' Motion for Partial Summary Judgment on Count IV of Plaintiffs' Complaint and Accompanying Request for Punitive Damages) as well as Defendants' Response to Plaintiffs' Additional Facts in Doc. 549 (Reply in Support of Partial Summary Judgment on Count IV of Plaintiffs' Complaint and Accompanying Request for Punitive

an "unsteady gait," apparently from "weakness." *Id.*, ¶ 70.  Stufflebean told a nurse at the prison

that he had been having "this flare-up" of his Addison's disease since he was sentenced. *Id.*, ¶ 71.

Stufflebean did not receive any medications at the WRDCC from October 29-31, 2015.  BC AF,[4]

¶ 46.

On October 31, 2015, Stufflebean arrived by ambulance at a medical center, unresponsive

and in cardiac and respiratory arrest.  On November 16, 2015, he was pronounced dead.

### b.  Sheriff's Deputy Gross

Brian Gross is a Buchanan County Sheriff's Deputy.  At all relevant times, he was assigned

to courtroom security at the Buchanan County Courthouse.  His duties included maintaining order

in the courtroom and transferring those sentenced from the courthouse to the jail.  BC SF,[5] ¶ 6; BC

SF Reply,[6] ¶ 6.  Strong, the Buchanan County Sheriff at the time, testified that the transporting

officer was expected to advise the booking officer of any medical conditions of which the

transporting officer was aware, and therefore, "there was an expectation that the transporting

officer would be paying attention" to courtroom proceedings.  Doc. 447-1 (Deposition of Sheriff

Jerry Michael Strong), 55:11-15 (Q.  .  .  .  [T]he question is here, there was an expectation that the

---

Damages).  The Court cites the statements of fact only insofar as they were substantively
uncontested.

[4] "BC AF" refers to Defendants' Response to Plaintiffs' Statement of Additional Material Facts in
Doc. 564 (Reply Suggestions in Support of Buchanan County Defendants' Motion for Summary
Judgment).

[5] "BC SF" refers to Plaintiff's Response to the Buchanan County Defendants' Statement of
Uncontroverted Facts in Doc. 447 (Suggestions in Opposition to Buchanan County Defendants'
Motion for Summary Judgment).

[6] "BC SF Reply" refers to Defendants' Reply to Plaintiffs' Response to Defendants' Statement of
Facts in Doc. 564.

transporting officer would be paying attention, fair? A. Correct.); BC AF, ¶ 6 (noting that, as transporting officer, Gross was responsible for answering the booking officer's standard question on the Medical Intake Screening Questionnaire of whether "the arresting or transporting officer believe[s] the inmate is a medical, mental health, or suicide risk now"). The Buchanan County Sheriff's Department policies state that, "[w]hen a detainee requiring special needs care is identified, the facts surrounding the case shall be relayed to the jail commander (or designee) and the medical staff . . . ." BC AF, ¶ 53.

Gross was on duty in the courtroom during Stufflebean's sentencing hearing on October 26, 2015. He was sitting approximately 30 feet from the witness chair when Stufflebean's long-time treating physician, Dr. Brewer, discussed Stufflebean's uniquely fragile condition. Doc. 447-3 (Moden Affidavit), ¶ 5. Gross admits that he normally can hear testimony in the courtroom. BC SF, ¶¶ 8, 10. Gross also acknowledged that it is "rare" for doctors to testify at sentencing hearings. Doc. 447-4 (Deposition of Brian M. Gross), 10:14-16. Dr. Brewer's testimony was made all the more unusual by the fact that he claimed he had canceled a trip "so [he] could be [t]here for Justin and to say what [he] – to help clarify his medical condition." Doc. 477-18, 12:4-7.

Dr. Brewer explained that Stufflebean's extraordinarily low calcium-levels could become "life-threatening," that an Addison's flare-up could manifest as "[f]atigue, malaise that's followed by severe nausea, vomiting, dehydration" and that, "if not intervened upon in the hospital, in a hospital setting, it can be death within 24 to 48 hours." *Id.*, ¶¶ 3-4; Doc. 447-18, 8:2-10:9. The doctor emphasized that "to someone with Addison's who is as brittle as he is and with his electrolyte disturbances, not being able to have access to the hospital would be—or delayed access could—it kills people." *Id.*, 10:20-25. Dr. Brewer testified that Stufflebean had been hospitalized 16 times in the prior year, not counting all of the out-patient emergency room visits that didn't

involve in-patient care, and indeed, Stufflebean had been hospitalized just the prior week. *Id.*, 9:23-10:9.

After Stufflebean was sentenced, Gross took him into custody and transported him to the jail. Despite Stufflebean's doctor's detailed and unusual testimony that Stufflebean's medical conditions would endanger his life if they were not properly controlled, Gross provided no information about Stufflebean's medical condition to the booking officer. BC SF, ¶ 19.

### c. Sheriff's Deputy Nauman

Nauman is and at all relevant times was a Buchanan County Sheriff's Deputy assigned to the booking desk at the Buchanan County Jail. BC SF, ¶ 17. Nauman's job per Buchanan County's medical policies and procedures was to review and be familiar with those policies and procedures requiring him to conduct the "BCSD Medical Intake Screening" carefully, with an eye towards identifying prisoners with chronic conditions or special needs so that their needs would be addressed properly throughout their incarceration. BC AF, ¶ 17. This required Nauman to be attentive to the questioning and the answers. *Id.* Strong, who was Sheriff at the time, testified that he expected that the medical history for a prisoner like Stufflebean would be obtained "[a]t the booking process." *Id.*, ¶ 92.

The first question on the jail's Medical Intake Screening form is, "Was inmate a medical, mental health or suicide risk during any prior contact or confinement within the department?" *Id.*, ¶ 10. Nauman stated that he was not certain if Stufflebean's prior Medical Intake Screening form, from 2014, was available to him. *Id.*, ¶ 16. Stufflebean's prior booking records showed that he had been classified as "Special Condition – Medical," and that Stufflebean needed medical attention due to his calcium deficiency." *Id.*, ¶ 18.

The second question on the form is: "Does the arresting or transporting officer believe that the inmate is a medical, mental health or suicide risk now?" *Id.*, ¶ 11. However, Gross did not report Stufflebean's medical conditions to Nauman.

The information that Nauman entered in the medical questionnaire when he booked Stufflebean into the Buchanan County Jail on October 26, 2015 indicates that Stufflebean reported abdominal pain, unexplained weight loss, loss of appetite, night sweats, and fatigue,[7] and that he was taking several prescribed medications, including prednisone, fludrocortisone, NATPARA, Calcitriol, magnesium, E, and potassium. *Id.*, ¶ 27. Although the Medical Intake Screening Form asks for the "dosage, and frequency" of medications, Nauman did not document that information. BC AF, ¶ 12.

Despite the facts that Stufflebean had been hospitalized just the prior week (in addition to fifteen other in-patient hospitalizations), and his longtime treating physician had testified at his sentencing hearing that same day, the medical intake screening questionnaire indicates that Stufflebean was not under the care of a physician. *Id.*, ¶ 8. Nauman also recorded that Stufflebean did not "currently" need medical attention. BC SF, ¶ 23. In contrast, Stufflebean's medical intake screening questionnaire from his prior booking, in December 2014, stated that Stufflebean was in

---

[7] Defendants claim that these complaints were historical, rather than reports of conditions Stufflebean was experiencing at the time of the booking. Defendants cite a portion of the medical intake screening questionnaire titled "Questionnaire: Ebola" to support their claim. Stufflebean's form indicates that he denied having "abdominal (stomach) pain." The fact that Stufflebean apparently denied having abdominal pain on an Ebola questionnaire that begins with questions concerning travel to and contact with people from West Africa at best raises a disputed issue as to whether Stufflebean's symptoms of abdominal pain reported to Nauman were supposed to be historical rather than a description of his condition at that time. The intake form, which appears to be describing Stufflebean's present general medical condition rather than his exposure to Ebola, already lists abdominal pain among other symptoms. Construing the facts in the light most favorable to Plaintiffs, the Court finds for the purpose of this motion that Stufflebean reported to Nauman conditions he was experiencing at that time.

need of medical attention "BECAUSE OF A CALCIUM DEFICIENCY." Doc. 447-9. Had Nauman recorded that Stufflebean currently needed medical attention, Stufflebean would have been classified as "Special Condition—Medical," as he was the first time he was booked into the jail, and both the medical staff and jail commander would have been notified of his condition. BC SF, ¶ 24; Doc. 631 (transcript of November 18, 2019 teleconference), 7:2-8:19.

After completing the medical questionnaire for Stufflebean upon booking him into the jail, Nauman printed a copy of the completed questionnaire and placed it in the nurse's box, and then contacted a nurse by telephone to advise her that he had booked an inmate who needed to be seen for medical issues. BC AF, ¶ 28. Stufflebean was placed in a separate cell from other inmates being booked into the jail, but Nauman could not recall the reason for it. Doc. 447-8 (Deposition of Dustin R. Nauman), 20:3-11.

When Nauman's shift ended at 5 p.m., Stufflebean still was in a holding cell. BC SF, ¶ 29. Nauman could not recall following up with the nurse as to Stufflebean's care. BC AF, ¶ 95. Nauman did not know whether, or when, a nurse came to check on Stufflebean. BC SF, ¶ 30. Stufflebean was in the holding cell in the booking area for 12 hours and was never seen by a nurse while in the holding cell. BC AF, ¶ 96.

Nauman had no further contact with Stufflebean during his stay in the Buchanan County Jail in October 2015. BC SF, ¶ 31.

### d. Medical Providers—ACH and Its Employees

Ann Slagle is a Licensed Practical Nurse employed by ACH and assigned to the Buchanan County Jail. ACH AF, ¶ 14. Slagle was on duty on October 26, 2015 from 2 p.m. until 10:29 p.m.; October 27, 2015 from 12:07 p.m. until 10:28 p.m.; and October 28, 2015 from 1:55 p.m. until 10:24 p.m. *Id.*

April Helsel (also called April Powers) is a Licensed Practical Nurse employed by ACH as the site manager for the Buchanan County Jail. *Id.*, ¶ 16. As site manager, Helsel was responsible for supervising and training the nursing staff at the jail. *Id.*, ¶ 17. She was on duty October 26, 2015 from 6:00 a.m. until 2:20 p.m.; October 27, 2015 from 12:14 p.m. until 10:30 p.m.; October 28, 2015 from 6:03 a.m. until 2:01 p.m.; and October 29, 2015 from 6:00 a.m. until 11:15 a.m. *Id.*, ¶ 16.

Dr. Catherine Van Voorn was the medical director covering the Buchanan County Jail. Doc. 447-22, 20:7-13.

### e. Stufflebean's Medical Treatment at the Buchanan County Jail

#### i. Nurse Slagle's Intake

Nauman claims that, on October 26, 2015, the day that Stufflebean was booked into the jail, Nauman contacted a nurse by telephone to let her know that he had "booked in an inmate who needed to be seen due to medical issues." *Id.*, ¶ 23. A reasonable juror could find, based on the 14:03PM print time shown on the questionnaire (Doc. 447-5, p. 19) and Slagle's documented arrival time of 2pm on October 26, 2015 (ACH AF, ¶ 14) that Slagle was the nurse that Nauman contacted. During the nearly 11 hours that Stufflebean was in the holding cell in the booking area, no nurse came to see him. *Id.*, ¶ 29; *see also* Doc. 474-21 (Deposition of Ann Marie Slagle, Vol. II), 30:22-31:17 (testifying that she "did not see him" on the 26th), Doc. 474-1 (Inmate Activity Log showing that Stufflebean was admitted to the facility at 13:54 on October 26 and was sent to housing at 00:47 on October 27, 2015).

On October 26, 2015, the day that Stufflebean was brought to the Buchanan County Jail, his mother, Brenda Davis, delivered to the jail what she could find of Justin's medications, including NATPARA, melatonin, hydrocodone, ondansetron, fludrocortisone, paroxetine,

Calcitriol, prednisone, and Vitamin D, as well as specialized injection tips for the NATPARA, *id.*, ¶ 24; BC AF, ¶ 19, and Slagle retrieved the medications, *id.*, ¶ 26.[8] Stufflebean was supposed to take his medications daily, and indeed, he was supposed to take some of his medications more than once a day. *See* Doc. 447-15 (records from October 19, 2015 emergency-room visit).

Once-a-day medications were passed to inmates at 7 a.m. Any once-daily medication that was not entered in the jail's system before 7 a.m. on a given day would not be administered. Doc. 474-21, 33:9-17, 35:6-17, 48:5-6; *see also id.*, 49:13-21 ("Q. So the medications were to be given at 7:00 a.m.? A. That's correct. Q. Was this per Dr. Van Voorn's orders? A. It's the per setup in the MAR system. Q. Because it was after 7:00 a.m. when you got the order from Dr. Van Voorn when you put it into the system, it just bumped it to the next day? A. Correct."). Thus, for Stufflebean to receive his daily medications on October 27, they needed to be entered in the system before 7 a.m. that day. *Id.*, 33:9-17, 35:6-17, 48:5-6. Yet, despite having picked up at least nine medications as well as specialized injection tips prescribed for Stufflebean, and although she worked for more than eight hours on October 26 after Nauman advised her to evaluate Stufflebean, Slagle did not call a doctor to ask for an order to administer his prescription medications on that day. Slagle knew that meant that Stufflebean would not receive the nine prescription medications in her custody for more than 24 hours. *See* Doc. 474-29, 50:6-9 ("Q. . . . But in your medication verification form, you recognize that the medications were to be given daily? A. Yes.")

On October 27, 2015, Stufflebean filed a formal request for his medications, stating, "I called to have my medicine brought in. I have Addison's and hypoparathyroid disease. Medications brought to jail." Doc. 474-6 (Medical Progress Notes for Stufflebean prepared at

---

[8] Dr. Van Voorn later suggested that the medications "didn't wind up with medical with the nurse," and that what happened to the medications was "a mystery." 474-24 (Deposition of Catherine Van Voorn, MD), 214:19-216:2.

1:16 p.m. on October 27, 2015). Slagle made note of Stufflebean's request, and apparently in response, called Dr. Van Voorn that afternoon and received oral orders for some of the prescriptions. *See id.* (repeating Justin's medication request and writing under "PLAN" "1300 Contacted Dr. Van Voorn and received verbal orders."); ACH AF, ¶¶ 28, 37. As discussed above, because Slagle entered the order after 7 a.m. on the 27th, the soonest Stufflebean could have received his medication was October 28, 2015.

Thus, despite his formal request on October 27 for the medications that had been brought to the jail, and although Stufflebean told a fellow inmate that he had requested his medications repeatedly, and that fellow inmate witnessed him requesting his medications in person at least twice, Doc. 474-23 (Deposition of Ross Ellis), 82:16-83:10, there is no dispute that Stufflebean was not given his medications on either October 26 or 27, 2015. ACH AF, ¶ 48; BC AF, ¶¶ 35-36.

Slagle claims that she saw Stufflebean on October 27, 2015 in the infirmary before she called Dr. Van Voorn. *See* Doc. 474-21, 13:4-18. However, the jail's inmate activity log, which tracks the movements of inmates within the facility, shows that once Stufflebean was moved from the holding cell (where he was never seen by medical staff) to the cell pod, he did not leave the cell pod (to go to the infirmary or elsewhere) until he was transferred to prison. AF for ACH, ¶¶ 35-36; Ex. 474-1 (inmate activity log for Stufflebean).

The only evidence that ACH points to in arguing that Slagle saw Stufflebean on October 27, 2015 are the progress note and the medication verification form that Slagle created. *See* Doc. 631, 23:15-19. The Medical Progress Notes contains just two sections. In the section titled "SOA" is Stufflebean's request for his medication, written in the first person, as though transcribing Stufflebean's formal request ("I called to have my medicine brought in. I have Addison's and

hypoparathyroid disease."), and on the next line, the statement, "Medications brought to jail." Doc. 474-6. The second section, titled "Plan," states only "10/27/15 1300 Contacted Dr. Van Voorn and received verbal orders." *Id.* The only indication on the medical verification form that Slagle saw a patient are vital signs (B/P, Temp, Resp, Pulse), Doc. 474-5, which, Plaintiffs point out, could have been fabricated. Neither of the two documents that ACH cites contains any notes from Slagle concerning Stufflebean's appearance, any indication that he complained about symptoms, or even, conversely, that he felt fine. Docs. 474-5, 474-6. Nor did she tell Dr. Van Voorn about these factors.

Slagle testified that her list of medications on the medication verification form was based on the bag of medications Stufflebean's mother brought to the jail. Doc. 447-21, 16:21-25. Thus, the list of medications itself does not indicate that Slagle spoke with Stufflebean. In fact, to the contrary, the list of medications suggests that Slagle did not see Stufflebean. During her deposition, Slagle testified as follows about her usual procedure for identifying discrepancies between the medication verification form and other documentation:

> Q. So you would not reconcile back to the intake screening form or the property form that the corrections officer fills out . . . when you were completing the medication verification form?
>
> A. Not usually, unless there was a discrepancy.
>
> Q. Well –
>
> A. And that would be after I spoke to the patient, and then I would compare it to see if maybe it got placed in his property or was, you know, being sent back home.
>
> Q. Okay. Well, I mean what we know in this case is there's medications listed on the intake screening form and the property intake form . . . that don't show up on your medication verification report; and so the question is did you reconcile it in this case or not?
>
> A. No, I didn't.

Q. Is there a reason why not?

MR. HICKS: Object to the form. I feel like she just explained everything.

A. I would talk to the patient, which I would have the medications that were there, and I would ask him at that time if there were other medications that he was taking, and I would go from there. I would then look back and go, "Okay, well, it's got Vitamin D." "Yeah, I took that sometimes." You know, I don't know if that's what he said at that point, but that's what I would go for.

(By Mr. Bird) Are you suggesting that Mr. Stufflebean told you not to include certain medications on his medication verification form?

A. He possibly could, yes.

Q. What is your evidence for that that's in his chart?

A. Nothing in -- in his chart.

Q. Then you're speculating, correct?

A. Yes, sir, I would be speculating.

Q. Okay. And the point being that you rec- -- recognize now that if you had done a reconcilement with the intake screening form and the property form, that you would have seen medications that were identified but not listed in your verification form?

A. Yes, I would have seen that there were medications that were not on my form.

Slagle's list of medications omits at least two of the medications that Stufflebean told Nauman he takes. *Compare* 474-8 (Questionnaire: BCSD Medical Intake screening listing, *inter alia*, "MAGNISIUME and POTASIUME [*sic*]") *with* 474-5 (Slagle's Medication Verification Form, mentioning neither magnesium nor potassium). It is reasonable to infer that, if given the opportunity to speak with a nurse about the medications he had already formally requested, Stufflebean would report to the nurse the same medications he reported to the booking officer of the jail. The fact that Stufflebean did not tell Slagle about at least two of his medications reasonably suggests that Slagle never spoke with Stufflebean.

Slagle also omitted Stufflebean's Calcitriol from her medications list, even though that was among the medications that Davis brought to the jail. In addition, although Stufflebean's mother had brought both NATPARA and the special injection tips needed to administer it, Slagle wrote, "Pt. must supply."

### ii. Dr. Van Voorn's Orders

On October 27, 2015, Dr. Van Voorn ordered continuation of some of Stufflebean's medications: NATPARA, Vitamin D Ergo, Paxil, Prednisone and Fludrocortisone. ACH AF, ¶ 40. Dr. Van Voorn denied Stufflebean one of the medications from Slagle's list: Zofran/ondansetron, a medication used to control severe nausea and vomiting that Stufflebean had been prescribed during an emergency room visit nine days earlier related to an Addisonian crisis. *Id.*, ¶¶ 41, 44.

Dr. Van Voorn admitted that if a patient with hypoparathyroidism or Addison's disease reported "fatigue or . . . abdominal pain or tingling, those could all be symptoms of a crisis coming on for that condition," and indeed "[c]ertainly" were "red flags." ACH AF, ¶ 87. She acknowledged that in such a situation, she would "know that [she] need[s] to take a closer look to make a determination as to their state of health," because otherwise "it could become a crisis" and "could lead to serious injury or death." *Id.* She stated that she understood that "somebody having Addison's disease and hypoparathyroidism could be at risk if they didn't get their medication; so [she] would take extra actions to make sure [she] had the list correct and [she was] following the right course." *Id.* She admitted that she had this knowledge in October 2015. *Id.* She further acknowledged at her deposition that it is critical for a brittle patient with Addison's and hypoparathyroidism to receive medications daily. *Id.*, ¶ 80. Yet, when she ordered on October 27, 2015 that some of Stufflebean's prescribed medications be administered, she understood that

Stufflebean would not receive the medications until October 28 or 29, 2015. Doc. No. 474-24, 123:25-124:7.

Dr. Van Voorn visited the Buchanan County Jail once a week. ACH SF,[9] ¶ 11. Despite knowing that Stufflebean had Addison's Disease and hypoparathyroidism, Slagle did not put Stufflebean on the list of patients that Dr. Van Voorn would see on her October 28, 2015 visit. ACH AF, ¶ 49. Helsel, too, did not put Stufflebean on the list of patients that Dr. Van Voorn would see on October 28, 2015. *Id.*, ¶ 50. However, Helsel testified that the responsibility for first identifying a prisoner with a chronic condition who warranted being placed on the doctor's "list" belonged to the doctor herself. Doc. 474-21, 8-25. (Q: "[E]ssentially, as the nurse, you're reliant on that first phone call with the physician to instruct you . . . 'I want to follow up. Let me see that patient when I come in this week'? A. Yes."). Consequently, although Dr. Van Voorn was on site at the jail on October 28, 2015, she did not see Stufflebean. ACH AF, ¶ 51. Dr. Van Voorn admitted that, as a patient with Addison's disease and hypoparathyroidism and a long list of medications to treat those conditions, Stufflebean should have been "on her list" for proper evaluation. *Id.*, ¶ 52.

### iii. Helsel's Failure to Administer Medication

There is no evidence that anyone gave Stufflebean his medications on October 28, 2015. Helsel was on duty the morning of October 28, 2015—during the time when once-a-day medications were supposed to be administered. ACH AF ¶ 17. Helsel, like Slagle, was aware at that time that Stufflebean needed medications daily. Doc. 447-21 (Deposition of April (Powers)

---

[9] "ACH SF" refers to Doc. 371 (Suggestions in Support of Partial Summary Judgment on Count IV of Plaintiffs' Complaint and Accompanying Request for Punitive Damages), Statement of Uncontroverted Facts

Helsel), 45:6-9. Helsel testified that, on that day, she gave Stufflebean the medication that Dr. Van Voorn had ordered. *Id.*, 7:8-15. However, when pressed, she admitted that she had no recollection of having given Stufflebean his medications, and she could point to no records supporting her statement that she had given him medications: her statement that she had administered his medications was mere conjecture based on the fact that there was no notation in the record indicating that Stufflebean had refused his medications. *Id.*, 7:8-23:13, 24:20-25:5. Helsel theorized that the lack of any indication that she gave Stufflebean his medications was just a computer error, but she could point to no evidence supporting this theory. *Id.*, 29:12-17.[10]

Some evidence suggests that Stufflebean received some medication, from a third ACH nurse, on October 29, 2015, the day that he was transferred to the prison. Doc. 549-2 (Deposition of Carrie Reindollar), 113:9-118:13; ACH SF, ¶ 32; *see also* Doc. 474-5.

### iv. Failure to Take Vitals

There is no evidence that Slagle, Helsel, or anyone else checked Stufflebean's vital signs on October 28 or 29, 2015, despite the fact that Dr. Van Voorn had ordered that his vitals be taken for three consecutive days. ACH AF, ¶¶ 39, 56, 59. Indeed, Helsel admitted that nothing in Stufflebean's record indicates that she provided any care to him at all. *Id.*, ¶ 60. Plaintiffs' counsel represented that the vitals were supposed to be taken in the afternoons, and Slagle was on duty the afternoon of October 28, 2015. Doc. 631, 19:16-20-15.

---

[10] There is no dispute that Slagle did not give Stufflebean any medications on October 28, 2015. *Id.*, ¶¶ 53, 57.

### v.  Stufflebean's Deteriorating Condition

During his incarceration at the Buchanan County Jail, Stufflebean was not eating, and he was getting noticeably weaker.  ACH AF, ¶ 61.  He had difficulty getting down stairs such that he had to lean on the rail for assistance.  *Id.*, ¶ 62.  He also vomited at least one time at the jail—a sign of Addison's crisis.  ACH SF, ¶ 30; *see* Doc. 447-18, 9:17-24 (Stufflebean's treating physician testifying that Stufflebean's Addison's flare-up is marked by "[f]atigue, malaise that's followed by severe nausea, vomiting, dehydration" and that, "if not intervened upon in the hospital, in a hospital setting, it can be death within 24 to 48 hours").

### f.  Transfer to Prison

On October 29, 2015, at 12:35 p.m., Stufflebean was transferred from the Buchanan County Jail to the Western Reception Diagnostic and Correctional Center ("WRDCC").  ACH AF, ¶ 64.  During the transfer, Stufflebean "struggl[ed]" to walk in his shackles.  *Id.*, ¶ 63.

The transfer from the Buchanan County Jail to the prison was effectuated in just nine minutes.  *Id.*, ¶ 68.  The nurse performing intake at the prison noted that Stufflebean complained of vomiting, weakness, and tachycardia (elevated heart rate), and that Stufflebean appeared "lethargic" and had an "unsteady gait," apparently from "weakness."  *Id.*, ¶¶ 69, 70.  Stufflebean told a nurse at the prison that he had been having "this flare-up" of his Addison's disease since he was sentenced.  *Id.*, ¶ 71.

Stufflebean did not receive any medications at the WRDCC from October 29-31, 2015.  BC AF, ¶ 46.

On October 31, 2015, Stufflebean arrived by ambulance at a medical center, unresponsive and in cardiac and respiratory arrest.  On November 16, 2015, Stufflebean was pronounced dead.  *Id.*, ¶ 47; ACH AF, ¶ 72.  Dr. Marius C. Tarau, M.D., from the Jackson County Medical Examiner's

office, declared the cause of Stufflebean's death to be "[c]omplications of polyglandular endocrinopathy." *Id.* Plaintiffs' expert, Dr. Bilezikian, opined that, had Justin received proper care for his Addison's disease, he would not have died. *Id.*, ¶ 73.

### g. ACH and Buchanan County Policies and Procedures

During discovery, ACH initially denied that it had any medical policies or procedures for its operations at the Buchanan County Jail. *Id.*, ¶ 88. Buchanan County relied on ACH's production, and therefore in effect initially denied having any medical policies or procedures. BC AF, ¶ 67 (arguing that Buchanan County did not itself deny having relevant policies, but instead simply referred Plaintiffs to ACH's policies). However, ACH later produced policies and procedures that it had provided to Buchanan County to adopt. ACH AF, ¶ 90. Among the policies that ACH and Buchanan County implemented is the following: "It is the policy of the ____ County Jail to provide access to appropriate care for serious medical . . . needs . . . . Access to care— means in a timely manner, a detainee can be seen by a clinician, to be given professional clinical judgment, and receive care that is ordered." *Id.*, ¶ 91. The policies further provide: "Prescribed medications are reviewed and appropriately maintained according to the medication schedule the inmate was following before admission." *Id.*, ¶ 96.

The policies require "regularly scheduled administrative meetings" with the health care team and Buchanan County. *Id.*, ¶ 92. The jail was supposed to arrange regular meetings with the responsible physician and jail administrative staff to review "the effectiveness of the healthcare system, healthcare issues that need improvement, changes implemented since last reporting period and any recommended changes to improve the healthcare provided." *Id.*, ¶ 93.

### h.  Oversight by ACH

ACH has not presented admissible evidence that it had a real system in place to monitor the accuracy of its Continuous Quality Improvement ("CQI") reporting—which covered medication errors and prisoner grievances. *Id.*, ¶ 101 (stating only that "ACH clearly had a system in place," without further explanation, and citing for support only the ACH deposition transcript without page or line references). ACH left it up to the local nurses to provide "monthly contact logs" for the Regional Nurse Manager to prepare the CQI reports. *Id.*  Regional Nurse Managers were supposed to "try" to walk through the facility every couple of months and "spot check" some files. *Id.*  There was no policy governing how many files were to be reviewed or how they were supposed to review them. *Id.*  Only the most recent version of the records was kept, preventing review of historical trends. *Id.*, ¶¶ 101-102.

### i.  Oversight of ACH

Sheriff Strong was the final decision-maker with regard to policies and procedures at the Buchanan County Jail prior to and at the time of Stufflebean's incarceration in October 2015.  BC AF, ¶ 69.  Strong understood at that time that inmates had a constitutional right to receive medical care for their serious medical needs, and that he was responsible for making sure they received it. *Id.*, ¶ 71.  Nonetheless, Strong had no system in place to monitor the accuracy of ACH's Continuous Quality Improvement ("CQI") reporting. *Id.*, ¶ 76.  Strong never compared prisoners' medical grievances with ACH's CQI reports to verify that ACH's "zero" grievance reporting was accurate. *Id.*, ¶ 77.  He simply trusted that ACH was providing proper care to the Buchanan County prisoners. *Id.*, ¶ 76.

BCSD Medical policies appoint the Jail Administrator, Captain Hovey, as the Responsible Health Authority to "oversee the medical operations of the jail," including "arranging for all levels

of healthcare and ensuring the quality and accessibility of all health services provided to the detainee population" and monitoring "to assure all aspects of detainee care occurs for the treatment of illnesses classified as 'serious' by the practitioner." *Id.*, ¶ 49. Strong expected that Hovey was exercising "constant oversight" over ACH. *Id.*, ¶ 75. However, Hovey's immediate supervisor, Undersheriff Bill Puett had "no specific steps" in place to ensure that Hovey was overseeing the provision of health care to detainees. *Id.*, ¶ 88.

As part of Buchanan County's oversight of medical care, Hovey (and other jail officers) were supposed to review medical grievances and attend CQI meetings and report to Strong. *Id.*, ¶ 79. There was no formal process for reviewing medical grievances from a systemic viewpoint. *Id.*, ¶ 80. Puett testified that, while he was undersheriff through December 2015, Buchanan County did not review prisoner medical grievances and did not look at any documentation outside of CQI reports to determine whether prisoners were being provided their medications. *Id.*, ¶ 98.

To Puett's knowledge, there was no discussion at the Sheriff's Department in 2015 or earlier about how to monitor ACH's performance. *Id.*, ¶ 85. Puett testified that routine monitoring of the basic CQI program involved attending the CQI meetings and reviewing ACH's CQI reports. *Id.*, ¶ 83. In reality, however, ACH essentially was left to self-report issues or problems with the medical care it was providing to prisoners. *Id.*, ¶ 81. Outside of ACH's self-reporting, Hovey had no system in place to analyze or review the care being provided to prisoners. *Id*.

### j. Medical Care Discrepancies and Purported Deficiencies

Prior to October 2015, there were discrepancies in ACH's self-reporting. For example, the January 2015 report showed ten prisoner grievances in 2014, while the May 2015 report showed zero prisoner grievances in 2014. BC AF, ¶¶ 103-104; ACH AF, ¶¶ 109-10. CQI reports for 2014 and 2015 both indicated that there were zero medication errors or prisoner grievances. BC AF, ¶

110, ACH AF, ¶¶ 105. However, after reviewing "a summary of the dates and prisoners . . . that . . . didn't get their medications" in that timeframe prepared by Plaintiffs' expert, Strong was "astonished" by the number of errors and agreed that the medication errors were "extensive," BC AF, ¶ 111, ACH AF, ¶¶ 106, and that in fact, there were "dozens of prisoner grievances in 2014 [and] 2015." *Id.*; *see also* Doc. 474-34 (Roscoe Supplemental Report), at 1 (Plaintiffs' expert opining that she found "over 250 medication errors" after reviewing 18 months' of data, including evidence that "[c]ritical medications for anticoagulation, diabetes and cardiovascular disease were not administered to patients, even though they were ordered by a physician").[11]

Puett agreed, based on Plaintiffs' expert's report, that there were "some obvious problems with the system in place for monitoring ACH and its performance in providing prisoners with medical care that they were entitled to back in 2015." *Id.*, ¶ 106. Puett acknowledged that medication errors indicated that "we weren't obviously provided with information that we should have had." BC AF, ¶ 101. Puett also agreed that "if CQI reports were repeatedly inaccurate regarding prisoner grievances and medication errors that would be a serious systemic problem with meeting the County's constitutional duties to prisoners" and that a "continuing widespread pattern of inmates not getting their medications" would have indicated a "serious systemic problem at the Buchanan County Jail." *Id.*, ¶ 99. Strong too agreed that there was a serious systemic problem at

---

[11] Around the time of Stufflebean's incarceration at the jail, the nurses worked long hours. In the 7-week period from September 13, 2015 through November 7, 2015, the two full-time nurses employed by ACH at the Buchanan County Jail worked more than 161 hours of overtime, combined. Id., ¶ 124. Still, there were several days during which no nurse was at the facility at all. Plaintiffs' expert, Dr. Lori Roscoe, found that "there were days when no healthcare personnel were onsite [at the jail] to administer medications, a critical function that must be done daily in a correctional facility. This also meant there was no health staff available for intakes or to conduct nursing sick call or to respond to emergency calls." *Id.* On October 27, 2015, when no nurse was onsite at the jail in the morning, the Medication Administration Record review indicates that at least four people, including Stufflebean, did not get the medication that was ordered for them. *Id.*

the Buchanan County Jail in 2015 affecting prisoners' ability to obtain their medications. Doc. 447-1, 131:3-21, 132:9-133:9.

Strong acknowledged that he might have been able to prevent the circumstances that led to Stufflebean's not receiving his medications had there been an accurate CQI system in place showing that prisoners were not getting their medications and had complained about the deprivation. BC AF, ¶ 115.

Moreover, prior to Justin's death in November 2015, ACH had been sued multiple times in Missouri by prisoners alleging that necessary medical treatment was withheld. ACH AF, ¶ 119. ACH settled all of them. *Id.*

On June 11, 2014, a Buchanan County Jail prisoner, Craig Wilkerson, sued ACH and Dr. Van Voorn, alleging that she and ACH nurses failed to examine him, to monitor him, to obtain his complete medical history, and to provide medication for his serious medical condition, including by refusing to continue medications a physician had prescribed him. *Id.*, ¶ 120; *see also* BC AF, ¶ 112; *see also* Doc. 474-33. Specifically, the plaintiff alleged that he fell from his bunk in his cell, breaking his back, after jail medical personnel deprived him of his schizophrenia medication. Doc. 474-33, ¶ 3. Although he was not named in the suit, Strong acknowledged that the facts of that action against Dr. Van Voorn and ACH, in which Wilkerson claimed that he fell and broke his back while having a seizure, "sound[ed] familiar." Doc. 447-1, 115:22-116:11. ACH took no action to review or investigate the merits of the Wilkerson lawsuit. ACH AF, ¶ 122. Yet, ACH settled the case. *See* Order Approving Settlement dated November 15, 2016 in *Wilkerson v. Van Voorn*, No. 14BU-CV2595.

On August 27, 2015, another Buchanan County Jail prisoner, Tyler Fee, sued Nurse Slagle, Sheriff Strong, and Captain Hovey, alleging that Slagle and others failed to examine him,

to monitor him, to obtain his complete medical history, and to administer medication for his serious medical conditions, including by refusing to continue medications his physician had prescribed. *Id.*, ¶ 121; *see also* Doc. 474-17. The petition alleged that, upon incarceration at the jail, Fee, who previously had suffered a traumatic brain injury, was not given his prescribed medications, despite the fact that his father twice called jail officials to notify them of his son's condition and also had brought his son's medications to the jail. Doc. 447-32, pp. 11-12. Fee suffered either a panic attack or seizure and hit his head, suffering a skull fracture that was not diagnosed for days because he was not sent to a hospital. *Id.*, pp. 13-21. Fee allegedly suffered near-total paralysis on his right side as a result of the lack of attention and continued to require therapy. *Id.*, p. 21. The Buchanan County Defendants acknowledge that they had been served with process in the Fee suit by the time Stufflebean was incarcerated. Doc. 564, pp. 86-87.[12]

Despite the fact that Defendants had notice of these lawsuits alleging serious injuries due to ACH's failure to provide medication for serious medical conditions before Stufflebean's October 2015 incarceration, and despite the discrepancies in ACH's CQI reports, neither Strong nor Hovey undertook any effort to test or verify the accuracy of ACH's CQI reporting or otherwise oversee ACH's administration of medications. BC AF, ¶ 113. ACH apparently took no action to review or investigate whether there were systemic problems that led to these lawsuits involving allegations similar to those at issue in this case. ACH AF, ¶ 123.

---

[12] The *Fee* case was voluntarily dismissed without prejudice on motion by the Plaintiff on March 22, 2017 (*see* March 22, 2017 judgment in *Fee v. Advanced Correctional Healthcare, Inc.*, No. 15BU-CV02918), presumably because of ACH's settlement (ACH AF, ¶ 119 ("ACH settled all of them.")).

## II.    Legal Standards

### a.    Summary Judgment Standard

"Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Anderson v. Durham D &M, LLC*, 606 F.3d 513, 518 (8th Cir. 2010) (citing *Johnson v. Ready Mixed Concrete Co.*, 424 F.3d 806, 810 (8th Cir. 2005)); Fed. R. Civ. P. 56(a).  The Court must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Robert Johnson Grain Co. v. Chemical Interchange Co.*, 541 F.2d 207, 210 (8th Cir. 1976); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  While the moving party bears the burden of establishing a lack of any genuine issues of material fact, *Brunsting v. Lutsen Mountains Corp.*, 601 F.3d 813, 820 (8th Cir. 2010), the party opposing summary judgment "must set forth specific facts showing that there is a genuine issue of material fact for trial." *Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007). "Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment." *Id*.  "Summary judgment is proper if, after viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmovant, no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law." *Higgins v. Union Pac. R.R. Co.*, 931 F.3d 664, 669 (8th Cir. 2019) (quotation marks and citation omitted).

### b.    Deliberate Indifference to a Serious Medical Need

"It is well established that deliberate indifference to a prisoner's serious medical needs is cruel and unusual punishment in violation of the Eighth Amendment." *Langford v. Norris*, 614 F.3d 445, 459 (8th Cir. 2010) (quotation marks and citation omitted).

An objectively serious medical need is "one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Camberos v. Branstad,* 73 F.3d 174, 176 (8th Cir. 1995) (quotation marks and citation omitted). The Buchanan County Defendants do not dispute that a physician testified that Stufflebean required treatment for his medical conditions. *See* Doc. 564, p. 80 ("[A]s Plaintiffs state, a serious medical need is one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention. Defendants agree with Plaintiffs that Justin Stufflebean's physician did testify at his sentencing hearing concerning Stufflebean's medical condition.") The ACH Defendants, too, effectively concede that Stufflebean's medical needs were serious. *See* Doc. 371, p. 11.

At issue is whether each defendant knew of and was deliberately indifferent to Stufflebean's serious medical needs. *See, e.g.,* Doc. 564 (Buchanan County Reply), p. 80 ("Plaintiffs' contention that the Buchanan County Defendants knew of Stufflebean's condition, and were deliberately indifferent to that condition, is simply not supported by any evidence in this case."); Doc. 371 (ACH Suggestions in Support), p. 1 ("There is no genuine issue of fact and plaintiffs have failed to prove defendants were deliberately indifferent with respect to their care and treatment of Stufflebean.").

To be found "deliberately indifferent," an official must "'know[] of and disregard[]' a serious medical need or a substantial risk to an inmate's health or safety." *Saylor v. Nebraska*, 812 F.3d 637, 644 (8th Cir. 2016) (citations omitted). Thus, "[f]irst, [Plaintiffs] must . . . demonstrate that [each defendant] knew of the substantial risk of serious harm to [Stufflebean]." *Blair v. Bowersox*, 929 F.3d 981, 987-88 (8th Cir. 2019) (quotation marks and citations omitted).

"Plaintiffs do not have to prove that [each defendant] had actual knowledge of the risk of harm; [they] can instead demonstrate that the risk was obvious enough to support the inference that [the defendant] knew the risk existed." *Id.* Constructive knowledge is not sufficient; instead, Plaintiffs ultimately must "show that [each defendant] had been exposed to information concerning the risk and thus must have known about it." *Id.*

Deliberate indifference also requires Plaintiffs to "prove that [each defendant] deliberately disregarded that risk by showing that [he or she] knew that his [or her] conduct was inappropriate in light of the risk." *Id.* (quotation marks and citation omitted). However, "a total deprivation of care is not a necessary condition for finding a constitutional violation: [g]rossly incompetent or inadequate care can also constitute deliberate indifference, as can a doctor's decision to take an easier and less efficacious course of treatment." *Langford*, 614 F.3d at 460 (quotation marks omitted, citing *Smith v. Jenkins*, 919 F.2d 90, 93 (8th Cir. 1990)). To prove deliberate indifference to a medical need, a plaintiff must show more than negligence, more even than gross negligence . . . ." *Langford*, 614 F.3d at 460 (quotation marks and citation omitted). "The subjective standard is akin to that of criminal recklessness: the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference before acting—or failing to act—with a conscious disregard for the risk." *Blair*, 929 F.3d at 987-88 (quotation marks and citation omitted). The Court must "measure the official's state of mind according to his knowledge at the time of the incident, without the benefit of hindsight." *Id.*, at 988 (quotation marks and citation omitted).

### c.  Qualified Immunity

The individual Buchanan County Defendants have asserted in their motions for summary judgment the defense of qualified immunity.[13]  "In § 1983 actions, qualified immunity shields government officials from liability [in their individual capacities] unless their conduct violated a clearly established constitutional or statutory right of which a reasonable official would have known."  *Bishop v. Glazier*, 723 F.3d 957, 961 (8th Cir. 2013) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982))).  Qualified immunity is available only with respect to federal claims.  *D'Aguanno v. Gallagher*, 50 F.3d 877, 879 (11th Cir. 1995); *see also, e.g., Westerfield v. Lucas*, No. 07-3518, 2011 U.S. Dist. LEXIS 51148, at *40 n.20 (N.D. Ohio May 12, 2011) (holding that "qualified immunity does not apply to [a] state law claim").

The Court must consider two factors in analyzing qualified immunity: (1) whether the facts alleged show that the public official's conduct violated a constitutional right; and (2) whether the constitutional right was clearly established at the time of the alleged misconduct.  *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).  "Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right."  *Id.*; *see also Hess v. Ables*, 714 F.3d 1048, 1051 (8th Cir. 2013) ("Qualified immunity is appropriate only if no reasonable factfinder could answer yes to both of these questions."  (quotation marks and citation omitted)).  "The 'clearly established' standard . . . requires that the legal principle . . . be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Dist. of Columbia v. Wesby*, ___ U.S. ___, 138 S. Ct. 577, 590, 199 L. Ed. 2d 453 (2018) (citations omitted).

---

[13] The ACH Defendants raised qualified immunity only in their motion to dismiss, Doc. 372, which the Court does not address here.

Upon a defendant's raising the qualified immunity defense in a summary judgment motion, "the plaintiff must produce evidence sufficient to create a genuine issue of fact regarding whether the defendant violated a clearly established right." *Bishop*, 723 F.3d at 961 (citation omitted). The "plaintiff bears the burden of proving that the law was clearly established." *Hess*, 714 F.3d 1051.

## III.    Discussion

### a.   Official-Capacity Claims

As an initial matter, the Buchanan County Defendants move for dismissal of the official-capacity claims against the individual Buchanan County Defendants, arguing that the official-capacity claims are redundant of the claim against Buchanan County. Because "a suit against a government officer in his official capacity is functionally equivalent to a suit against the employing governmental entity," official-capacity claims against the government should be dismissed. *King v. City of Crestwood*, 899 F.3d 643, 650 (8th Cir. 2018) (quotation marks and citation omitted). Accordingly, the Court dismisses the official-capacity claims against Gross, Nauman, Strong, and Hovey.

### b.   Individual-Capacity Claims

#### i.   Deputy Sheriff Gross

##### A.   Whether a Reasonable Fact-Finder Could Conclude that Gross Was Deliberately Indifferent to Stufflebean's Serious Medical Needs

Plaintiffs' claims against Gross are based on the fact that he did not summon a nurse or advise any jail personnel of Stufflebean's medical condition. Doc. 447, p. 48. There is no dispute that if Gross knew that Stufflebean was ill or in need of special medical attention when Gross took Stufflebean into custody, Gross would have been obligated to pass that information to the booking desk staff at the jail or to call a nurse to attend to Stufflebean. BC SF, ¶¶ 13-14; *see also* Doc. 564

(Buchanan County Reply), p. 5 (acknowledging that Sheriff Strong testified that "deputies at sentencing hearings are supposed to report special medical conditions when they bring a prisoner over from court to the jail, if they have such information"); *id.*, p. 74 ("[B]oth Gross and Sheriff Strong testified that, although deputies at sentencing hearings are supposed to report special medical conditions when they bring a prisoner over from court to the jail, if they have such information, those deputies are not necessarily 'supposed to be watching out for that information during the sentencing hearings' because 'they have several duties to do right then.'"). The question is whether Gross was aware of the life-threatening nature of Stufflebean's medical conditions.

Gross was on courtroom-security duty in the courtroom during Stufflebean's sentencing hearing on October 26, 2015. BC SF, ¶¶ 5-6. In addition to maintaining order in the courtroom, he was responsible for transferring those sentenced from the courthouse to the jail. *Id.*; BC SF Reply, ¶ 6. Strong, who was the Buchanan County Sheriff at the time, testified that, because the transporting officer was expected to advise the booking officer of any medical conditions of which the transporting officer was aware, "there was an expectation that the transporting officer would be paying attention" to courtroom proceedings. Doc. 447-1, 55:11-15 (Q. . . . the question is here, there was an expectation that the transporting officer would be paying attention, fair? A. Correct.); BC AF, ¶ 6 (noting that, as transporting officer, Gross was responsible for answering the booking officer's standard question on the Medical Intake Screening Questionnaire of whether "the arresting or transporting officer believe[s] the inmate is a medical, mental health, or suicide risk now"). Moreover, the Buchanan County Sheriff's Department policies state that, "[w]hen a detainee requiring special needs care is identified, the facts surrounding the case shall be relayed to the jail commander (or designee) and the medical staff . . . ." BC AF, ¶ 53.

Gross normally can hear testimony in the courtroom. BC SF, ¶¶ 8, 10. He was seated

approximately 30 feet from the witness chair when Stufflebean's long-time treating physician discussed Stufflebean's unusual and fragile condition. *Id.*, ¶¶ 3, 10; Doc. 447-3, ¶ 5. Gross acknowledged that it is "rare" for doctors to testify at sentencing hearings. Doc. 447-4, 10:14-16. Dr. Brewer's testimony was all the more unusual because he explained that he had canceled a trip "so [he] could be [t]here for Justin and . . . to help clarify his medical condition." Doc. 477-18, 12:4-7.

More notably still, Stufflebean's treating physician described multiple times the risk of death that would arise from any lapse in treatment for Stufflebean. Dr. Brewer explained that "Mr. Stufflebean suffers from one of the lowest calcium levels that any of us doctors have ever seen in the hospital and that can make him quite – makes him quite ill and very badly damaging to a body and can be life-threatening in and of itself also and has to be controlled." Doc. 447-18, 8:2-10:9. The doctor noted that Stufflebean's Addison's disease had been "light years worse" in the prior year than it had been in the years past, perhaps because of the stress from his having been charged with the crime at issue. *Id.*, 11:1-18. The doctor testified that an Addison's flare-up could manifest as "[f]atigue, malaise that's followed by severe nausea, vomiting, dehydration" and that, "if not intervened upon in the hospital, in a hospital setting, it can be death within 24 to 48 hours." *Id.*, 8:2-10:9. The doctor testified that Stufflebean had been hospitalized 16 times in the prior year, not counting all of the out-patient emergency room visits that didn't involve in-patient care. *Id.*, 9:23-10:9. Indeed, Stufflebean had been hospitalized just the prior week. *Id.* Dr. Brewer emphasized that "to someone with Addison's who is as brittle as he is and with his electrolyte disturbances, not being able to have access to the hospital would be—or delayed access could—it kills people." *Id.* 10:20-25.

Based on these undisputed facts, a reasonable juror could infer that Gross heard

Stufflebean's treating physician's extraordinary testimony and knew that Stufflebean would face serious harm or death if there were any lapse in his medical treatment. *See Jones v. Minn. Dep't of Corr.*, 512 F.3d 478, 481-82 (8th Cir. 2008) ("The determination that prison officials had actual knowledge of a serious medical need may be inferred from circumstantial evidence or from the very fact that the risk was obvious."). Gross claims that he does not recall hearing Stufflebean's doctor's testimony, but such a credibility determination is the province not of the Court at the summary judgment stage but of the factfinder at trial. *See United States v. Dico, Inc.*, 136 F.3d 572, 579 (8th Cir. 1998) ("Assessing the credibility of witnesses and evaluating the weight to assign to their testimony is the job of the fact-finder, and is not a function for the court on a motion for summary judgment."); *see also Snow v. City of Citronelle*, 420 F.3d 1262, 1270 (11th Cir. 2005) (holding, where defendant officer denied facts that suggested that he knew of detainee's suicide risk, "the conflicting testimony creates an issue of fact for a jury to decide about [the officer's] knowledge," as "[v]iewing the facts in the light most favorable to [plaintiff], a jury could find that [the officer] subjectively believed that there was a strong risk that [decedent detainee] would attempt suicide and deliberately did not take any action to prevent her suicide").

After Stufflebean was sentenced, Gross took him into custody and transported him to the jail. BC AF, ¶ 4. Gross was responsible for answering the booking officer's standard question on the Medical Intake Screening Questionnaire of whether "the arresting or transporting officer believe[s] the inmate is a medical, mental health, or suicide risk now." BC AF, ¶ 6. Yet, despite Stufflebean's doctor's detailed and remarkable testimony that Stufflebean's medical conditions would endanger his life if they were not properly controlled, Gross provided no information about Stufflebean's medical condition to the booking officer or any other jail staff or medical care providers. BC SF, ¶ 19; BC SF Reply, ¶ 13; *see* Doc. 447-4, 31:7-21.

From the facts in the record, a reasonable fact-finder could find that Gross was obligated to pay attention to the doctor's testimony, that he heard the doctor's testimony that Stufflebean was at serious risk of death if he were not given prompt medical attention, that he had an obligation to convey that information to the medical providers at the jail and the intake officer, and that his failure to do so was knowing and deliberate. The doctor's testimony concerning the extreme consequences that would attend failure to give Stufflebean his medications or to recognize and promptly address an Addisonian crisis was so extraordinary and so dire that a reasonable factfinder could conclude that the risk of not conveying that information to those at the jail who had the power to see that Stufflebean received the treatment he needed was obvious.[14] *See Snow*, 420 F.3d at 1270 (finding that where "a jury could find that [officer] had subjective knowledge that there was a strong risk that [detainee] would attempt suicide and deliberately did not take any action to prevent that suicide"—including such actions as advising another officer to check on the detainee or sending detainee to medical center for treatment and observation—the officer was not entitled to summary judgment on Fourteenth Amendment claim).

Further, a jury reasonably could infer that, had Gross communicated the substance of Stufflebean's testifying physician's testimony to Nauman or a nurse at the jail, the jail's medical staff "would have been more vigilant" (*id.*) and would administer his prescribed medications daily, would have monitored his vitals as per Dr. Van Voorn's orders, would have examined him in person, and would have monitored him while he was incarcerated, which would have alerted them to signs of an impending Addisonian crisis.

---

[14] A reasonable fact-finder could also draw the inference that Gross deliberately chose not to help Stufflebean because Stufflebean had been found guilty of a sex offense.

### B.  Whether the Right Was Clearly Established

Having determined that a reasonable fact-finder could conclude that Gross violated Stufflebean's rights, the Court turns to the question of whether the right was clearly established at the time.

"For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.  This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful . . . ."  *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quotation marks and citation omitted).  "[G]eneral statements of the law are not inherently incapable of giving fair and clear warning to officers, but in the light of pre-existing law the unlawfulness must be apparent."  *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (quotation marks and citations omitted).

Since well before October 2015, courts have repeatedly concluded that a jail or prison official who was aware of a prisoner's serious medical need but did nothing to try to abate the risk of harm to the inmate violated the prisoner's constitutional rights.  Where an officer asked for permission to have a detainee evaluated by a nurse instead of hospitalizing him, but failed to tell the nurse that the detainee had ingested drugs, and the officer later observed the detainee sleeping in his cell for several hours without moving, the Eighth Circuit affirmed the district court's conclusion that the officer was not entitled to qualified immunity.  *McRaven v. Sanders*, 577 F.3d 974, 981-82 (8th Cir. 2009).  Where an officer delayed in procuring medical attention for an inmate who had stated that he was a heart patient and displayed "obvious[]" symptoms of having a heart attack, the Eighth Circuit concluded that "a reasonable fact finder could conclude the Defendants violated his clearly established constitutional rights [under the Eighth Amendment] by disregarding his need for medical care . . . ."  *Plemmons v. Roberts*, 439 F.3d 818, 825 (8th Cir. 2006).  Similarly, where a factfinder could infer that an official "had actual knowledge of at least

33

some of [two inmates'] medical problems and how those problems had been dealt with, the Eighth Circuit found that "a reasonable official standing in [the official]'s shoes would have understood that ignoring [the inmates'] complaints about receiving deficient medical care contravened clearly established principles of Eighth Amendment jurisprudence." *Langford*, 614 F.3d at 462.

In *Matis v. Johnson*, 262 F. App'x 671 (5th Cir. 2008), the Fifth Circuit affirmed the district court's conclusion that a jury could find that a defendant had been deliberately indifferent to a deceased pretrial detainee's serious medical need where defendant allegedly knew of the decedent's suicide risk but did not alert anyone. *Id.*, at 673. The Fifth Circuit noted that there were issues of fact as to defendant's knowledge of the decedent's "demeanor, physical condition, and prior suicide attempt" and defendant's "reasons for failing to complete the intake form required by the policy manual." *Id.; see also Snow*, 420 F.3d at 1270 (11th Cir. 2005) (reversing grant of summary judgment to officer who, some evidence showed, was aware of inmate's suicide risk and yet did nothing to mitigate the risk). Similarly, the Eleventh Circuit concluded in 2010 that a jail official "who is aware of but ignores the dangers of acute alcohol withdrawal and waits for a manifest emergency before obtaining medical care [for a pretrial detainee] is deliberately indifferent to the inmate's constitutional rights." *Harper v. Lawrence Cty.*, 592 F.3d 1227, 1235 (11th Cir. 2010) (quotation marks and citation omitted)); *see also Fisher v. Glanz*, No. 14- 678, 2016 U.S. Dist. LEXIS 38466, at **21-22 (N.D. Okla. Mar. 24, 2016) (finding that failure by official "aware of repeated notifications by the detainee's family of his mental health condition and need for anti-seizure medication in order to prevent life-threatening injuries" to "provide a life-saving medication to a mentally handicapped individual within 48 hours upon booking" into jail "falls under *clearly established law* prohibiting deliberate indifference to serious medical needs") (emphasis added).

The Court accordingly concludes that, when Stufflebean was incarcerated at the Buchanan County Jail, it was clearly established that an officer who was aware that an inmate had a life-threatening medical condition such that he would face a serious risk of harm if not timely provided prescribed medical treatment and prompt access to a hospital in the event of deterioration was required to take steps to abate the risk by communicating that information to those in a position to provide the requisite care. Thus, if Gross heard Stufflebean's treating physician's testimony about Stufflebean's risk of death, his failure to communicate that information to Nauman or a nurse at the jail cannot be protected by qualified immunity. Even a lay person in a similar situation with a custodial obligation with respect to Stufflebean would understand the necessity of communicating information of that significance and magnitude to those into whose custody Stufflebean was being delivered.

*     *     *

Because a reasonable factfinder could conclude that Gross violated a clearly established right, the Court must conclude that Gross, in his individual capacity, is not entitled to assert qualified immunity. For the same reason, Gross's motion for summary judgment in his individual capacity on the Section 1983 claim is denied.

### ii. Deputy Sheriff Nauman

Plaintiffs' claims against Nauman are based on his processing of Stufflebean at the booking desk. There is no dispute that Buchanan County's medical policies and procedures required Nauman to conduct the "BCSD Medical Intake Screening" carefully, with the goal of identifying prisoners with chronic conditions or special needs so that their needs would be addressed properly during their incarceration. BC AF, ¶ 17. Despite this obligation, Nauman did not identify Stufflebean's serious medical conditions.

Plaintiffs argue that one reason for Nauman's failure in this regard is his deviation from the Medical Intake Screening form procedure. The first question on the jail's Medical Intake Screening form is, "Was inmate a medical, mental health or suicide risk during any prior contact or confinement within the department?" *Id.*, ¶ 10. Strong, who was Sheriff at the time, testified that he expected that the medical history for a prisoner like Stufflebean would be obtained "[a]t the booking process." *Id.*, ¶ 92. Nonetheless, Nauman did not note that Stufflebean's prior Medical Intake Screening form from 2014 designated Stufflebean as "Special Condition – Medical" and showed that Stufflebean needed medical attention due to his calcium deficiency. *Id.*, ¶ 18. Nauman stated that he was not certain if Stufflebean's prior Medical Intake Screening form was available to him (although he later claimed that it was not available). *Id.*, ¶ 16. Nauman's statement suggests that the prior form might have been available to him, but he made no effort to review it.

Despite the fact that the Medical Intake Screening Form asks for the "dosage, and frequency" of medications, in addition to "types," Nauman did not document the dosage and frequency of Stufflebean's medications. *Id.*, ¶ 12. Nauman claims that he asked Stufflebean for the information, but Stufflebean did not provide it. *Id*. A reasonable factfinder could conclude that Stufflebean provided at least some dosage information, and that Nauman simply did not record it.

Nauman's screening form for Stufflebean also incorrectly indicates that Stufflebean was not under the care of a physician. *Id.*, ¶ 8. Whether Stufflebean represented that he was not under a doctor's care, as Nauman claims, or Nauman input the wrong answer is a disputed fact. A reasonable factfinder could infer from the fact that Stufflebean's longtime physician had just testified at his sentencing hearing as to Stufflebean's serious medical conditions, including the fact

that Stufflebean had been hospitalized just the week before, and the fact that Nauman noted that Stufflebean was taking multiple medications, that Stufflebean would have told Nauman that he was under a physician's care.

Similarly, although Nauman recorded that Stufflebean was not "currently" in need of medical attention (Doc. 447-2), a reasonable factfinder could infer from the record, including Stufflebean's intake form from his prior booking at the jail in December 2014 (Doc. 447-9), which indicated that he did need medical attention "because of a calcium deficiency," that Nauman did not accurately record Stufflebean's response.

On the other hand, Nauman noted that Stufflebean reported abdominal pain, a runny nose, nasal congestion, unexplained weight loss, loss of appetite, night sweats, and fatigue. BC SF, ¶ 26. Nauman also noted that Stufflebean was taking several prescribed medications, including prednisone, fludrocortisone, NATPARA, Calcitriol, magnesium, E, and potassium. *Id.*, ¶ 27. Nauman claims that, after booking Stufflebean into jail, he printed a copy of the completed questionnaire and placed it in the nurse's box and then contacted the nurse by telephone to advise her that he had booked an inmate who needed to be seen for medical issues. *Id.*, ¶ 28.

Plaintiffs argue that Nauman may never have put the questionnaire in the nurse's box and may not have called a nurse about Stufflebean upon booking him, but Plaintiffs expressly stated that the following statement is not controverted: "After completing the medical questionnaire for Stufflebean on October 26, 2015, Defendant Nauman then printed out a copy of that questionnaire and placed it in the nurse's box, and he then contacted the nurse by telephone and let her know that he had booked in an inmate who needed to be seen due to medical issues." *Id.* Even if this concession were merely the result of a clerical error or oversight, contemporaneous documentary evidence corroborates Nauman's statement:  the medical questionnaire in the record displays a

"Print Date/Time" of October 26, 2015 at 14:03, which is approximately two hours after the "Arrest Datetime [*sic*]" reflected on that form and just minutes after the time at which the intake was recorded as being "Given By" Nauman. Doc. 447-5, p. 19. On the other hand, Plaintiffs have not suggested that there is evidence that Nauman did not print the form and call the nurse. For example, there is no suggestion that there would have been a call log or other written evidence had Nauman in fact called the nurse. There is no suggestion that the "Print Date/Time" is the time at which the questionnaire was electronically logged into the system rather than a time at which a hard copy of the questionnaire was printed. In the face of evidence supporting Nauman's claim that he arranged for Stufflebean to receive medical evaluation or attention, Plaintiffs have presented no evidence to the contrary.

Nauman did not follow up with medical staff to ensure that Stufflebean was seen. Doc. 447-9, 40:3-11.

In short, construing all factual disputes in Plaintiffs' favor, the salient facts concerning Nauman are as follows: (1) Nauman failed to note that Stufflebean's prior booking records showed that he had special medical conditions, (2) Nauman failed to record the dosage and frequency for the drugs that he noted Stufflebean was taking, (3) Nauman failed to record the fact that Stufflebean was under the care of a physician, and (4) Nauman did not follow up to ensure that a nurse saw Stufflebean. Even accepting, for the purpose of this summary judgment motion, that these acts and omissions were deliberate, the unrebutted evidence showing that Nauman arranged for medical attention or evaluation for Stufflebean precludes a finding that Nauman was deliberately indifferent to Stufflebean's medical needs. *See Greeno v. Daley*, 414 F.3d 645, 655-56 (7th Cir. 2005) ("We do not think Miller's failure to take further action once he had referred the matter to the medical providers can be viewed as deliberate indifference."); *Spruill v. Gillis*,

372 F.3d 218, 236 (3d Cir. 2004) ("If a prisoner is under the care of medical experts . . . , a non-medical prison official will generally be justified in believing that the prisoner is in capable hands."); *Daniels v. Ferguson*, 321 F. App'x 531, 532 (8th Cir. 2009) (finding that officer's having administered the wrong medication to inmate was "at most" negligent, particularly in light of fact that "defendants' unrebutted evidence shows that after [inmate's] fall, they contacted a jail nurse and placed [the inmate] under observation pursuant to her instructions"). Nauman's situation also is distinguishable from that of Gross because nothing in the record suggests that Nauman knew that failure to promptly monitor and treat Stufflebean could result in imminent death.

Because Nauman cannot be said to have violated a clearly established constitutional right, he is entitled to qualified immunity with respect to Plaintiffs' claims against him in his individual capacity.

### iii. Nurse Slagle

On October 26, 2015, the day that Stufflebean was booked into the jail, Nauman contacted a nurse by telephone, after printing Stufflebean's medical intake questionnaire and placing it in the nurse's box, to let her know that he had "booked in an inmate who needed to be seen due to medical issues." *Id.*, ¶ 23. The questionnaire was printed at 14:03PM. Doc. 447-5, p. 19. Given that Slagle began working at 2pm (ACH AF, ¶ 14), it is reasonable to infer that Slagle was the nurse that was charged with seeing Stufflebean.[15]

---

[15] Helsel and Slagle overlapped for 20 minutes, from 2:00 to 2:20 p.m., on October 26, 2015. *See* ACH AF, ¶ 16. However, given that Slagle was the nurse who continued working into that evening after Helsel left at 2:20 p.m., and that Helsel was Slagle's supervisor (*see id.*, ¶ 17), a reasonable juror could find that Slagle alone bore responsibility for seeing Stufflebean at Nauman's request. At the very least, it is a disputed issue of fact.

During the nearly 11 hours that Stufflebean was in a separate holding cell in the booking area, no nurse came to see him. *Id.*, ¶ 29; *see also* Doc. 474-21, 30:22-31:17 (Slagle testifying that she "did not see him" on the 26th), Doc. 474-1 (Inmate Activity Log showing that Stufflebean was admitted to the facility at 13:54 on October 26 and was sent to housing at 00:47 on October 27, 2015).

On October 26, 2015, the date of Stufflebean's sentencing and arrival at the jail, Stufflebean's mother, Brenda Davis, delivered to the jail what she could find of Justin's medications, including NATPARA, melatonin, hydrocodone, ondansetron, fludrocortisone, paroxetine, Calcitriol, prednisone, and Vitamin D, as well as specialized injection tips for the NATPARA. *Id.*, ¶ 24; BC AF, ¶ 19. Slagle retrieved the medications that same day. *Id.*, ¶ 26.

When she picked up Stufflebean's medication, Slagle also would have retrieved the intake screening forms that the booking officer left for the nurses. Doc. 474-21, 23:9-21. Stufflebean's medical questionnaire reflected that he had reported abdominal pain, fatigue, unexplained weight loss, loss of appetite, and night sweats, and of course, that he was taking several prescription medications. ACH AF, ¶¶ 19, 21.

Stufflebean was supposed to take each of his medications at least daily, and indeed, he was supposed to take several of his medications more than once a day. *See* Doc. 447-15 (records from October 19, 2015 emergency-room visit showing that two medications were to be taken thee times a day and two medications were to be taken twice a day). Yet, Slagle did not administer Stufflebean any medications on October 26, 2015. Doc. 474-21, 32:3-33:3.

Because any once-a-day medications were passed to inmates at 7 a.m., once-daily medications that were not entered in the jail's system before 7 a.m. on a given day would not be administered. Doc. 474-29, 33:9-17, 35:6-17, 48:5-6; *see also id.* 49:13-21. Thus, Stufflebean

would not receive his daily medications on October 27 unless the medications were entered in the system before 7 a.m. that day. *Id.*, 33:9-17, 35:6-17, 48:5-6. Slagle knew that Stufflebean's medications were to be administered at least once a day. *Id.*, 50:6-9. Yet, despite having picked up at least nine medications as well as specialized injection tips prescribed for Stufflebean, and although she worked for more than eight hours on October 26 after Nauman advised her that Stufflebean needed to be seen for medical issues, Slagle did not call a doctor on October 26 to ask for an order to administer Stufflebean's prescription medications. *See* ACH SF, ¶ 6. Slagle knew that not seeking an order on the 26th meant that Stufflebean would not receive the nine prescription medications in her custody for more than 40 hours after his booking.

Stufflebean told a fellow inmate that he had requested his medications repeatedly, and that inmate witnessed Stufflebean requesting his medications in person at least twice, and also through the speaker. Doc. 474-23, 16:18-20:2, 82:16-83:10. Stufflebean also asked at every mealtime to see a doctor. *Id.*, 22:10-15.

On October 27, 2015, Stufflebean filed a formal request for his medications, stating, "I called to have my medicine brought in. I have Addison's and hypoparathyroid disease. Medications brought to jail." Doc. 474-6.

Slagle made note of Stufflebean's request, and apparently in response, called Dr. Van Voorn that afternoon and received oral orders for some of the prescriptions she had in her custody. *See id.* (repeating Justin's medication request and writing under "PLAN" "1300 Contacted Dr. Van Voorn and received verbal orders."). *See id.*; ACH AF, ¶¶ 28, 37. Slagle omitted Stufflebean's Calcitriol from her medications list, even though that was among the medications that Davis brought to the jail. *See* BC AF, ¶ 34; *compare* ACH SF, ¶ 4, *with* ACH AF, ¶ 44. Slagle also did not request the magnesium and potassium that were listed in the medical intake

41

questionnaire that Nauman prepared.  BC AF, ¶ 31.  As discussed above, because Slagle entered

the order after 7 a.m. on the 27th, she precluded Stufflebean's receiving any of his medication on

October 27, 2015.  *See* ACH AF, ¶ 48 and BC AF, ¶¶ 36 (no dispute that Stufflebean received no

medication at the jail on October 27, 2015).

Slagle claims that she "would have seen" Stufflebean on October 27, 2015 in the infirmary.

*See* Doc. 474-21, 13:4-18.  However, the jail's inmate activity log, which tracks the movements

of inmates within the facility, shows that once Stufflebean was moved from the holding cell (where

he was never seen by medical staff) to the cell pod, he did not leave the cell pod, to go to the

infirmary or elsewhere, until he was transferred to prison.  AF for ACH, ¶¶ 35-36; Ex. 474-1.[16]

To Stufflebean's cellmate's knowledge, Stufflebean never saw a medical provider.  *See*

Doc. 474-23, 22:16-23.  Indeed, while being transferred to the prison, Stufflebean expressed hope

to his jail cellmate that he would finally see a doctor.  *See id.*, 23:25-24:15.

The only evidence that ACH points to in arguing that Slagle saw Stufflebean on October

27, 2015 are the progress note and the medication verification form that Slagle created.  *See* Doc.

631, 23:15-19.  The Medical Progress Notes contains just two sections.  In the section titled "SOA"

is Stufflebean's request for his medication, written in the first person, as though transcribing

Stufflebean's formal request ("I called to have my medicine brought in.  I have Addison's and

hypoparathyroid disease."), and on the next line, the statement, "Medications brought to jail."  The

second section, titled "Plan," states only "10/27/15 1300 Contacted Dr. Van Voorn and received

verbal orders."  Doc. 474-6.  The only indication on the medical verification form that Slagle saw

---

[16] Slagle explained that "Custody," usually two guards, would have brought Stufflebean to the
medical unit for her examination.  Doc. 474-21, 13:19-24.  She could not recall any situation in
which an inmate was permitted to go from the housing unit to the infirmary without a guard escort.
*Id.*, 13:25-14:4.

a patient are vital signs (B/P, Temp, Resp, Pulse). Doc. 474-5.[17] Neither document contains notes concerning Stufflebean's appearance, or his symptoms, physical complaints, or lack thereof—a peculiar omission in what is supposed to be a contemporaneous medical record. *Id.*; Doc. 474-6.

Slagle testified that her list of medications on the medication verification form was based on the bag of medications Stufflebean's mother brought to the jail. Doc. 447-21, 16:21-25. Thus, the list of medications does not indicate that Slagle spoke with Stufflebean. In fact, to the contrary, the list of medications suggests that Slagle did *not* see Stufflebean. During her deposition, Slagle testified as follows about her usual procedure for identifying discrepancies between the medication verification form and other documentation:

> Q. So you would not reconcile back to the intake screening form or the property form that the corrections officer fills out . . . when you were completing the medication verification form?
>
> A. Not usually, unless there was a discrepancy.
>
> Q. Well –
>
> A. And that would be after I spoke to the patient, and then I would compare it to see if maybe it got placed in his property or was, you know, being sent back home.
>
> Q. Okay. Well, I mean what we know in this case is there's medications listed on the intake screening form and the property intake form . . . that don't show up on your medication verification report; and so the question is did you reconcile it in this case or not?
>
> A. No, I didn't.
>
> Q. Is there a reason why not?
>
> MR. HICKS: Object to the form. I feel like she just explained everything.

---

[17] The fact that, as discussed further below, Slagle did not take Stufflebean's vital signs after Dr. Van Voorn ordered that they be taken raises the inference that she did not take Stufflebean's vital signs on the October 27, 2015, and instead just fabricated them on the form.

A. I would talk to the patient, which I would have the medications that were there, and I would ask him at that time if there were other medications that he was taking, and I would go from there. I would then look back and go, "Okay, well, it's got Vitamin D." "Yeah, I took that sometimes." You know, I don't know if that's what he said at that point, but that's what I would go for.

(By Mr. Bird) Are you suggesting that Mr. Stufflebean told you not to include certain medications on his medication verification form?

A. He possibly could, yes.

Q. What is your evidence for that that's in his chart?

A. Nothing in -- in his chart.

Q. Then you're speculating, correct?

A. Yes, sir, I would be speculating.

Q. Okay. And the point being that you rec- -- recognize now that if you had done a reconcilement with the intake screening form and the property form, that you would have seen medications that were identified but not listed in your verification form?

A. Yes, I would have seen that there were medications that were not on my form.

Slagle's list of medications omits at least two of the medications that Stufflebean told Nauman he takes. *Compare* 474-8 *with* 474-5. It is reasonable to infer that, if Stufflebean had been given the opportunity to speak with a nurse about the medications he had already formally requested, he would have reported to the nurse the same medications he reported to the booking officer of the jail. The fact that Slagle's notes do not reflect those two medications reasonably suggests that Slagle never spoke with Stufflebean.

At her deposition, Dr. Van Voorn admitted that if a patient with hypoparathyroidism or Addison's disease reported "fatigue or . . . abdominal pain or tingling, those could all be symptoms of a crisis coming on for that condition," and indeed "[c]ertainly" were "red flags." ACH AF, ¶ 87. She acknowledged that in such a situation, she would "know that [she] need[s] to take a closer

look to make a determination as to their state of health," because otherwise "it could become a crisis" and "could lead to serious injury or death." *Id.* She stated that she understood that "somebody having Addison's disease and hypoparathyroidism could be at risk if they didn't get their medication; so [she] would take extra actions to make sure [she] had the list correct and [she was] following the right course." *Id.* Nothing in the medical records indicates that Slagle told Dr. Van Voorn that Stufflebean was suffering from abdominal pain, fatigue, or nausea, and indeed, the fact that Dr. Van Voorn did not order the anti-nausea medication ondansetron that had been prescribed for Stufflebean suggests that Slagle did not tell Dr. Van Voorn that Stufflebean had reported nausea.

Although she knew (from Stufflebean's formal request for his medications) that Stufflebean had Addison's Disease and Hypoparathyroidism and (from the medical questionnaire Nauman completed) that Stufflebean reported abdominal pain, fatigue, unexplained weight loss, loss of appetite, and night sweats (ACH AF, ¶¶ 19, 21), and (from the bag of medications she picked up) that Stufflebean was taking at least nine different prescription medications, Slagle did not put Stufflebean on the list of patients that Dr. Van Voorn would see the next morning. *Id.*, ¶ 49. As such, although Dr. Van Voorn was on site at the jail on October 28, 2015, she did not see Stufflebean. *Id.*, ¶ 51.

Despite the fact that Dr. Van Voorn had ordered on October 27 that his vitals be taken for three consecutive days, Slagle did not check Stufflebean's vital signs on October 28 or 29, 2015. ACH AF, ¶¶ 39, 56, 59.

In sum, construing the evidence in the light most favorable to Plaintiffs, Slagle (A) knew on October 26, 2015 at around 2 p.m. that Stufflebean was in a holding cell awaiting medical examination, (B) knew on October 26, 2015 that Stufflebean had at least nine different prescription

medications that needed to be taken at least once daily, (C) knew that if she did not call a doctor on October 26, 2015, Stufflebean would not receive his nine prescription medications on October 27, 2015, (D) knew that Stufflebean had reported at intake abdominal pain, fatigue, unexplained weight loss, loss of appetite, and night sweats, (E) did not call a doctor for an order permitting administration of Stufflebean's prescriptions on October 26, 2015, (F) did not see Stufflebean on October 26, 2015, (F) did not see Stufflebean on October 27, 2015, and instead, falsified vital sign information purporting to be for Stufflebean for October 27, 2015,[18] (G) after Stufflebean formally requested his medications on October 27, 2015, called Dr. Van Voorn for an order permitting administration of some (but not all) of Stufflebean's prescribed medications, omitting at least one medication that Stufflebean's mother brought to the jail and at least two medications that Stufflebean mentioned to Nauman at intake; (H) failed to place Stufflebean on Dr. Van Voorn's

---

[18] If Slagle had seen Stufflebean on October 27, 2015, it is reasonable to infer that he would have told her that he was experiencing weakness, nausea and vomiting, that he urgently needed his medications, and that he had been hospitalized frequently in the prior year, including once in just the past week, because of his medical conditions. *See* Doc. 474-26 (October 29, 2015 intake form from prison showing that Stufflebean mentioned "vomiting, weakness, tachycardia" as "medical problems [they] need to know about," noting that he had been hospitalized 16 times in the last year for Addison's complications, and describing Stufflebean as lethargic and weak). He might have told her that, just the previous day, his doctor had testified that, if not promptly treated, he might die. *See* Doc. 447-18, 8:2-10:25. Even if Slagle was not familiar with Addison's disease and hypothyroidism, under the circumstances, it would have been obvious to even a lay person that failure to advise Dr. Van Voorn of the seriousness of Stufflebean's condition and his current symptoms placed Stufflebean's health and life at serious risk. *See Pearson v. Prison Health Serv.*, 850 F.3d 526, 537 (3d Cir. 2017) (reinstating deliberate indifference claim against nurse where "[a] layperson is capable of concluding that" the alleged violation "violates professional standards of care"). A reasonable factfinder could conclude that, had Dr. Van Voorn known that Stufflebean was experiencing symptoms of Addisonian flare-up, she may well have ordered that Stufflebean receive medications at the jail forthwith, or even that he be sent to an emergency facility for evaluation or intravenous medication, or at the very least, that Stufflebean be placed on her list of patients to see the next day. Thus, under either scenario, a reasonable juror could find Slagle to have been deliberately indifferent to Stufflebean's serious medical needs.

list of patients to see the following day; and (I) failed to take any vital signs for Stufflebean, despite Dr. Van Voorn's order that they be taken for three consecutive days.

On the record before the Court, a reasonable factfinder could conclude that Slagle was deliberately indifferent to Stufflebean's serious medical needs. *See, e.g., Phillips v. Jasper Cty. Jail*, 437 F.3d 791, 796 (8th Cir. 2006) (noting that "the knowing failure to administer prescribed medicine can itself constitute deliberate indifference" and finding that testimony that inmate was "not given the prescribed amount of anti-seizure medication" and that he filed grievance regarding this failure, to no effect, "create[d] a genuine issue of material fact on the question of whether the jail employees were deliberately indifferent"); *Foulks v. Cole Cty.*, 991 F.2d 454, 457 (8th Cir. 1993) (holding, in Eighth Amendment case, that "if a reasonable official would have known that observation and treatment was necessary, the refusal to provide access [to] the treatment would constitute deliberate indifference to [inmate's] constitutional rights"); *Torres v. Trombly*, No. 03-0696, 2004 U.S. Dist. LEXIS 12192, at **21-23 (D. Conn. June 29, 2004) (finding that allegation that defendants failed to provide blood-pressure medication on a single day could amount to "clearly established" Eighth Amendment violation if defendant were able to establish that one day without the medication would carry "a substantial risk of serious harm"). Therefore, the Court denies her motion for summary judgment on the Section 1983 claim.

### iv. Nurse Helsel

Helsel was the only nurse on duty on the morning of October 28, 2015, when Stufflebean was first scheduled to receive medication at the Buchanan County Jail. *Id.*, ¶ 17. Helsel was aware at that time that Stufflebean needed medications daily. Doc. 447-21, 45:6-9. Yet, there is no evidence that Stufflebean received his medication that morning. Helsel claimed in her deposition that she gave Stufflebean the medication on that day. Doc. 447-21, 7:8-15. However, when

pressed, she admitted that she had no recollection of having given him his medications. *Id.*, 22:24-23:4. She could point to no records supporting her statement that she had given him medications; her statement that she had administered his medications was mere conjecture based on the fact that there was no notation in the record indicating that Stufflebean had refused his medications. *Id.*, 7:16-23:13, 24:20-30:3. Helsel theorized that the lack of any indication that she gave Stufflebean his medications was just a computer error, but she could point to no evidence supporting this theory. *Id.*, 29:12-30:3. Helsel in fact admitted that nothing in Stufflebean's record indicates that she provided any care to him at all. *Id.*, ¶ 60.

Plaintiffs' claim against Helsel for her personal actions hinges on her failure to administer Stufflebean's medications on October 28, 2015. However, Plaintiffs have not put forth evidence that Helsel knew that failure to dispense Stufflebean's prescribed medications on a single day would put him at serious risk of harm. Indeed, there is no indication that Helsel knew that Stufflebean had Addison's disease or hypoparathyroidism. *See* Doc. 631, 72:16-73:2 (Plaintiffs citing Helsel's claim that she gave Stufflebean medications on the 28th as evidence that she knew or strongly suspected that he had an adrenal disease that required follow-up).[19]

On the record presented, the Court finds that a reasonable factfinder could not conclude that Helsel's failure to administer medication constituted deliberate indifference to Stufflebean's serious medical needs. *See, e.g., Long v. Thomas*, No. 89-0759, 1990 U.S. Dist. LEXIS 16839, at *3 (W.D. Mo. Dec. 8, 1990) (finding that contention "that the prison withheld plaintiff's medication for one day" did "not rise to a level of deliberate indifference to serious medical need");

---

[19] The evidence could show either that Helsel did not give Stufflebean his medication, in which case she presumably did not review the chart and could not, on the record presented, reasonably have been known of Stufflebean's medical condition, or that she actually gave Stufflebean his medication, in which case she did not fail in her duties.

*see also Champion v. Kelley*, 495 F. App'x 769, 770 (8th Cir. 2012) (affirming grant of summary judgment to nurse who failed to provide two of three daily doses of pain medication, noting that "inadvertent or negligent failure to provide adequate medical care cannot be said to constitute 'unnecessary and wanton infliction of pain'").

### v. Doctor Van Voorn

At 1 p.m. on October 27, 2015, Slagle requested a verbal order from Dr. Van Voorn for some of Stufflebean's medications. ACH AF, ¶¶ 37; BC AF, ¶ 30. That same day, Dr. Van Voorn ordered continuation of some of Stufflebean's medications: NATPARA, Vitamin D Ergo, Paxil, Prednisone and Fludrocortisone. ACH AF, ¶ 40. However, she did not order that Stufflebean be provided Zofran/ondansetron, a medication used to control severe nausea and vomiting that Stufflebean had been prescribed during an emergency room visit nine days earlier for an Addisonian crisis. *Id.*, ¶ 41.

Dr. Van Voorn admitted that if a patient with hypoparathyroidism or Addison's disease reported "fatigue or . . . abdominal pain or tingling, those could all be symptoms of a crisis coming on for that condition," and indeed "[c]ertainly" were "red flags." ACH AF, ¶ 87. She acknowledged that in such a situation, she would "know that [she] need[s] to take a closer look to make a determination as to their state of health," because otherwise "it could become a crisis" and "could lead to serious injury or death." *Id.* She stated that she understood that "somebody having Addison's disease and hypoparathyroidism could be at risk if they didn't get their medication; so [she] would take extra actions to make sure [she] had the list correct and [she was] following the right course." *Id.* She admitted that she had this knowledge in October 2015. *Id.* She further acknowledged at her deposition that it is critical for a brittle patient with Addison's and hypoparathyroidism to receive medications daily. ACH AF, ¶ 80. Yet, on October 27, 2015, when

she ordered that some of Stufflebean's prescribed medications be administered, she knew that Stufflebean would not receive the medications until October 28 or 29, 2015. Doc. No. 447-22, 123:25-124:7.

Although Dr. Van Voorn was on site at the jail on October 28, 2015 for her once-a-week visit, and although she reviewed Stufflebean's chart, she did not see Stufflebean. ACH AF, ¶ 51. Dr. Van Voorn admitted that, as a patient with Addison's disease and hypoparathyroidism and a long list of medications to treat those conditions, Stufflebean should have been "on her list" for proper evaluation. *Id.*, ¶ 52. There is evidence that it was at least in part the doctor's responsibility to identify a prisoner with a chronic condition who warranted being placed on the "list" for the doctor to evaluate. Doc. 474-10, 100:13-101:7 (Helsel testifying that "[t]he physician normally would request too to be placed on the list, that 'I want to see this person in doctor clinic'"); Doc. 474-21 (Slagle testifying that "If Dr. Van Voorn says 'Put him down for me to see on my next visit,' then I would put them [sic] down. Per the documentation, if the nurse felt like the vital signs were out of order, something did not appear right with the patient, then we would have put him on the list to see the doctor on the next visit.").

In short, despite later acknowledging that Stufflebean's conditions were sufficiently serious to warrant an in-person evaluation, Dr. Van Voorn made no effort to personally evaluate Stufflebean the one time she was at the jail that week. In addition, despite knowing at the time that it was "critical" for a patient with both Addison's disease and hypoparathyroidism to take his medications on a daily basis, and despite knowing that Stufflebean had been taking numerous medications prescribed for his conditions, Dr. Van Voorn ordered Stufflebean's medications in such a way that there was to be at least a two-day gap between his doses.

On the other hand, Dr. Van Voorn ordered that all but one of the medications that Slagle requested be provided, and she ordered that Stufflebean's vitals be taken for three days in a row. Thus, she ordered both treatment and regular monitoring for his condition. The record presented does not suggest that Dr. Van Voorn was aware of Stufflebean's abdominal pain, nausea, or fatigue, or the fact that he had been hospitalized 16 times in the prior year, including once just the preceding week. On this record, although it is a close question, the Court finds that Dr. Van Voorn's actions cannot be deemed to have been more than merely negligent. *See Dulany v. Carnahan*, 132 F.3d 1234, 1240 (8th Cir. 1997) (holding that evidence indicating merely "possible negligence . . . is insufficient to supply an inference of deliberate indifference"). Therefore, Dr. Van Voorn is entitled to summary judgment on the deliberate indifference claim against her.

### c. Supervisory Liability for Buchanan County Employees' Conduct

Plaintiffs argue that they have sufficient evidence for a factfinder to reasonably conclude that Sheriff Strong and jail administrator Captain Hovey are liable for failure to train and supervise personnel and failure to supervise the provision of medical services to inmates. Doc. 447, p. 53.

### i. Failure to Train or Supervise Nauman

The Eighth Circuit's "general rule" is that, "in order for [supervisory] liability to attach, individual liability first must be found on an underlying substantive claim," and "a plaintiff must show the failure to train or supervise caused the injury." *Johnson v. City of Ferguson*, 926 F.3d 504, 506 (8th Cir. 2019) (quotation marks and citation omitted). Because the Court has concluded that Nauman was not deliberately indifferent to Stufflebean's serious medical need, Plaintiffs cannot hold Strong or Hovey liable in connection with Nauman's conduct. Strong and Hovey thus are entitled to qualified immunity insofar as the Section 1983 claims against them concern their

supervision or training of Nauman.  *See City of Ferguson*, 926 F.3d at 506 (8th Cir. 2019) (holding that police chief could not be liable where no constitutional violation occurred).

### ii.  Failure to Train or Supervise Gross

The Court has found that a reasonable factfinder could conclude that Gross was aware of the serious nature of Stufflebean's medical conditions but nonetheless did not communicate the risk or need for medical attention to either the booking officer or medical staff, despite his acknowledged obligation to do so.  For supervisory liability to attach, Gross's failure to communicate with jail staff about the seriousness of Stufflebean's medical condition would need to represent a failure in Strong's training or supervision of Gross.[20]

"[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."  *City of Canton v. Harris*, 489 U.S. 378, 388-89, 109 S. Ct. 1197, 1204-05 (1989).  In other words, to hold a supervisor liable for failure to supervise or train over his assertion of the qualified immunity defense, Plaintiffs must show that the supervisor "himself violated a well-established constitutional right . . . ."  *Jane Doe A. v. Special Sch. Dist. of St. Louis Cty.*, 901 F.2d 642, 645 (8th Cir. 1990).  The question then is whether a reasonable fact-finder could conclude that Strong and Hovey showed deliberate indifference or "violate[d] clearly established statutory or constitutional rights of which a reasonable person would have known . . . ."  *Id.*

To establish that an official violated a constitutional right by failing to supervise, Plaintiffs must show that (1) the supervising official "[r]eceived notice of a pattern of unconstitutional acts

---

[20] Plaintiffs do not argue and have not presented facts or evidence suggesting that Hovey should be liable for failure to train or supervise Gross.  *See, generally*, Doc. 447.  The Court therefore considers only whether Strong might be held liable in connection with Gross's conduct.

committed by subordinates; (2) the supervising official "[d]emonstrated deliberate indifference or tacit authorization of the offensive acts; (3) the supervising official "[f]ailed to take sufficient remedial action;" and (4) such failure proximately caused injury to" the plaintiff.  *Id.*  Similarly, "[t]o be individually liable for failing to train his subordinates, [an official] must have received notice of a pattern of unconstitutional acts committed by subordinates, demonstrated deliberate indifference to or tacit authorization of the offensive acts, and failed to take sufficient remedial action—and the failure must have proximately caused [plaintiff's] injury." *Audio Odyssey, Ltd. v. Brenton First Nat'l Bank*, 245 F.3d 721, 742 (8th Cir. 2001) (quotation marks and citation omitted).  Notice of a pattern of unconstitutional acts thus is critical to a claim for supervisory liability in this context.[21]  *See Vaughn v. Greene Cty.*, 438 F.3d 845, 851 (8th Cir. 2006) (reversing denial of qualified immunity where "there is no indication from the record Sheriff . . . had notice his policies, training procedures, or supervision were inadequate and likely to result in a constitutional violation," noting that "such a showing is required to impose individual liability on a supervisor") (quotation marks and citations omitted).

There is no indication in the record before the Court that Strong had notice of a pattern of unconstitutional acts committed by Gross, let alone a pattern of Gross deliberately withholding

---

[21] In some circumstances, a Court might find "that in light of the duties assigned to specific officers or employees the need for more or different training [wa]s so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton*, 489 U.S. at 390.  However, this case does not present such circumstances.  The risk that a transporting officer would deliberately fail to convey a prisoner's serious medical needs to jail staff cannot be said to have been obvious to a supervisor under ordinary circumstances.  *Cf. id.*, n. 10 (citing the following as an example:  "[C]ity policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons.  The city has armed its officers with firearms, in part to allow them to accomplish this task.  Thus, the need to train officers in the constitutional limitations on the use of deadly force can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." (citing *Tennessee* v. *Garner*, 471 U.S. 1 (1985))).

information concerning a prisoner's serious medical conditions. Indeed, at oral argument, counsel for Plaintiffs conceded that he could point to no such facts. "Without such notice, [Strong] cannot be liable for [Gross]'s alleged constitutional violations." *Audio Odyssey*, 245 F.3d at 742.

Strong and Hovey therefore are entitled, in their individual capacities, to qualified immunity with respect to Plaintiffs' allegations concerning Gross's alleged constitutional violations. *See Otey v. Marshall*, 121 F.3d 1150, 1156 (8th Cir. 1997) (finding that police chief who did not have sufficient notice of excessive force violations was "entitled to qualified immunity" because he "did not violate any well-established constitutional right").

### d. Liability for ACH Employees' Conduct

Plaintiffs seek to hold site manager Nurse Helsel, site medical director Dr. Van Voorn, Sheriff Strong, jail administrator Captain Hovey, ACH, and Buchanan County liable in connection with the conduct of the ACH employees.

### i. Policies, Procedures, and Customs for Medical Care and Oversight

ACH and Buchanan County employees' supervision must be considered in the context of the entities' policies, procedures, and customs.[22] The formal policies include statements that a detainee "can be seen by a clinician, to be given professional clinical judgment, and receive care that is ordered" and that "[p]rescribed medications are reviewed and appropriately maintained according to the medication schedule the inmate was following before admission." *Id.*, ¶¶ 91, 96.

The policies required "regularly scheduled administrative meetings" with the health care team and Buchanan County. *Id.*, ¶ 92. The jail was supposed to arrange regular meetings with the

---

[22] ACH and Buchanan County initially denied that they had any medical policies or procedures for operations at the Buchanan County Jail. ACH AF, ¶¶ 88-89. However, ACH subsequently produced policies and procedures that it had provided to Buchanan County for adoption. *Id.*, ¶ 90.

responsible physician and jail administrative staff to review "the effectiveness of the healthcare system, healthcare issues that need improvement, changes implemented since last reporting period and any recommended changes to improve the healthcare provided." *Id.*, ¶ 93.

ACH and its employees did not have a formal system for monitoring the accuracy of ACH's CQI reporting—which covered medication errors and prisoner grievances. *Id.*, ¶ 101. ACH left it up to the local nurses to provide "monthly contact logs" for the Regional Nurse Manager to prepare the CQI reports. *Id.* Regional Nurse Managers were supposed to "try" to walk through the facility every couple of months and "spot check" some files. *Id.* There was no policy governing how many files they were to review or how they were to review them. *Id.* Only the most recent version of the records was kept, precluding review of historic trends. *Id.*, ¶¶ 101-102.

Even before October 2015, there were discrepancies in ACH's self-reporting. For example, the January 2015 report showed ten prisoner grievances in 2014, while the May 2015 report showed zero prisoner grievances in 2014. BC AF, ¶¶ 103-104; ACH AF, ¶¶ 109-10. CQI reports for 2014 and 2015 both indicated that there were zero medication errors or prisoner grievances. BC AF, ¶ 110, ACH AF, ¶¶ 105. However, after reviewing "a summary of the dates and prisoners . . . that . . . didn't get their medications" in that timeframe prepared by Plaintiffs' expert, Strong agreed that the medication errors were "extensive," and that, in fact, there were "dozens of prisoner grievances in 2014 [and] 2015." BC AF, ¶ 111; *see also* Doc. 474-34, at 1 (plaintiff's expert's opinion that 18 months of data showed "over 250 medication errors" at the Buchanan County Jail that were not included in the CQI reports, including failure to administer "[c]ritical medications for anticoagulation, diabetes and cardiovascular disease").

Prior to Justin's death in November 2015, ACH had been sued multiple times in Missouri by prisoners alleging that necessary medical treatment had been withheld. ACH AF, ¶ 119. ACH settled all of those suits. *Id.*

On June 11, 2014, a Buchanan County Jail prisoner, Craig Wilkerson, sued ACH and Dr. Van Voorn, alleging that Van Voorn and ACH nurses failed to examine him, to monitor him, to obtain his complete medical history, and to provide medication for his serious medical condition, including by refusing to continue medications a physician had prescribed him. *Id.*, ¶ 120; BC AF, ¶ 112. Specifically, the plaintiff alleged that he fell from his bunk in his cell, breaking his back, after jail medical personnel deprived him of his schizophrenia medication. Doc. 447-33, p. 2. ACH took no action to review or investigate the merits of the Wilkerson lawsuit. ACH AF, ¶ 122.

At oral argument, counsel for Buchanan County suggested that because Buchanan County and its employees were not parties to the state court proceeding, the Wilkerson lawsuit did not put it on notice of any potential healthcare problems. However, the Court takes judicial notice of the federal action *Wilkerson v. Turner*, No. 12-0618-GAF, in which Wilkerson sued Sheriff Strong, Captain Hovey, and Dr. Van Voorn, among others. The Buchanan County Defendants observed that summary judgment was granted to the defendants in that case. *See Wilkerson*, W.D. Mo. No. 12-0618, Doc. 120 (November 4, 2014). Indeed, summary judgment was entered in Defendants' favor nearly a year before Stufflebean's October 2015 incarceration. However, Wilkerson's state court proceeding continued against Dr. Van Voorn and ACH until ACH settled the case in November 2016. *See* Order Approving Settlement dated November 15, 2016 in *Wilkerson v. Van Voorn*, No. 14BU-CV2595. Strong acknowledged that the facts of the action against Dr. Van Voorn and ACH "sound[ed] familiar." Doc. 447-1, 115:22-116:11. On the evidence before the Court, a reasonable factfinder could conclude that Strong and Hovey had notice of a plausible

allegation against ACH and Dr. Van Voorn involving failure to administer critical medications that resulted in severe injuries.

On August 27, 2015, another Buchanan County Jail prisoner, Tyler Fee, sued Nurse Slagle, Sheriff Strong, and Captain Hovey, alleging that Slagle and others failed to examine him, to monitor him, to obtain his complete medical history, and to administer medication for his serious medical conditions, including by refusing to continue medications his physician had prescribed. *Id.*, ¶ 121; *see also* Doc. 474-17. The petition alleged that, upon incarceration at the jail, Fee, who previously had suffered a traumatic brain injury, was not given his prescribed medications, despite the fact that his father twice called jail officials to notify them of his son's condition and also had brought his son's medications to the jail. Doc. 447-32, pp. 11-12. Fee suffered either a panic attack or seizure and hit his head, suffering a skull fracture that was not diagnosed for days because he was not sent to a hospital. *Id.*, pp. 13-21. Fee allegedly suffered near-total paralysis on his right side as a result of the lack of attention and continued to require therapy. *Id.*, p. 21. The Buchanan County Defendants acknowledge that they had been served with process in the Fee suit by the time Stufflebean was incarcerated. Doc. 564, pp. 86-87.[23]

### ii.   Liability for Failure to Train or Supervise Helsel or Van Voorn

As discussed above, individual liability is a prerequisite for supervisory liability. *See Johnson,* 926 F.3d 504, 506 ("in order for [supervisory] liability to attach, individual liability first must be found on an underlying substantive claim," and "a plaintiff must show the failure to train or supervise caused the injury") (quotation marks and citation omitted). Because the Court has

---

[23] The *Fee* case was voluntarily dismissed without prejudice on motion by the Plaintiff on March 22, 2017 (*see* March 22, 2017 judgment in *Fee v. Advanced Correctional Healthcare, Inc.*, No. 15BU-CV02918), presumably because of ACH's settlement (ACH AF, ¶ 119 (not contesting that "ACH settled all of them.")).

concluded that neither Helsel nor Dr. Van Voorn can be held liable for deliberate indifference to Stufflebean's serious medical needs, Plaintiffs cannot hold any supervisors liable for their conduct.

### iii.   ACH Employees' Failure to Train or Supervise Slagle

Because the Court has found that Slagle is not entitled to summary judgment on Plaintiffs' deliberate-indifference claim, it must consider whether her failure to examine Stufflebean, to arrange for prompt administration of his medications, to monitor him, or to convey salient facts concerning his condition to Dr. Van Voorn arose from any failure in her training or supervision.

As discussed above, to establish that an official violated a constitutional right by failing to supervise, Plaintiffs must show that (1) the supervising official "[r]eceived notice of a pattern of unconstitutional acts committed by subordinates; (2) the supervising official "[d]emonstrated deliberate indifference or tacit authorization of the offensive acts; (3) the supervising official "[f]ailed to take sufficient remedial action;" and (4) such failure proximately caused injury to" the plaintiff. *Jane Doe A.*, 901 F.2d at 645.  Similarly, "[t]o be individually liable for failing to train his subordinates, [an official] must have received notice of a pattern of unconstitutional acts committed by subordinates, demonstrated deliberate indifference to or tacit authorization of the offensive acts, and failed to take sufficient remedial action—and the failure must have proximately caused [plaintiff's] injury."  *Audio Odyssey*, 245 F.3d at 742 (quotation marks and citation omitted).  "Notice of a pattern of unconstitutional acts" thus is critical to a claim for supervisory liability in this context.

The Court will consider separately whether any supervisors of Nurse Slagle can be held liable for a failure to train or supervise.

## A. Nurse Helsel

As site manager, Helsel was responsible for supervising and training the nursing staff at the jail. *Id.*, ¶ 17. Plaintiffs argue that Helsel's supervisory performance was marked by several hallmarks of "reckless indifference to the health and safety of the prisoners": (1) CQI reports, which were based on the site nurse's (*i.e.*, Helsel's) reporting, falsely reflected no medication errors or prisoner grievances when in fact, according to Plaintiffs' expert, there were hundreds of medication errors and dozens of prisoner grievances over the 18 months leading up to Stufflebean's incarceration; (2) the lack of nursing staff on multiple shifts at the jail, which resulted in prisoners not receiving medications during that window; (3) excessive overtime for the two full-time nurses in the time surrounding Stufflebean's incarceration at the jail; (4) a history of false records, as alleged by former ACH nurse Carlos Marte; and (5) staff failure to follow policies requiring prisoners with chronic conditions to receive priority assessment and classification. Doc. 474, pp. 42-43.

Plaintiffs' expert Lori Roscoe found "over 250 medication errors" at the Buchanan County Jail in 18 months' worth of data that were not included in the CQI reports. Doc. 474-34 (Roscoe Supplemental Report), at 1. She found that "[c]ritical medications for anticoagulation, diabetes and cardiovascular disease were not administered to patients, even though they were ordered by a physician." *Id.* These failures were contrary to ACH policies. *See* ACH AF, ¶¶ 91, 96 (stating that ACH will "provide access to appropriate care for serious medical . . . needs," where "[a]ccess to care—means in a timely manner, a detainee can be seen by a clinician, to be given professional clinical judgment, and receive care that is ordered" and that "[p]rescribed medications are reviewed and appropriately maintained according to the medication schedule the inmate was following before admission").

Because the responsibility for preparing the CQI reports was Helsel's alone, a reasonable factfinder could conclude that Helsel was aware of multiple failures to provide patients at the jail with time-sensitive medications—a pattern of medication errors—despite prescriptions and doctor's orders, yet deliberately ignored, and indeed, concealed, those problems. Helsel's failure to supervise Slagle with respect to timely administration of medications thus could form the basis of a deliberate indifference claim against Helsel. *See Jackson v. United States*, No. 15-153, 2018 U.S. Dist. LEXIS 46186, at *8 (W.D. Pa. Mar. 21, 2018) (denying motion to dismiss where plaintiff alleged that jail "had a policy of denying incoming inmates prescribed medication and that this policy was pursued with deliberate indifference to Plaintiff's medical condition" and "each of the identified supervisors had notice of the policy and yet was deliberately indifferent to the risks associated with the delays in providing Plaintiff his prescribed medication"); *cf. Mpaka v. Migoya*, No. 18-22178-CV-WILLIAMS, 2019 U.S. Dist. LEXIS 10039, at *22-23 (S.D. Fla. Jan. 18, 2019) (finding that plaintiff had not alleged sufficient facts showing a history of widespread abuse that would have put Defendants on notice that inmates' medications were "being unlawfully changed or denied" where plaintiff provided only "one instance where the change in another inmate's medication adversely affected that individual" because "a random act or isolated incident is insufficient to make the requisite showing to hold an unconstitutional custom or policy purportedly attributable to a supervisory official" (citing *City of Oklahoma v. Tuttle*, 471 U.S. 808, 823-24, 105 S. Ct. 2427, 85 L. Ed. 2d 791 (1985) (plurality); *Depew v. City of St. Marys*, 787 F.2d 1496 (11th Cir. 1986))).[24]

---

[24] Insofar as Helsel argues that the pleadings did not give notice of Plaintiffs' claim against her for failure to supervise, the Court finds that the argument is without merit. *See* Doc. 414 (Second Amended Complaint), ¶ 15 ("At all relevant times Powers was the Nursing Supervisor for ACH at the Buchanan County Law Enforcement Center in St. Joseph, Missouri. She was responsible for training, supervising and/or monitoring ACH's nursing employees, including Defendant Ann

### B. Doctor Van Voorn

Plaintiffs also seek to hold Dr. Van Voorn, as the site medical director at the Buchanan County Jail, liable for the conduct of the other ACH medical staff. However, Plaintiffs have not presented any evidence that Dr. Van Voorn was aware of the discrepancies in CQI reporting, the lawsuit against Slagle alleging failure to administer necessary medications, or even grievances concerning lack of medication.

Plaintiffs argue that Dr. Van Voorn "should have educated the nurses that Justin was a Medical Special Need patient whose conditions could become critical and that he required daily monitoring and medication—making sure the nurses understood the critical importance of the situation . . . ." However, Dr. Van Voorn did order that Stufflebean's vitals be taken for three consecutive days, and without evidence that she had notice that the nurses might fail to carry out her orders, she cannot be found to have been deliberately indifferent to the risk that they would not follow through. Thus, any claim against Dr. Van Voorn for the conduct of other ACH employees cannot withstand summary judgment.

### iv. Failure by Strong and Hovey to Train or Supervise ACH Employees

#### A. Whether a Reasonable Factfinder Could Conclude that Either Strong or Hovey Was Deliberately Indifferent to a Serious Medical Need

Strong and Hovey had oversight responsibilities over the provision of medical services at the jail. Strong was the final decision-maker with regard to policies and procedures at the jail prior to and at the time of Stufflebean's October 2015 incarceration. BC AF, ¶ 69. Strong understood

---

Marie Slagle, in providing for detainees', including Justin Stufflebean, medical needs at the Buchanan County Law Enforcement Center in St. Joseph, Missouri."); ¶ 83 (alleging that Powers failed to "communicate, supervise, provide necessities, [and] implement appropriate policies and procedures").

at that time that inmates had a constitutional right to receive medical care for their serious medical needs, and there is no dispute that he was responsible for making sure inmates received such care. *Id.*, ¶ 71; *see also Crooks v. Nix*, 872 F.2d 800, 804 (8th Cir. 1989) ("Where a prisoner needs medical treatment prison officials are under a constitutional duty to see that it is furnished." (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976))). Strong believed that it was his responsibility to make sure he had systems in place to get prisoners their medical care and to follow up as appropriate. BC AF, ¶ 72.

As Jail Administrator, Hovey was to "oversee the medical operations of the jail," including "arranging for all levels of healthcare and ensuring the quality and accessibility of all health services provided to the detainee population" and monitoring "to assure all aspects of detainee care occurs for the treatment of illnesses classified as 'serious' by the practitioner." *Id.*, ¶ 49. Strong expected that Hovey was exercising "constant oversight" over ACH. *Id.*, ¶ 75. However, Hovey's immediate supervisor, Undersheriff Bill Puett, said that there were "no specific steps" in place to ensure that Hovey was overseeing the provision of health care to detainees. *Id.*, ¶ 88.

Strong and Hovey both appear to have relied entirely on their subordinates to perform the oversight function. Strong admitted that he had no system in place to monitor the accuracy of ACH's CQI reporting. *Id.*, ¶ 76. Strong never compared prisoners' medical grievances with ACH's CQI reports to verify that ACH's "zero" grievance reporting was accurate. *Id.*, ¶ 77. He simply trusted that ACH was providing proper care to the Buchanan County prisoners. *Id.*, ¶ 76.

To Puett's knowledge, there was no discussion at the Sheriff's Department in 2015 or earlier about how to monitor ACH's performance. *Id.*, ¶ 85. Puett testified that routine monitoring of the basic CQI program involved attending the CQI meetings and reviewing ACH's CQI reports. *Id.*, ¶ 83. As part of Buchanan County's oversight of medical care, Hovey (and other jail officers)

were supposed to review medical grievances and attend CQI meetings and report to Strong. *Id.*, ¶ 79. There was no formal process for reviewing medical grievances from a systemic viewpoint; instead, Hovey claims to have had officers he supervised deal with the grievances case by case. *Id.*, ¶ 80. However, this claim is contradicted by Puett's testimony that while he was undersheriff through December 2015, Buchanan County did not review prisoner medical grievances and did not look at any documentation outside of CQI reports to determine whether prisoners were being provided their medications. *Id.*, ¶¶ 97-98.

In essence, ACH was left to self-report issues or problems with the medical care it was providing to prisoners. *Id.*, ¶ 81. Outside of ACH's self-reporting, Hovey had no system in place to analyze or review the care that was being provided to prisoners. *Id.*

Puett agreed that the inconsistency between the January 2015 report, which showed ten prisoner grievances for 2014, and the May 2015 report, which showed *no* prisoner grievances for 2014, suggested that ACH's reporting was inaccurate. *Id.*, ¶¶ 103-105. Similarly, although CQI reports for 2014 and 2015 both indicated that there were zero medication errors or prisoner grievances, *id.*, ¶ 110, after reviewing "a summary of the dates and prisoners . . . that they didn't get their medications like we've been discussing," Strong was "astonished" by the number of errors and agreed that such instances in fact were "extensive"—indeed, they numbered in the hundreds and prompted dozens of prisoner grievances. *Id.*, ¶ 117 (not disputing Plaintiff's statement that "in 2014 & 2015 there were actually HUNDREDS of instances where prisoners did not get their medications for serious medical conditions (medication errors) and dozens of prisoner grievances in 2014 & 2015"). The grievances themselves, which purportedly were reviewed on a "case-by-case" basis under Hovey's supervision, might also have alerted the jail officials to the medication errors.

63

Strong, Hovey, and Slagle were all named as defendants in the Fee lawsuit filed on August 27, 2015, prior to Stufflebean's October 2015 incarceration, alleging deliberate indifference to a medical need—specifically, failure to provide prescribed medications to a prisoner with a serious medical condition, which allegedly led to Fee's falling, sustaining a skull fracture, and ultimately becoming nearly totally paralyzed on one side. *Id.*, ¶ 112; Doc. 447-32, pp. 13-21.[25] Strong also described as "familiar" the facts of another suit by an inmate, Wilkerson, initiated in June 2014 in state court against ACH and Dr. Van Voorn, alleging that, because jail medical personnel deprived him of his schizophrenia medication, he fell from his bunk in his cell, breaking his back. BC AF, ¶ 112; Doc. 447-33, p. 2; Doc. 447-1, 115:22-116:11.[26] ACH settled both the Fee and Wilkerson state court actions. ACH AF, ¶ 119.

Despite these lawsuits alleging that inmates with serious medical conditions were deprived of critically important medications, each of which was filed before Stufflebean's October 2015 incarceration, and one of which named Slagle herself as a defendant, and despite the discrepancies in ACH's CQI reports and between the CQI reports and prisoner grievances, and despite the grievances themselves, neither Strong nor Hovey undertook any effort to oversee ACH's administration of medications. BC AF, ¶ 113.

Puett agreed that there were "some obvious problems with the system in place for monitoring ACH and its performance in providing prisoners with medical care that they were

---

[25] The Buchanan County Defendants argue that, because the case was in its initial stages, they did not have notice of the medication errors. However, the Buchanan County Defendants acknowledge that they had been served with process in advance of Stufflebean's incarceration. They did not need a final judgment to put be on notice that inmates were complaining of serious problems with the jail's administration of medications, or lack thereof.

[26] In Wilkerson's federal suit against Strong, Hovey, Dr. Van Voorn, and others, summary judgment was entered in favor of the defendants prior to Stufflebean's incarceration. *Wilkerson*, W.D.Mo. No. 12-0618, Doc. 120 (November 4, 2014).

entitled to back in 2015." *Id.*, ¶ 106. Puett acknowledged that medication errors indicated that "we weren't obviously provided with information that we should have had." *Id.*, ¶ 101. Puett also agreed that "if CQI reports were repeatedly inaccurate regarding prisoner grievances and medication errors that would be a serious systemic problem with meeting the County's constitutional duties to prisoners" and that a "continuing widespread pattern of inmates not getting their medications" would have indicated a "serious systemic problem at the Buchanan County Jail." *Id.*, ¶ 99.

Strong too agreed that there was a serious systemic problem at the Buchanan County Jail in 2015 affecting prisoners' ability to obtain their medications. Doc. 447-1, 131:3-21, 132:9-133:9 ("I would say we definitely had a problem looking back prior to this. I'm not sure what happened with Mr. Stufflebean, but it's obvious it was a problem back then.").

Strong acknowledged that, had there been an accurate CQI system in place showing that prisoners were not getting their medications and had complained about that deprivation, he might have been able to prevent the circumstances that led to Stufflebean's not receiving his medications. BC AF, ¶ 115.

A reasonable fact-finder could find that the two lawsuits alleging failure to provide medication filed before Stufflebean was sentenced in October 2015 and the discrepancies in the CQI reports and the medication errors in the grievances warranted at a minimum more scrutiny or oversight. *Id.*, at 1119 (noting that a "prison official . . . would not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist" (omission in original, quoting *Farmer v. Brennan*, 511 U.S. 825, 843 n.8 (1994))). Even if Strong and Hovey did not have direct control over Slagle's conduct, they had the authority and responsibility to require ACH

and ACH supervisors to address the known problem of medication errors. They knew that failing to get prisoners their prescribed medications posed a substantial risk of harm to the prisoners and they knew some prisoners had in fact been severely injured as a result of medication errors. They were also aware of allegations that Slagle had made medication errors with severe consequences.

Strong's and Hovey's inaction in the face of these red flags could be construed as condoning or turning a blind eye to ACH's unconstitutional conduct, which itself is a constitutional violation. *See Meloy v. Bachmeier*, 302 F.3d 845, 849 (8th Cir. 2002) ("We have held a supervisor is . . . liable for an Eighth Amendment violation . . . when the supervisor's corrective inaction constitutes deliberate indifference toward the violation. The supervisor must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye to it. Likewise, other courts have stated supervisory officials are liable under § 1983 . . . if . . . they tacitly authorize or are indifferent to the prison doctors' constitutional violations." (quotation marks and citation omitted)).

Given Strong's statements that he might have been able to help Stufflebean had the CQI reporting systems worked as he had expected (BC AF, ¶ 115), there can be no doubt that there is a plausible causal link between the purported lack of oversight over the administration of medication and the jail's failure to administer Stufflebean's prescribed medications.

The Buchanan County Defendants argue that they cannot be held responsible for allegations involving medical treatment because they lack medical expertise and relied on ACH's medical staff's superior knowledge. Defendants cite *Meloy* in support of their position, but that case involved a doctor's order that a prison need not provide a CPAP to an inmate—a diagnostic decision. *Meloy*, 302 F.3d at 849. Here, at issue are not any medical decisions, but rather, the administrative tasks of getting a prison doctor to order prescriptions approved by the prisoner's

treating physician and administering prescribed medications. There is no medical discretion or judgment involved in dispensing a prescription medicine or getting an order for a prescription as required by Buchanan County policies. *Meloy* thus is distinguishable. As *Meloy* notes, courts have held supervisory officials liable under Section 1983 when they "are indifferent to the prison doctors' constitutional violations." *Id.* In this case, unlike in *Meloy*, construing the facts in the light most favorable to Plaintiffs, the supervisors had actual notice that the institution's medical service providers had deprived seriously ill inmates of critical medications and that the deprivation had caused severe injuries, and nonetheless the supervisors took no steps to investigate or prevent such deprivations in the future and a prisoner was injured once again. Under these facts, neither Strong nor Hovey can rely on the ACH employees' medical expertise to escape liability.

The fact that ACH contracted with Buchanan County to provide medical services at the jail does not insulate Strong and Hovey from liability for deliberate indifference towards ACH's failure to provide medically necessary treatment to inmates. *See Williams v. York*, 891 F.3d 701, 707 (8th Cir. 2018) ("If Defendants were deliberately indifferent to Williams's serious dental condition, they may be held personally liable, notwithstanding [Arkansas Department of Corrections]'s contract with [private medical provider] Corizon."); *Langford*, 614 F.3d at 460 (8th Cir. 2010) (noting that "where the duty to furnish treatment is unfulfilled, the mere contracting of services with an independent contractor does not immunize the State from liability for damages in failing to provide a prisoner with the opportunity for such treatment," and holding, despite the fact that prison had contracted with private medical services provider, that if the supervisor "knew that [inmate]'s serious medical needs were not being adequately treated yet remained indifferent, he may be held personally liable").

On the record presented, the Court finds that a reasonable factfinder could conclude that Strong's and Hovey's failure to oversee ACH's administration of medications constituted deliberate indifferent to serious medical needs.

## B. Whether the Right Was Clearly Established

The Court next must consider whether the right at issue was clearly established. "A precedential case need not be on all fours to clearly establish a constitutional violation, but it must be sufficiently analogous to put a reasonable officer on notice that his conduct was unconstitutional." *Hope*, 536 U.S. at 739.

The Eighth Circuit has long made clear that withholding "necessary medical attention" is a constitutional violation. *Campbell v. Cauthron*, 623 F.2d 503, 508 (8th Cir. 1980) ("It is much too late in the day for states and prison authorities to think that they may withhold from prisoners the basic necessities of life, which include . . . necessary medical attention." (quotation marks and citation omitted)). In 1991, the Eighth Circuit concluded that a pharmacist was not entitled to summary judgment based on qualified immunity where he refused to fill an inmate's prescription for anti-seizure medication, despite the fact that the pharmacist purported to have reasonable doubts about whether the medication was "medically appropriate." *Johnson v. Hay*, 931 F.2d 456, 463 (8th Cir. 1991). In 1999, the Eighth Circuit held that a deputy sheriff accused of denying an inmate diabetes medication or a special diet without a doctor's prescription was not entitled to summary judgment on a claim for an Eighth Amendment violation. *Roberson v. Bradshaw*, 198 F.3d 645, 648 (8th Cir. 1999). Soon after Stufflebean was incarcerated in October 2015, a sister court within the Eighth Circuit held that a delay in administering drugs prescribed before incarceration at the beginning of a prisoner's incarceration could amount to violation of a clearly established right. *Ingram v. Helder*, No. 15-5068, 2015 U.S. Dist. LEXIS 175898, at **18-19

(W.D. Ark. Dec. 21, 2015); *also see Monmouth County Correctional Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) (stating that "deliberate indifference is demonstrated when prison authorities prevent an inmate from receiving recommended treatment for serious medical needs"); *Torres*, 2004 U.S. Dist. LEXIS 12192, at **21-23 (finding, on motion to dismiss, that allegation that defendants failed to provide blood-pressure medication on a single day could amount to Eighth Amendment violation if defendant were able to establish that one day without the medication would carry "a substantial risk of serious harm"); *Baker v. Cty. of Sonoma*, No. 08-03433, 2010 U.S. Dist. LEXIS 26035, at **59-60 (N.D. Cal. Mar. 19, 2010) (denying officer's motion for summary judgment on qualified immunity grounds in Eighth Amendment case where "a reasonable inference c[ould] be drawn that [the officer] knew of Plaintiff's medical condition and that a refusal to provide Tylenol or otherwise assist in obtaining pain and other prescription medication . . . would cause unnecessary and wanton infliction of pain in violation of the Constitution").

It has been clear for decades that these constitutional principles apply in the supervisory-liability context as well. As early as 1980, it was clear that a supervisor who took no action in the face of actual notice of constitutional violations within his purview could be held liable for a constitutional violation. *See Cummings v. Roberts*, 628 F.2d 1065, 1067-68 (8th Cir. 1980) (holding that deliberate denial of medical care and failure to carry out treatment prescribed by doctors is an Eighth Amendment violation). In 2004, the Eighth Circuit found that an allegation that a sheriff had been aware of two prior suicides at a jail—only one of which occurred while he was sheriff—had sufficient notice that his training and supervision of his employees was inadequate. *Wever v. Lincoln Cty.*, 388 F.3d 601, 607 (8th Cir. 2004). In 2010, the Eighth Circuit held that a supervisor who "knew that [an inmate]'s serious medical needs were not being

adequately treated yet remained indifferent, . . . may be held personally liable." *Langford*, 614

F.3d at 461. *See also Johnson v. Turner*, No. 08-06063, 2010 U.S. Dist. LEXIS 85609, at **13-

14 (W.D. Ark. Aug. 2, 2010) (noting that, "[w]hile supervisors cannot be held liable on a theory

of *respondeat superior*, they may be held liable if they knew the prisoner's 'serious medical needs

were not being adequately treated yet remain indifferent,'" (quoting *Langford*, 614 F.3d at 445),

and finding that supervisor who had booking information "had knowledge of [prisoner's] medical

condition and medications" and that "there [we]re issues of fact as to whether the County's

policies, or lack thereof, caused, or contributed to, the alleged delays in the provision of medical

care and prescription medications"); *cf. Lindsay v. Hunter*, No. 04-460, 2008 U.S. Dist. LEXIS

38565, at **26-27 (M.D. Fla. May 12, 2008) (noting that "[s]upervisory liability can be imposed

under § 1983 when there are facts supporting an inference that the supervisor knew that

subordinates would act unlawfully and failed to stop them," but finding that defendants did not

have notice of plaintiff's need for blood pressure medication).

That supervisory liability can attach for deliberate indifference to serious medical needs

even where a governmental entity contracts with a private entity for the provision of medical

services has been established for at least three decades. In 1989, the Eighth Circuit expressly held

that contracting with a private entity for the provision of medical services "does not provide

absolute immunity against a prisoner's claim where prison policies are alleged to contribute to the

denial of proper medical and dental care." *Crooks*, 872 F.2d at 804. The Eighth Circuit held in

*Crooks* that the "named defendants," the warden and the director of corrections, had a

"nondelegable duty to provide medical care when needed," and that the plaintiff had sufficiently

alleged "inadequate prison policies or medical supervision which, if true, would result in these

defendants being held liable" for the conduct of employees of an independent contractor providing

care and treatment for prisoners "as if the[warden and director of prisoners] had refused to deliver those [medical] services themselves." *Id.* The Eighth Circuit also has held, in a case in which a prison contracted with a private medical services provider, that if a prison administrator "knew that [a particular inmate]'s serious medical needs were not being adequately treated yet remained indifferent, he may be held personally liable." *Langford*, 614 F.3d at 460-61. *See also Burke v. Regalado*, 935 F.3d 960 n.17 (10th Cir. 2019) (upholding jury finding that sheriff was liable for constitutional violations perpetrated by employees of a health care contractor, noting that "[f]or supervisory liability, a supervisor may be liable even if the person who committed the underlying constitutional violation was not an employee").

The Court finds that the particular right at issue—a right to timely receive critical prescription medication for a serious medical need—was clearly established when Stufflebean was booked into the Buchanan County Jail. It also was clear at the time that county supervising officials had an obligation to take steps to ensure that constitutional violations by employees of private contractors providing medical services for the county were addressed to abate the risk of future violations. Because a reasonable factfinder could conclude that Strong's and Hovey's failure to oversee ACH's administration of medications constituted deliberate indifference to Stufflebean's serious medical needs, the Court must deny Strong and Hovey, in their individual capacities, summary judgment on the issue of qualified immunity as to their supervision of ACH, and similarly must deny their motions for summary judgment on the merits of Plaintiffs' Section 1983 claims in connection with their supervision of ACH.

### v. *Monell* Liability
#### 1. ACH

ACH's sole argument as to why it is not liable under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), is that *Monell* liability cannot attach where there is no individual liability. Doc.

371, p. 18.  Because the Court now has found that Plaintiffs' claims against Slagle and the supervisory claim against Helsel may proceed, there is no basis on the instant motion for granting ACH summary judgment on the *Monell* claim.[27]

### 2.  Buchanan County

Under *Monell*, "a municipality cannot be held liable solely because it employs a tortfeasor—or in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691.  "[M]unicipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986).  As discussed above, a reasonable factfinder could conclude on the record before the Court that Strong, the official responsible for establishing final policy for the jail (*see* BC AF, ¶ 69), made a deliberate choice to turn a blind eye to ACH employees', and particularly, Slagle's, failures to provide critical medications to inmates with serious medical conditions, leaving the inmates at serious risk of substantial harm.  *See Mettler*, 165 F.3d at 1204-05 ("Evidence that a police department has failed to investigate previous incidents similar to the incident in question may support a finding that a municipal custom exists, and that such a custom encourages or allows officers to use excessive force without concern for punishment.").

---

[27] In any event, ACH's failure to take any action to ensure that or determine whether those held at the Buchanan County Jail were receiving critical prescribed medications in a timely fashion, in the face of two lawsuits alleging serious harm because of ACH employees' refusal to provide critical medications, could lead a reasonable factfinder to conclude that ACH was deliberately indifferent to inmates' serious medical needs.  *See, e.g., Mettler v. Whitledge*, 165 F.3d 1197, 1205 (8th Cir. 1999) (noting that evidence of failure "to investigate previous incidents similar to the incident in question may support a finding that a municipal custom exists, and that such a custom encourages or allows officers to use excessive force without concern for punishment").

A reasonable factfinder also could conclude that the failure by multiple Buchanan County employees to oversee ACH in any manner demonstrates the County's willful disregard to inmates' serious medical needs. *See Ridgell v. City of Pine Bluff*, 935 F.3d 633, 637 (8th Cir. 2019) ("[A] plaintiff's theory of municipal liability need not always hinge on the actions of a single official or employee. . . . Situations may arise where the combined actions of multiple officials or employees may give rise to a . . . violation, supporting municipal liability, but where no one individual's actions are sufficient to establish personal liability for the violation.") (quotation marks and citations omitted).

The Court therefore denies Buchanan County's motion for summary judgment on the Section 1983 claim. *See King v. Kramer*, 680 F.3d 1013, 1021 (7th Cir. 2012) (holding that county can be held liable for deliberate indifference if "it was on notice that [the contractor]'s physician- and medication-related policies" had "violated inmates' constitutional rights" at jail where plaintiff presented sufficient evidence that the County's policy requiring that medications come from the formulary, which caused plaintiff to come off of his medication at booking, had caused "severe seizures that ultimately contributed to his death"); *Layton v. Bd. of Cty. Comm'rs*, 512 F. App'x 861, 872 (10th Cir. 2013) (holding that county and sheriff in his official capacity—the only type of claim against the sheriff that was at issue on appeal—could be held liable for allegedly turning a blind eye to problems with the jail's medical care system despite the fact that a contractor provided the medical services for the jail).

## IV.    Conclusion

For the reasons set forth above, (1) the motion by the individual Buchanan County Defendants for summary judgment on the Section 1983 claims against them in their official capacities is GRANTED and those official-capacity claims are DISMISSED; (2) Nauman's

motion for summary judgment on the basis of qualified immunity (Doc. 350) is GRANTED and the Section 1983 claim against him (Count IV) is DISMISSED; (3) Dr. Van Voorn's motion for summary judgment on the Section 1983 claim against her is GRANTED and that claim is DISMISSED; and (4) the motions for summary judgment by Gross, Strong, Hovey, and Buchanan County (Doc. 350) and Slagle, Helsel (for failure to supervise), and ACH (Doc. 370) on the Section 1983 claims (Count IV) are DENIED except as to the punitive damages issue raised in Doc. 370, which is taken under advisement.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated:  <u>December 23, 2019</u>
Jefferson City, Missouri