# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
## ST. JOSEPH DIVISION

| | | |
|---|---|---|
| BRENDA DAVIS, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 5:17-cv-06058-NKL |
| | ) | |
| BUCHANAN COUNTY MISSOURI, *et al.*, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## ORDER

Before the Court is a motion for summary judgment by defendants Amy Mowry, LPN, Alice Bergman, NP, and Karen Williams, LPN (Doc. 392), Frederick Covillo, D.O. (Doc. 382), Michelle Munger, R.N. (Doc. 399), and their employer, Corizon, LLC (Doc. 394), seeking, *inter alia*, summary judgment on Count IV of Plaintiffs' complaint, which asserts civil rights claims against them.[1]  For the reasons discussed below, the Court grants Mowry's, Bergman's and Williams' motion for summary judgment on Count IV, but denies in part the motions by Covillo and Munger for summary judgment on Count IV.[2]  The Court also finds that Corizon cannot assert the defense of qualified immunity to Count IV.

---

[1] The Defendants also seek summary judgment on Count III, Plaintiffs' wrongful-death claim.  The Court will address Plaintiffs' wrongful-death claim against these Defendants in a separate order. In addition, the Court has only found here that Corizon is not entitled to assert the affirmative defense of qualified immunity. The Court has not addressed whether a reasonable jury could find against Corizon on the merits of Count IV.

[2] The denial is partial because the Court does not address punitive damages in this order.

## I.    Background[3]

On October 26, 2015, Justin Stufflebean, son of plaintiffs Brenda Davis and Frederick Stufflebean, was sentenced for a sex crime.   Immediately following his sentencing, Stufflebean was held at the Buchanan County Jail until he was transferred on October 29, 2017 to the Western Reception Diagnostic and Correctional Center ("WRDCC"), a receiving center in St. Joseph, Missouri, for the Missouri Department of Corrections ("MODOC").

### a.   Intake

Amy Mowry, LPN, was working in receiving at the WRDCC on the date of Stufflebean's transfer from the jail.  She was the intake LPN responsible for performing the intake assessment for Stufflebean.  She received Stufflebean at the WRDCC and completed his Initial Receiving Screening.  She was responsible for gathering subjective current medical information.  Stufflebean told Mowry that he had Addison's disease and hypoparathyroidism; Doc. 492-22 (Deposition of Amy Mowry), 51:16-18; that he was experiencing vomiting, weakness, and tachycardia (fast heart rate), *id.*, 51:8-15; that he had been hospitalized 16 times in the last year for Addison's complications; and that he was on various medications:  fludrocortisone, NATPARA, vitamin D, paroxetine, and prednisone.  Doc. 492-1(Complete Medical Record History), p. 1.  Prednisone and fludrocortisone are used to treat Addison's disease.  Defendant Mowry's "objective" assessment included Stufflebean's being lethargic and having an unsteady gait from weakness.  *Id.*, p. 3.  Nonetheless, and despite the fact that the records sent from the jail did not indicate when Stufflebean last took his medications, Mowry did not inquire of Stufflebean when he last received his medications.  *See, generally, id*.  At intake, Stufflebean's blood pressure was 121/89 and his

---

[3] The facts are viewed in the light most favorable to the Plaintiffs based on admissible evidence. *Johnson v. McCarver*, 942 F.3d 405, 2019 U.S. App. LEXIS 32772, at *1 (8th Cir. 2019).

pulse rate was 124. *Id.*, p. 3.

Mowry called Alice Bergman, APRN, the on-call provider, with regard to Stufflebean. At 2:30 p.m. on October 29, 2015, Defendant Mowry obtained a "verbal" order from Defendant Bergman, Nurse Practitioner (NP), for a promethazine 50 mg injection. Nurses' AF,[4] ¶ 30; Doc. 492-1, p. 5. Promethazine is used for nausea and vomiting. Bergman claims that Mowry did not tell her that Stufflebean was weak and tachycardic, or that Stufflebean had been hospitalized 16 times in the prior year. *Id.*, ¶¶ 33, 35. Bergman could not recall whether Mowry told her that Stufflebean had Addison's disease and hypoparathyroidism. *Id.*, ¶ 34. Bergman ordered that Stufflebean be admitted to the Transitional Care Unit ("TCU") for observation and for evaluation by Dr. Covillo. Doc. 492-1, pp. 5-6.

### b. Initial TCU Visit

Mowry took Stufflebean to the infirmary, known as the Transitional Care Unit ("TCU"). There, still on October 29, 2015, at approximately 4:00 p.m., Stufflebean advised Nurse Sybert that he had Addison's disease. *Id.*, p. 8. Stufflebean informed Sybert that he began vomiting that morning while at the jail. Stufflebean told Sybert, "I have Addison's and when I am stressed out I start throwing up and hurting" (*id.*)—an indication of an "impending Addisonian crisis" (Doc. 492-19 (Report of John P. Bilezikian, MD, PhD), p. 27). Sybert charted that the reason for TCU admission was "Observation for Addison's and Hypoparathyroidism." Doc. 492-1, p. 8. Sybert

---

[4] "Nurses' AF" refers to Plaintiffs' Additional Facts in Doc. 487 (Plaintiffs Brenda Davis's Suggestions in Opposition to Defendants Amy Mowry, Alice Bergman, and Karen Williams' Motion for Summary Judgment) and the Corizon Nurses' responses in Doc. 577 (Defendants Amy Mowry, Alice Bergman, and Karen Williams' Reply to Plaintiff Brenda Davis's Response to Their Statement of Facts in Support of Motion for Summary Judgment and Response to Plaintiff Brenda Davis's Additional Facts in Opposition to their Motion for Summary Judgment). The Court cites statements of fact only insofar as they were substantively uncontested.

noted, "Offender states that due to stress his Addison's disease is 'acting up' and causing 'abd. pain and vomiting.'" Doc. 492-1, p. 8.

Nurse Sybert took Stufflebean's vitals at 3:19 p.m. on October 29, 2015, charting a blood pressure of 121/89 and a heartrate of 116 beats per minute. *Id.* The Corizon protocol for Nausea/Vomiting states in bold, "**Refer to Practitioner Immediately**" in the event of, *inter alia,* "Signs of dehydration-dry mucus membranes, poor skin turgor, skin cool to touch, recent 5% weight loss, BP less than 100 systolic, pulse >90." Doc. 487-4, p. 2. Nonetheless, Stufflebean was "escorted out of TCU" and "sent back to wing . . . ." Doc. 492-1, p. 9.

Bergman, the nurse who prescribed the promethazine, ordered a KUB abdominal film for Stufflebean, noting "upper abdominal pain x 1 day, nausea and vomiting, Addison's disease, hypoparathyroidism." *Id.* The results showed "abundant stool." *Id.* Stufflebean was given a laxative, but none of the medications that his treating physician had prescribed before his incarceration, including those needed for his Addison's disease. *Id.* Bergman did not review Stufflebean's medications before prescribing new medications for him. Nurses' AF, ¶ 49. Bergman ordered Stufflebean's release to the wing, and she never saw him in person. *Id.*, ¶¶ 46, 48.

### c. In the Wing

Trent Millsap, an inmate whose bunk was located in the common area into which Stufflebean's cell opened, could see Stufflebean's cell from his bunk in the days leading up to Stufflebean's cardiac arrest. Millsap testified that Stufflebean was brought in to his cell "on a wheelchair" and described his appearance as follows:

> [T]here was, like, a lot of things wrong with him. We could tell he was really shrunk. Like you could see cheekbones real prominent. It looked like he had been, like, either really, like, strung out at one point or he had some sort of, like, condition like he had, like, cancer or AIDS or we didn't know. At first we kind of

made fun of him because of his name and then we started to realize something was really wrong with this guy, you know, because he kind of looked weird, you know. . . . [W]e really didn't know how bad it was until we went up to him. He wasn't going out to eat, and we were trying to see if he was okay, and he wasn't.

Doc. 492-17 (Deposition of Trent Millsap), 16:3-25. Stufflebean, according to Millsap, "was really sick"—his hair "looked like it was falling out . . . ." 17:16-24. Stufflebean was "just slouching over . . . in the wheelchair when they brought him in," and "was really skinny." *Id.*, 18:1-4. Millsap never saw Stufflebean standing or even sitting erect. *Id.*, 36:23-24. Millsap thought perhaps Stufflebean was "deaf or maybe mute or something because he wasn't responding to anything anybody was saying, but he looked like he was trying to, but nothing was making -- he couldn't vocalize anything." *Id.*, 35:20-24; *see also id.*, 35:13-19 (stating that Stufflebean "would open his mouth like he was trying to vocalize – verbalize something, but he wouldn't -- no words would come out").

During meal times, Millsap and other inmates noticed that Stufflebean would not emerge from his open cell. Millsap said, "And then we looked in the window and he's just laying [*sic*] on his bed. We were like, hey, man. You going to come eat? We kept on knocking on the window. He wouldn't roll over. He looked like he was already gone." *Id.*, 20:21-25; *see also id.*, 19:24-20:6 ("We were -- we were making fun at first and then we're like, okay, why is he not coming out to do anything, eat, shower, nothing. And we would look in there and we were like, oh, my God. Is he -- is he alive? We were joking. Oh, somebody go check his pulse. But then after a while, we're like, no, really. Somebody needs to go in there and probably check on him."). Millsap claimed that he told corrections officers more than once that Stufflebean "was not looking good," and he heard others ask for help for Stufflebean as well. *Id.*, 36:11-22.

Millsap observed nurses checking on Stufflebean occasionally, but "[t]hey weren't in there for more than two minutes. It seems like they took his blood pressure and then just left, and that

was it." *Id.*, 23:10-24:4. Millsap also remembered Stufflebean being taken in a wheelchair "to medical, . . . but . . . it didn't take them ten minutes to bring him right back down." *Id.*, 32:25-33:3.

Millsap was "dumbstruck" by how Stufflebean was treated. *Id.*, 21:19-22:4. Millsap suspected from the way prison guards were treating Stufflebean that he might have been a sex offender. *See id.*, 44:25-45:6 ("When a person comes in, the first thing they do is they want to check their face sheets. . . . And what that will do is it will say whether or not you're a registered sex offender."); *id.*, 46:16-48:9 ("[T]hen there was the ones that didn't do anything and they, like, stayed to themselves all the time, and certain COs would, you know, say degrading things at certain times. And we're like, why did he deserve that? And then we'd start thinking somebody probably should go check that guy's paperwork. Because if he was just minding his own business and the cops do that, you know, then, okay, maybe there's a reason behind it. And that's what would tip us off, and most of the time it was because the person had that -- that charge. And that was one of the things we thought maybe Justin had. We were like, okay, so this guy is getting treated really poorly. He hasn't done anything that we saw to deserve that . . . . We never checked his paperwork. We didn't really care because he was so bad that we didn't -- what were we going to do, you know. There was -- we just knew that, okay, something is off here. Either he's really faking it, he's got one of those charges, or they just really don't care.").

### d. Doctor's Examination

Dr. Covillo alleges that he performed a physical exam of Stufflebean on October 30, 2015 at 9:00 a.m. Doc. 492-16 (Deposition of Frederick V. Covillo, D.O.), 76:5-77:6.

At his deposition, Dr. Covillo claimed that Stufflebean "seemed very stable." *Id.*, 72:16-25. He insisted that Stufflebean's reports of nausea, vomiting, dizziness, and tachycardia (from

just the previous day) were from "the past" and did not represent his condition at the time of the examination. *Id.*, 73:1-11. When asked where Stufflebean's condition at the time of the examination was noted, Dr. Covillo stated simply, "I examined him," and then claimed he "would have written it in there if [Stufflebean] had a problem." *Id.*, 73:12-16. Dr. Covillo noted that Stufflebean's blood pressure was 121 over 89, commenting, "That's pretty stable." *Id.*, 73:20-74:6. Covillo then admitted that the blood pressure listed in the record in connection with his examination of Stufflebean in fact was taken by Nurse Mowry, probably the day before Covillo purportedly examined Stufflebean, and that Covillo did not actually know what Stufflebean's blood pressure was on the day of the examination. *Id.*, 74:15-75:7.

Dr. Covillo did not try to determine when Stufflebean was last given his medications, even though Dr. Covillo knew that Stufflebean's condition was serious enough that he needed his medication that day. *Id.*, 71:19-72:6; 147:4-17. Dr. Covillo purportedly called his supervisor to request approval of medications from outside the formulary. *Id.*, 27:10-28:5. Dr. Covillo recalled Stufflebean arriving with a bag of medications (although Covillo acknowledged that the documentary evidence does not indicate that Stufflebean arrived with medications), and with the approval of his supervisor, Dr. Covillo ordered that Stufflebean receive some of those medications that day itself. *Id.*, 79:14-82:13. However, Dr. Covillo could not recall to whom he gave the verbal order regarding medications, there is no record indicating that the medications were dispensed, and there is no documentation of Dr. Covillo's asking for permission to dispense non-formulary medications or ordering that Stufflebean be given the medications that accompanied him. *Id.* Dr. Covillo maintains that he ordered calcium citrate, fludrocortisone and Vitamin D for Stufflebean on October 30, 2015, but the time-stamp in the record shows that the medications were not approved until October 31, 2015 at 5 a.m., after an emergency call had been placed with regard to

Stufflebean.  Doc. 492-1, p. 6.  Dr. Covillo acknowledged that Stufflebean "did not get any medication . . . like he was supposed to," but he claimed that the nurses had "[a]pparently" not followed his order in that regard.  Doc. 492-16, 148:7-14.

### e. First Code 16 – October 31, 2015 – 1:15 a.m. – No Documentation

On October 31, 2015, at 1:15 a.m., the medical record shows that somebody called a "Code 16," a medical emergency, with respect to Stufflebean.  Doc. 492-1, p. 13 ("10/31/2015  01:15 A ACCIDENT/CODE 16.").  However, no one, including the nurses on duty, Munger and Williams, documented why that Code 16 was called or what was done at that time.  *Id.*

### f. Second Code 16 – October 31, 2015 – 4:30 a.m. – No Documentation Until Nearly 24 Hours Later

A second Code 16 was called at 4:30 a.m. that same day.  *Id.*  The medical record entry, created "late," on November 1, 2015, at 1:07 a.m., notes that Nurse Williams found Stufflebean lying on his abdomen on the floor of his cell.  *Id.*  Stufflebean indicated that he had fallen when he got up to get a drink because he felt weak.  *Id.*  The notes reflect that "Sgt. Brown mentioned that there was a towel with greenish liquid on it close to his bunk and offender was asked if he was nauseated."  *Id.*  Stufflebean was placed in a wheelchair and was taken to the TCU.  *Id.*  Williams noted that, when asked about his diet, Stufflebean stated, "I took a few bites of corn a couple days ago, because I don't like the food."  *Id.*  Stufflebean was then given a carton of milk, which he "tolerated well," and he "asked for another milk at this time and stated that he was a little nauseated."  *Id.*

Defendant Williams charted Stufflebean's blood pressure of 96/62 and heart rate of 96 beats per minute.  *Id.*  The Corizon protocol for Nausea/Vomiting states in bold, "**Refer to Practitioner Immediately**" in the event of, *inter alia,* "Signs of dehydration-dry mucus

8

membranes, poor skin turgor, skin cool to touch, recent 5% weight loss, BP less than 100 systolic, pulse >90." Doc. 487-4, p. 2.

### g. Return to TCU – October 31, 2015 –Before 5:30 a.m.

Before 5:30 a.m. on October 31, 2015, Williams delivered Stufflebean into Munger's care in the TCU for further observation. His blood pressure was 100/64 and his heart rate was 91 beats per minute. Doc. 492-1, p. 14. As soon as he was brought to the TCU, Stufflebean stated that he needed to lie down. *Id.* He advised Munger that he had "not eaten in 3 days." *Id.* Munger provided Stufflebean with Promethazine at 5:30 a.m., after he had been given milk. *Id.* Stufflebean advised Munger that he had Addison's disease and had "been having this flare up since he was sentenced to prison." *Id.* He also stated that "when this has happened before he would just go to the hospital and he would receive IV fluids." *Id.* In her note, which was written after Stufflebean was taken to the hospital, Munger wrote, "He fully understands how and what is causing his condition to flare up and gets worse by not eating. . . . Encouraged offender that he needed to drink and eat, put an MSR [(medical service request)] into mental health to help with his stress, and if he felt he needed to see Dr. Covillo again to put in an MSR for the doctor." *Id.* Munger released Stufflebean to his cell without ever contacting a doctor. *See id.*

### h. Stufflebean Returned to His Cell – October 31, 2015 – Approximately 7 a.m.

Munger's "Late Entry"[5] in Stufflebean's chart says the following about Stufflebean's return to his cell on the morning of October 31, 2015:

> When offender was released from TCU at 7AM with CO1 Huddleston, offender got as far as the telephone and the offender became wobbly and layed [*sic*] on to

---

[5] This note was not created at the time of the incident described. Rather, it was created on November 1, 2015 at 1:36 a.m., after Stufflebean had been transported by ambulance from the prison to the hospital. *Id.*

the floor. This was during shift change and witnessed by several of the day shift nurses as well as the night shift nurses and CO1 Huddleston and CO1 Williams. My self and CO1 Huddleston helped offender walk back to his room and he walked fine with assistance. SGT Brown was called and notified. SGT Brown, CO1 Huddleston, and CO1 Green came to TCU to escort offender back to cell.

*Id.*, pp. 14-15.

However, CO Huddleston described Stufflebean during this incident as "weak and incoherent." Munger AF,[6] ¶ 91. He looked "dazed like he was sick." *Id.* Huddleston recalled Stufflebean "stumbling" and then falling down after ten to twenty steps. *Id.* He described Stufflebean's falling as "kind of slow. He fell down on his knees, and then he just kind of fell over. I mean it wasn't -- it didn't seem like it was that hard. He fell really slow to the ground." Stufflebean fell on his face. *Id.* Huddleston said Stufflebean did not say anything, instead, "[h]e just made grunting noises . . . ." *Id.* Huddleston believes he then got a wheelchair, and they placed Stufflebean in it. *Id.* Stufflebean was slumped over. *Id.* Huddleston wheeled Stufflebean to his cell and helped him to his bunk. *Id.*[7]

After reading Munger's description of Stufflebean's becoming "wobbly" and lying down on the floor, Dr. Covillo said, "Now that's a true Addison crisis," and he agreed that proper procedure would "definitely" have been for the nurse to immediately call the on-call physician. Doc. 492-16, 125:7-128:8. Dr. Covillo also thought Stufflebean should have remained in the TCU for monitoring. He said, "I don't know why they're in such a rush to kick him out of TCU. It

---

[6] "Munger AF" refers to Munger's response in Doc. 579 (Reply Suggestions in Support of Michelle Munger, R.N.'s Motion for Partial Summary Judgment) to Plaintiffs' Additional Facts.

[7] Although Munger noted that Stufflebean fell once, TCU guard CO Jacqueline Williams contemporaneously noted that Stufflebean fell twice on his way back to his cell. *Id.*, ¶ 94 (noting at 7:00 a.m. that Stufflebean "g[o]t as far as the telephone and the offender sat down on the floor," and noting at 7:11 a.m. that "Stufflebean got as far as the telephone again and layed [*sic*] on the floor").

doesn't make any sense." *Id.*, 127:4-10. He thought sending Stufflebean to his cell after his collapse on his way out of the TCU was "crazy." *Id.*, 127:11-15.

Munger did not report Stufflebean's condition to the oncoming nurse, Nurse Euler, or call for a doctor. 493-13 (Deposition of Michelle L. Munger), 36:9-21.

### i. Third Code 16 – October 31, 2015 – 10:45 a.m.

At 10:45 a.m. on October 31, 2015, less than three hours after Munger sent Stufflebean back to his cell, a third Code 16 was called. Doc. 492-1, p. 16. Stufflebean's fellow inmate Millsap testified that when officers came to Stufflebean's cell, they found Stufflebean on the ground, unmoving. Doc. 492-17, 25:1-3. Stufflebean was wrapped in his sheets, as though he had fallen out of bed. *Id.*, 25:16-23. Millsap, who later moved into the cell Stufflebean was in, testified that there was roughly 16 ounces of green vomit on the floor and sheets after Stufflebean was removed. *Id.*, 91:11-92:16.

Nurse Baker Smith[8] was the medical nurse working in the area next to the TCU at the time of the third Code 16. Baker Smith went to Stufflebean's cell. She noted later that Stufflebean's skin was "warm and dry" and "a little greenish in color" at that time. Doc. 492-1, p. 16. Although she did not make note of it in the medical record, at her deposition, Smith testified that Stufflebean vomited green liquid when they started CPR. Doc. 493-31 (Deposition of Janet Baker Smith), 17:8-19. Despite Stufflebean's condition, during the eight or ten minutes it took for a wheelchair to arrive, Baker Smith did not attempt to take Stufflebean's vitals. *Id.*, 35:4-5.

Millsap testified that when Baker Smith and a correctional officer took Stufflebean out, they dragged him out instead of bringing a wheelchair to him, despite the fact that the cell was

---

[8] Baker Smith is not named as a defendant in this lawsuit.

meant for handicapped inmates and therefore was wide enough to accommodate a wheelchair. Doc. 492-17, 25:24-26:13; *see also id.*, 29:9-14 (identifying the nurse at issue as Baker Smith).

Outside of the cell, the corrections officer put Stufflebean into the wheelchair roughly, and Baker Smith walked with him to the TCU at a "[l]eisurely" pace. *Id.*, 30:4-32:23. According to Baker Smith, "on the way to TCU, offender had his head back, went limp." Doc. 492-1, p. 16.

Baker Smith could not recall receiving any report from Nurse Williams, and she testified that, had she been told to monitor Stufflebean, she would have included that direction in her chart documentation. Doc. 493-31, Doc. 15:6-18:16. Baker Smith could not recall—and she did not document—anyone telling her that Stufflebean was having an Addison's flare-up, or that he had two serious medical issues. *Id.*, 20:1-9.

### j. Fourth Code 16 – October 31, 2015 – 11:30 p.m.

At the TCU, Stufflebean's pulse was 67 and Baker Smith was unable to get his blood pressure. Doc. 492-1, p. 16. Stufflebean became "unresponsive." *Id.* A fourth Code 16 was called in relation to Stufflebean. *Id.* Baker Smith wrote that "CRP [*sic*] was performed till the ambulance crew arrived." *Id.* Corizon noted an assessment of widespread anoxic injury with a poor outcome predicted. *Id.*, p. 15.

### k. Stufflebean's Death – November 16, 2015 – 12:43 p.m.

On November 16, 2015, at 12:43 p.m., Stufflebean died. Doc. 493-34 (Report of the Medical Examiner), p. 3. Dr. Marius C. Tarau, M.D., Deputy Medical Examiner from the Jackson County Medical Examiner's office, declared Stufflebean's cause of death as "Complications of polyglandular endocrinopathy." *Id.*, pp. 1-2.

Plaintiffs' expert, Dr. John Bilezikian, opined that, had Stufflebean received proper care for his Addison's disease, he would not have died. Doc. 492-19, p. 7. Dr. Bilezikian opined that

Stufflebean was symptomatic from the outset of his incarceration, and he stated that "[e]nsuring continuity of care by getting a proper history and verification of medications is one of the most basic actions in the field of medicine. The failure, on the part of all the defendants, was a serious breach of such standards [of care] and caused, or at the very least, contributed in a major way to[,] Mr. Stufflebean's death." *Id.*, p. 22. In light of Stufflebean's Addison's disease and his complaints and symptoms, the "standard of care," according to Dr. Bilezikian, would have been to administer "stress intravenous doses of cortisol or equivalent steroid medication . . . ." *Id.*, p. 28. Lack of steroids in such a situation results in death. *Id.* Dr. Bilezikian testified that:

> a. a man with Addison's disease does not get his life-sustaining adrenal medications and even had he received them orally, they more likely than not would not have absorbed due to upper gastrointestinal symptoms;

> b. a man with Addison's disease does not eat for three days and thus is dehydrated;

> c. a man with Addison's disease has ominous blood test results that if ordered STAT would have provided Dr. Covillo with objective data for developing an appropriate plan of care;

> d. a man with Addison's disease who tells the staff that when such a thing happens, he typically goes to the hospital for intravenous fluids. It is more likely than not that had staff not disregarded Mr. Stufflebean's experiences he would have responded to emergency treatment;

> e. a man with Addison's disease presenting with a very low blood pressure is not recognized as symptomatic.

> f. a man with Addison's disease who was likely hypoglycemic and had a blood sugar of 70 mg/dL only after consuming two servings of milk.

> g. a man with Addison's disease in crisis is not given stress parenteral doses of life-saving glucocorticoids.

*Id.*, pp. 47-48. Dr. Bilezikian opined that the cause of Stufflebean's death was the "[a]bject failure of the system and the caregivers . . . ." *Id.*

### l. Corizon

At all relevant times, Corizon was the healthcare provider for MODOC.

One of Plaintiffs' experts, Dr. Lori Roscoe, opined, on the basis of irregularities in and lack of documentation of training, evaluation, and peer review, that "Corizon failed to monitor the care provided by its staff at the WRDCC" and that "the training program conducted by Corizon for staff at the WRDCC fell below the administrative standard of care, due, in part, to the programmatic lack of supervision and monitoring."  Doc. 493-20 (Lori E. Roscoe letter), p. 5; *see also* Doc. 493-21 (Expert Witness Report of Lori E. Roscoe), p. 20.

CO Jacqueline Williams observed Corizon nurses frequently having to work two shifts, 20 hours together, with no help.  Doc. 493-23 (Deposition of Jacqueline Williams), 18:25-20:22.  Dr. Covillo, too, was "really busy," seeing approximately 50 to 70 patients a day around October 2015.  Doc. 492-16, 15:2-21.  He described himself as being "almost overbook[ed] . . . ."  *Id.*

## II.      Summary Judgment Standard

"Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."  *Anderson v. Durham D & M, LLC*, 606 F.3d 513, 518 (8th Cir. 2010) (citing *Johnson v. Ready Mixed Concrete Co.*, 424 F.3d 806, 810 (8th Cir. 2005)); Fed. R. Civ. P. 56(a).  The Court must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Robert Johnson Grain Co. v. Chemical Interchange Co.*, 541 F.2d 207, 210 (8th Cir. 1976); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  While the moving party bears the burden of establishing a lack of any genuine issues of material fact, *Brunsting v. Lutsen Mountains Corp.*, 601 F.3d 813, 820 (8th Cir. 2010), the party opposing summary judgment "must set forth specific facts showing that there is a genuine issue of material fact for trial," *Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007).

"Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment." *Id.*

"Summary judgment is proper if, after viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmovant, no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law." *Higgins v. Union Pac. R.R. Co.*, 931 F.3d 664, 669 (8th Cir. 2019) (quotation marks and citation omitted).

## III.    Discussion

### a.    Whether the Corizon Employees Are Entitled to Assert Qualified Immunity

"In § 1983 actions, qualified immunity shields government officials from liability [in their individual capacities] unless their conduct violated a clearly established constitutional or statutory right of which a reasonable official would have known." *Bishop v. Glazier*, 723 F.3d 957, 961 (8th Cir. 2013) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)). Because the motions at bar involve a private medical services provider and its employees, the Court first must consider whether these defendants are entitled to invoke qualified immunity, which shields government officials from liability in certain circumstances.

The Eighth Circuit has not decided whether employees of a business which provides contractual services for or on behalf of a government is entitled to qualified immunity, and there is no consensus among the federal appellate courts which have addressed the issue. *See Perniciaro v. Lea*, 901 F.3d 241, 251 (5th Cir. 2018) (finding that two private doctors who contract to provide medical services for government are entitled to qualified immunity but noting that "Circuits are divided on whether privately employed doctors who provide services at prisons or public hospitals pursuant to state contracts are entitled to assert qualified immunity," citing cases from the Sixth, Ninth, and Eleventh Circuits holding that such practitioners are not entitled to qualified immunity

and a case from the Tenth Circuit holding that such practitioners are entitled qualified immunity); *Estate of Lockett v. Fallin*, 841 F.3d 1098, 1108-09 (10th Cir. 2016) (finding that private doctor "hired to do a job for which a permanent government employee would have received qualified immunity" was entitled to assert qualified immunity defense); *see also Miranda v. Cty. of Lake*, 900 F.3d 335, 346-47 (7th Cir. 2018) (holding that, although doctors employed by private company that contracted with county to provide detainees' medical care were "state actors amenable to suit under section 1983," they "are not . . . entitled to qualified immunity"); *Petties v. Carter*, 836 F.3d 722, 734 (7th Cir. 2016) (*en banc*) (holding that "qualified immunity does not apply to private medical personnel in prisons"); *McCullum v. Tepe*, 693 F.3d 696, 704 (6th Cir. 2012) (holding that private doctor working for government "is not entitled to assert qualified immunity"); *Jensen v. Lane Cty.*, 222 F.3d 570, 580 (9th Cir. 2000) (finding that private psychiatrist providing service to government pursuant to contract is not entitled to assert qualified immunity); *Hinson v. Edmond*, 192 F.3d 1342, 1345 (11th Cir. 1999) (holding that privately employed prison physician was "not entitled to advance the defense of qualified immunity"); *c.f.*, *Filarsky v. Delia,* 566 U.S. 377, 132 S. Ct. 1657, 182 L. Ed. 2d 662 (2012); *Richardson v. McKnight,* 521 U.S. 399, 117 S. Ct. 2100, 138 L.Ed.2d 540 (1997).

For purposes of this motion, the Court assumes, without deciding, that employees of a private entity providing medical services for prisoners on behalf of the Missouri Department of Corrections and sued pursuant to Section 1983 are entitled to raise the defense of qualified immunity.

### b.  Analyzing Qualified Immunity

The Court must consider two factors in analyzing qualified immunity: (1) whether the facts alleged show that the public official's conduct violated a constitutional right; and (2) whether the

constitutional right was clearly established at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). "Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right." *Id.*; *see also Hess v. Ables*, 714 F.3d 1048, 1051 (8th Cir. 2013) ("Qualified immunity is appropriate only if no reasonable factfinder could answer yes to both of these questions." (quotation marks and citation omitted)). "The 'clearly established' standard . . . requires that the legal principle . . . be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Dist. of Columbia v. Wesby*, ___ U.S. ___, 138 S. Ct. 577, 590, 199 L. Ed. 2d 453 (2018) (citations omitted)

Upon a defendant's raising the qualified immunity defense in a summary judgment motion, "the plaintiff must produce evidence sufficient to create a genuine issue of fact regarding whether the defendant violated a clearly established right." *Bishop*, 723 F.3d at 961 (citation omitted). The "plaintiff bears the burden of proving that the law was clearly established." *Hess*, 714 F.3d at 1051.

### c. What is Deliberate Indifference to a Serious Medical Need

"It is well established that deliberate indifference to a prisoner's serious medical needs is cruel and unusual punishment in violation of the Eighth Amendment." *Langford v. Norris*, 614 F.3d 445, 459 (8th Cir. 2010) (quotation marks and citation omitted). An objectively serious medical need is "one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Camberos v. Branstad,* 73 F.3d 174, 176 (8th Cir. 1995) (quotation marks and citation omitted).

Deliberate indifference is equivalent to criminal recklessness. *Schaub v. VonWald*, 638 F.3d 905, 919 (8th Cir. 2011). It is more than negligence but less than "purposefully causing or

knowingly bringing about a substantial risk of serious harm." *Id.* at 914-915. Thus, a mere disagreement with the professional judgment of a medical provider is not sufficient. *Popoalii v. Corr. Med. Servs.*, 512 F.3d 488, 499 (8th Cir. 2008). Nothing in the Eighth Amendment prevents a medical provider from exercising their independent medical judgment. *White v. Farerier,* 849 F.2d 322, 327 (8th Cir. 1988)*.*

An official must "'know[] of and disregard[]' a serious medical need or a substantial risk to an inmate's health or safety." *Saylor v. Nebraska*, 812 F.3d 637, 644 (8th Cir. 2016) (citations omitted). "[T]he failure to treat a medical condition does not constitute punishment within the meaning of the Eighth Amendment unless [the medical provider] knew that the condition created an excessive risk to the inmate's health and then failed to act on that knowledge." *Long v. Nix,* 86 F.3d 761, 765 (8th Cir. 1996) (citation omitted). *See also Manual of Model Civil Jury Instructions for the District Courts of the Eighth Circuit* (2019), Section 4.23 (Definition: Deliberate Indifference) and 4.43 (Verdict Director for Denial of Medical Care).

"Prisoners may prove deliberate indifference by showing that the total deprivation of medical care resulted in 'pain and suffering' or 'a lingering death.'" *Langford*, 614 F.3d at 459-60 (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). However, "a total deprivation of care is not a necessary condition for finding a constitutional violation: [g]rossly incompetent or inadequate care can also constitute deliberate indifference, as can a doctor's decision to take an easier and less efficacious course of treatment." *Langford*, 614 F.3d at 460 (quotation marks omitted, citing *Smith v. Jenkins*, 919 F.2d 90, 93 (8th Cir. 1990)).

The Court considers the facts in the light most favorable to the Plaintiffs and addresses each defendant separately to determine whether a reasonable factfinder could conclude that she or he was deliberately indifferent to Stufflebean's serious medical needs.

### d. Nurse Mowry

#### i. Whether a Reasonable Fact-Finder Could Conclude that Mowry Was Deliberately Indifferent to Stufflebean's Serious Medical Needs

Defendants argue that there is no evidence that Mowry was aware that Stufflebean had a serious medical need, Doc. 393 (Suggestions in Support of Defendants Amy Mowry, Alice Bergman, and Karen Williams' Motion for Summary Judgment), pp. 16, 17.

Plaintiffs point to the following evidence to show otherwise: Mowry was aware that Stufflebean had Addison's disease and hypoparathyroidism, Doc. 492-22, 51:16-18; that he was experiencing vomiting, weakness, and tachycardia, *id.*, 51:8-15; and that he had been hospitalized 16 times in the last year for Addison's complications. Doc. 492-1, p. 1. Mowry observed that Stufflebean was lethargic and weak and had an unsteady gait. *Id.*, p. 3. She noted that Stufflebean was on at least fludrocortisone, NATPARA, vitamin D, paroxetine, and prednisone. *Id.*, p. 1. Despite the fact that the jail did not provide any documentation indicating when Stufflebean last took his medications, and despite the fact that the Corizon form directs the person performing intake to "List medications and date/time of last dose," Mowry did not ask Stufflebean when he was last administered the five medications he listed. *Id.*, p. 3.

Mowry did call Nurse Bergman to discuss how to treat Stufflebean and she followed Bergman's instruction to place Stufflebean in the TCU. Nurses' AF, ¶¶ 29, 14. Mowry did not tell Bergman that Stufflebean had Addison's disease and hypoparathyroidism. *Id.*, ¶ 34.[9] Mowry did not tell Bergman that Stufflebean was weak and tachycardic, or that he had been hospitalized 16 times in the prior year. *Id.*, ¶¶ 33, 35.

The Court has carefully considered these facts and based on this record, concludes that no

---

[9] On Defendants' summary judgment motions, disputed issues of fact are resolved in favor of the Plaintiffs.

reasonable jury could find that Nurse Mowry was deliberately indifferent to Stufflebean's serious medical needs. Mowry may have failed to comply with Corizon's directions, and she may have breached the standard of care by not communicating all relevant information to Nurse Bergman, but such conduct cannot be characterized as criminal recklessness under these circumstances. *See Manual of Model Civil Jury Instructions for the District Courts of the Eighth Circuit* (2019), Section 4.23 (Definition: Deliberate Indifference). She called Nurse Bergman and followed her instructions to take Stufflebean to the TCU for monitoring and examination by Dr. Covillo. Doc. 492-1, p. 6. Stufflebean's physical appearance and conduct was not yet sufficiently unusual or alarming as to require additional actions, and there is no evidence that communicating more thoroughly with Bergman would have altered Bergman's approach to Stufflebean's care.

Mowry's motion for summary judgment on Count IV, the Section 1983 claim, therefore is granted.

### e. Nurse Bergman

#### i. Whether a Reasonable Fact-Finder Could Conclude that Bergman Was Deliberately Indifferent to Stufflebean's Serious Medical Needs

Bergman became involved in Stufflebean's treatment when Mowry called her. Mowry told Bergman that Stufflebean had Addison's disease and hypoparathyroidism,[10] but did not advise Bergman that Stufflebean was weak and tachycardic or that he had been hospitalized 16 times in the prior year. Nurses' AF, ¶¶ 33-35.

In response to Mowry's call, Bergman issued a verbal order for a dose of promethazine, which is used for nausea and vomiting, and directed Mowry to take Stufflebean to the TCU. Doc. 492-1, p. 5.

---

[10] The Court resolves disputed issues of fact in favor of Plaintiffs.

On that same day, October 29, 2015, Bergman ordered a KUB abdominal film for Stufflebean. *Id*., p. 9. The medical record shows the stated "purpose of exam" as "upper abdominal pain x 1 day, nausea and vomiting, Addison's disease, hypoparathyroidism." *Id*. The abdominal film showed "abundant stool." *Id*. Stufflebean was given a laxative, but none of the medications that his treating physician had prescribed before his incarceration, including for his Addison's disease. *Id.*, p. 7. Bergman did not review Stufflebean's medications before prescribing new medications for him. Nurses' AF, ¶ 49. Without ever seeing Stufflebean herself, Bergman ordered his release to the wing. *Id., ¶* 46, 48.

Bergman knew that Stufflebean was suffering from vomiting and nausea and had Addison's disease and hypoparathyroidism, but there is no evidence or any inference that she knew that Stufflebean would be at risk of an Addison's crisis if she did not examine him in person or review his medications before addressing his symptoms. Nor is there evidence that she knew he was suffering an Addison's crisis at that time. Importantly, there is no evidence that she intentionally refused or failed to act knowing that she was exposing him to a serious risk of harm. Bergman ordered anti-nausea medication, additional testing (in the form of the KUB), and admission to the TCU not only for observation, but also for examination by Dr. Covillo. *See Daniels v. Ferguson*, 321 F. App'x 531, 532 (8th Cir. 2009) (finding that officer's having administered the wrong medication to inmate was "at most" negligent, particularly in light of fact that "defendants' unrebutted evidence shows that after the fall, they contacted a jail nurse and placed [the inmate] under observation pursuant to her instructions, and there is no evidence that . . . defendant was involved thereafter in the alleged deprivation of food or medical care"). The Court therefore grants summary judgment to Nurse Bergman on Count IV, the Section 1983 claim.

### f. Doctor Covillo

Dr. Covillo contends he did a complete physical examination of Stufflebean on October 30, 2015 at 9:00 a.m. and documented the results of that exam. *See* Doc. 383-6 (Physical Examination Report). However, the Physical Examination Report is dated October 29, 2015, one day *before* Dr. Covillo allegedly conducted the physical examination. *Id.*

By the time Dr. Covillo examined Stufflebean, Stufflebean's condition was noticeably deteriorating. Millsap, one of Stufflebean's fellow inmates, testified that when Stufflebean was first brought into his cell (before Dr. Covillo's examination), he was "on a wheelchair," "just slouching over," and "there was, like, a lot of things wrong with him. We could tell he was really shrunk. Like you could see cheekbones real prominent. It looked like he had been, like, either really, like, strung out at one point or he had some sort of, like, condition like he had, like, cancer or AIDS or we didn't know." Doc. 492-17, 16:3-25, 18:1-4. Millsap thought perhaps Stufflebean was "deaf or maybe mute or something because he wasn't responding to anything anybody was saying, but he looked like he was trying to, but nothing was making -- he couldn't vocalize anything." *Id.*, 35:20-24. Moreover, prior to Dr. Covillo's purported physical examination of Stufflebean, other medical staff had observed that Stufflebean was experiencing nausea and vomiting, tachycardia, and weakness, and that he appeared lethargic and weak. Doc. 492-1, pp. 1, 3.

In contrast with these observations by medical staff and prisoners, Dr. Covillo's testimony was that Stufflebean "seemed very stable," Doc. 492-16, 72:16-25, and was erect, Doc. 383-6, p. 2.

Dr. Covillo stated in his deposition that Stufflebean's reports of nausea, vomiting, dizziness, and tachycardia were from "the past" and did not represent his condition at the time of the examination. Doc. 492-16, 73:1-11. However, weakness, dizziness, nausea, and vomiting are

listed not in the "History" section of the Physical Examination Report, but in the "Interim Inventory by System" section, without any time frame. Doc. 383-6. The Physical Examination Report is dated October 29, 2015, one day before Dr. Covillo's purported physical exam. This might explain why Dr. Covillo thought these symptoms were from the past, but a reasonable fact-finder could find on this basis that Dr. Covillo did not conduct a physical examination of Stufflebean on October 30, 2015. Dr. Covillo was seeing 50 to 70 patients per day and felt overbooked. Doc. 492-16, 15:2-21. If he did not conduct a physical examination of Stufflebean, that—given Stufflebean's symptoms, appearance and the information that Dr. Covillo admits he had—would be evidence of deliberate indifference. At a minimum, there is a disputed issue of fact that precludes summary judgment.

Dr. Covillo volunteered in his deposition that Stufflebean's blood pressure was 121 over 89, commenting, "That's pretty stable." *Id.*, 73:20-74:6. However, Covillo then admitted that the blood pressure shown on the date of his purported examination in fact was taken by Nurse Mowry the day before, and that Covillo did not actually know what Stufflebean's blood pressure was on the day of his examination. *Id.*, 74:15-75:7.

When asked where Stufflebean's condition at the time of the examination was reflected in the medical record, Dr. Covillo stated simply, "I examined him," and then claimed that he "would have written it in there if [Stufflebean] had a problem." *Id.*, 73:12-16. However, a reasonable juror could find that, if Dr. Covillo had examined Stufflebean, Stufflebean at a minimum would have mentioned his immediate need for medication, as well as his abdominal pain, weakness, fatigue and nausea. Stufflebean had heard his treating physician's testimony at his sentencing; he knew that he had not gotten his medication for several days; he knew the risk of not taking his medicine; and he knew what an Addisonian flare-up felt like, having been hospitalized 16 times

in the previous year. He consistently reported, at a minimum, his physical symptoms, both at the Buchanan County Jail and upon admission to the prison. Further, if Dr. Covillo actually examined Stufflebean, he was the first doctor to see Stufflebean after his incarceration. A reasonable juror could conclude that, when he finally was seen by a doctor, Stufflebean would not remain mute about his urgent need for medication.

Dr. Covillo admits that he knew Stufflebean had both Addison's disease and hypoparathyroidism, and that Stufflebean's condition was serious enough that he needed his medication on a daily basis. *Id.*, 147:4-17. Dr. Covillo testified that he called his supervisor to request approval of medications from outside the formulary. *Id.*, 27:10-28:5. Dr. Covillo recalled Stufflebean arriving with a bag of medications (although the documentary evidence does not so indicate), and Dr. Covillo claimed that, with the approval of his supervisor, he ordered that Stufflebean receive some of those medications that day itself. Doc. 492-16, 79:14-82:13. However, Dr. Covillo could not recall to whom he purportedly gave the verbal order regarding medications, and no one has said that they received such an order. *Id.* Dr. Covillo could identify no records documenting his asking for permission to dispense non-formulary medications or ordering that Stufflebean be given the medications that purportedly accompanied him. *Id.* Dr. Covillo maintains that he ordered calcium citrate, fludrocortisone and Vitamin D for Stufflebean on October 30, 2015, but the only documentary evidence of these prescriptions is a time-stamp that shows the medications were approved at 5 a.m. on October 31, 2015, after an emergency call had been placed with regard to Stufflebean. Doc. 492-1, p. 6. There is no evidence that would explain the delay, if it was Dr. Covillo who actually tried to rush Stufflebean's medication. It is also undisputed that no medication for Stufflebean's Addison's disease or hypoparathyroidism was dispensed at the prison. Dr. Covillo acknowledged that Stufflebean "did not get any

medication … like he was supposed to," but he claimed that the unidentified nurses had "[a]pparently" not followed his order in that regard.  Doc. 492-16, 148:7-14.

Based on this record, a reasonable juror could conclude that Dr. Covillo acted with deliberate indifference to Stufflebean's serious medical needs by failing to order the immediate administration of medication for Stufflebean's conditions.  He knew that Stufflebean needed his medication for his Addison's disease that day.  He knew that Stufflebean was suffering from syncope, *i.e.*, passing out or fainting, chest pain, nausea, vomiting, low blood pressure and dizziness—all symptoms of Addison's disease and potential crisis.  Nonetheless, he did not order medication to be administered immediately.  In short, there is evidence that Dr. Covillo knew of the risk of not getting Stufflebean medication that day, and he intentionally refused or failed to provide it.  *See Letterman v. Does*, 789 F.3d 856, 862 (8th Cir. 2015) ("Generally, the actor manifests deliberate indifference by intentionally denying or delaying access to medical care, or intentionally interfering with treatment or medication that has been prescribed.  Further, the obvious inadequacy of a response to a risk may support an inference that the officer recognized the inappropriateness of his conduct."); *Ingram v. Helder*, No. 15-5068, 2015 U.S. Dist. LEXIS 175898, at **18-19 (W.D. Ark. Dec. 21, 2015) (finding that delay at the beginning of a prisoner's incarceration in administering drugs prescribed before incarceration could amount to violation of a clearly established right); *Torres v. Trombly*, No. 03-0696, 2004 U.S. Dist. LEXIS 12192, at **21-23 (D. Conn. June 29, 2004) (finding that allegation that defendants failed to provide blood-pressure medication on a single day could amount to "clearly established" Eighth Amendment violation if defendant were able to establish that one day without the medication would carry "a

substantial risk of serious harm").[11]

The Court denies summary judgment to Dr. Covillo on Count IV, the Section 1983 claim.

### g. Nurse Williams

#### i. Whether a Reasonable Fact-Finder Could Conclude that Williams Was Deliberately Indifferent to Stufflebean's Serious Medical Needs

The medical record shows that, on October 31, 2015, at 1:15 a.m., somebody called a "Code 16" with respect to Stufflebean. Doc. 492-1, p. 13. Neither Williams nor the other nurse on duty documented why the Code 16 was called or what was done in response. *Id.*

A second Code 16 was called at 4:30 a.m. that same day. *Id.* The medical record for the second Code 16 was made "late," on November 1, 2015, at 1:07 a.m., after Stufflebean had been rushed by ambulance to the hospital. It states that Williams found Stufflebean lying on his abdomen on the floor of his cell. *Id.* Stufflebean indicated that he had fallen when he got up to get a drink because he felt weak. *Id.* The notes reflect that "Sgt. Brown mentioned that there was a towel with greenish liquid on it close to his bunk and offender was asked if he was nauseated." *Id.*

Williams noted that, when asked about his diet, Stufflebean stated, "I took a few bites of corn a couple days ago, because I don't like the food." *Id.* Stufflebean was then given a carton of milk, which he "tolerated well," and he "asked for another milk at this time and stated that he was a little nauseated." *Id.*

Defendant Williams did not communicate with anyone about Stufflebean's appearance, his

---

[11] Dr. Covillo did not raise the defense of qualified immunity in his summary judgment motion. Accordingly, the Court need not determine whether the right at issue was clearly established, although, the Court is confident that if the issue had been raised in a timely fashion, the Court would have found that the right was clearly established given Dr. Covillo's knowledge and the risk of injury to which he subjected Stufflebean.

blood pressure (even though the systolic pressure was less than 100), his symptoms or his request for help.   Instead, by her account, she gave him milk, although Corizon's protocol is to not give milk if the patient is nauseous. Williams did not ask Stufflebean why he was so weak that he fell and couldn't get up, or why he was vomiting.  She just assumed it was because he was not eating and drinking enough because he didn't like the prison food.

Williams' notes and her affidavit indicate that she was unaware that Stufflebean was at serious risk of harm due to a medical condition.  Williams stated that Stufflebean's intake form was available to her, but she claims that she did not review it.  Doc. 492-14 (Deposition of Karen Williams), 47:21-48:1.  But in light of the fact that Stufflebean told nurse Munger shortly thereafter that he was experiencing an Addisonian flare-up, Doc. 492-1, p. 14, a reasonable fact-finder might infer that Williams' testimony is not credible with regard to her knowledge of the seriousness of Stufflebean's condition, and that in fact she was aware that Stufflebean had Addison's disease. Further, even a lay person would understand that Stufflebean's symptoms are unlikely to be the result of not eating anything because of a dislike of prison food and additional questions were required to see why Stufflebean was vomiting green liquid and so weak that he would fall and not be able to get up on his own.  Plaintiffs' expert also described William's behavior as a substantial deviation from the standard of care.

Williams claims that, at the end of her shift, she gave a report concerning Stufflebean to the oncoming nurse, Nurse Baker Smith.  Doc. 492-14, 24:4-11.  However, Baker Smith could not recall receiving any report from Nurse Williams, and she testified that, had she been told to monitor Stufflebean, she would have included that direction in her chart documentation.  Doc. 493-31, Doc. 15:6-18:16.  Nor is there evidence that Williams verbally told Nurse Munger of the incident.

Nonetheless, Williams took Stufflebean to the TCU for observation.  She turned his care

over to a registered nurse and there is no evidence that her failure to communicate his condition to Nurse Munger prevented Nurse Munger from observing Stufflebean firsthand and having a conversation with Stufflebean about his condition. *See Greeno v. Daley*, 414 F.3d 645, 655-56 (7th Cir. 2005) ("We do not think Miller's failure to take further action once he had referred the matter to the medical providers can be viewed as deliberate indifference.").

Thus, although it is a close question, the Court concludes that there is insufficient evidence for a jury to conclude that Nurse Williams intentionally failed to take reasonable measures to address Stufflebean's serious medical needs. The Court therefore grants summary judgment to Nurse Williams on Count IV, the Section 1983 claim.

### h. Nurse Munger

#### i. Whether a Reasonable Fact-Finder Could Conclude that Munger Was Deliberately Indifferent to Stufflebean's Serious Medical Needs

Although the medical record shows that somebody called a "Code 16" for Stufflebean at 1:15 a.m. on October 31, 2015, neither Munger nor the other nurse then working at the prison documented why the Code 16 was called or what happened. Doc. 492-1, p. 13.

After the second documented Code 16, Williams, having given Stufflebean two cartons of milk, delivered Stufflebean into Munger's care in the TCU for further observation. *Id.* Stufflebean's blood pressure then was 100/64 and his heart rate was 91 beats per minute. *Id.*, p. 14.

"As soon as he was brought to TCU," Stufflebean stated that he needed to lie down. *Id.* He advised Munger that he had "not eaten in three days" and that he had Addison's disease and had "been having this flare up since he was sentenced to prison." *Id.* He also explained that "when this has happened before he would just go to the hospital and he would receive IV fluids." *Id.* Munger wrote, "He fully understands how and what is causing his condition to flare up and get

worse by not eating.  . . .  Encouraged offender that he needed to drink and eat, put an MSR [(medical service request)] into mental health to help with his stress, and if he felt he needed to see Dr. Covillo again to put in an MSR for the doctor." *Id.*  Munger provided Stufflebean with Promethazine at 5:30 a.m., after he had been given milk. *Id.*  Munger then released Stufflebean to his cell. *Id.*

On November 1, 2015 at 1:36 a.m., after Stufflebean had been taken from the prison to the hospital, Defendant Munger made a "Late Entry" in Stufflebean's chart as follows:

> When offender was released from TCU at 7AM with CO1 Huddleston, offender got as far as the telephone and the offender became wobbly and layed [*sic*] on to the floor.  This was during shift change and witnessed by several of the day shift nurses as well as the night shift nurses and CO1 Huddleston and CO1 Williams.  My self and CO1 Huddleston helped offender walk back to his room and he walked fine with assistance.  SGT Brown was called and notified.  SGT Brown, CO1 Huddleston, and CO1 Green came to TCU to escort offender back to cell.

*Id.*, pp. 14-15.

CO Huddleston described Stufflebean during this incident as "dazed like he was sick" and "weak and incoherent."  Munger AF, ¶ 91.  Huddleston recalled Stufflebean "stumbling" and then falling down after 10-20 steps.  *Id.*  He described Stufflebean's falling as "kind of slow.  He fell down on his knees, and then he just kind of fell over. I mean it wasn't -- it didn't seem like it was that hard. He fell really slow to the ground." *Id.*  Stufflebean fell on his face.  *Id.*  Huddleston said Stufflebean did not say anything, instead, "[h]e just made grunting noises . . . ." *Id.*  Huddleston believes that he then got a wheelchair, and they placed Stufflebean in it.  *Id.*  Stufflebean was slumped over.  *Id.*  Huddleston wheeled Stufflebean to his cell and helped him to his bunk.  *Id.*[12]

---

[12] Although Munger noted the next day that Stufflebean fell once, TCU guard CO Jacqueline Williams contemporaneously noted that Stufflebean fell twice on his way back to his phone.  *Id.*, ¶ 94 (noting at 7:00 a.m. that Stufflebean "g[o]t as far as the telephone and the offender sat down on the floor," and noting at 7:11 a.m. that "Stufflebean got as far as the telephone again and layed [*sic*] on the floor").

After reading Munger's description of Stufflebean's becoming "wobbly" and lying down on the floor, Dr. Covillo said, "Now that's a true Addison crisis," and he agreed that proper procedure would "definitely" have been for the nurse to immediately call the on-call physician. Doc. 492-16, 125:7-128:8. Dr. Covillo also thought that Stufflebean should have remained in the TCU for monitoring, and he thought the nurse's "rush to kick him out of TCU . . . d[id]n't make any sense." *Id.*, 127:4-10. He characterized sending Stufflebean to his cell after his collapse on his way out of the TCU as "crazy." *Id.*, 127:11-15.

There is no evidence that Munger reported Stufflebean's condition to the incoming nurse and she did not contact a physician for advice.

Three hours after Munger returned Stufflebean to his cell, a third Code 16 was called for Stufflebean. Doc. 492-1, p. 15. Soon after, an ambulance was called to rush Stufflebean to the hospital. *Id.*, p. 16.

On this record a reasonable juror could conclude that Munger was deliberately indifferent because she knew that Stufflebean was experiencing an Addison's flare-up, she knew he was supposed to receive intravenous fluids when in such a state, she knew that he had been nauseated, that his blood sugar was very low, and that he was incoherent and weak, and yet she did not contact the on-call physician for guidance or even keep him in the TCU. She instead released Stufflebean back to his cell, even as he fell twice on his way back due to weakness. *See Wynn v. Southward*, 251 F.3d 588, 594 (7th Cir. 2001) (finding that inmate's allegation that "he repeatedly told prison officials that he needed his heart medication 'immediately,' that the officials did not respond to his requests, that he made two written requests . . . for his medication, that his heart had been 'fluttering' due to the lapse in medication, and that he risked 'heavy chest pains' if he did not

resume taking his medication" "adequately state[d] an Eighth Amendment claim that the officers were deliberately indifferent to [inmate]'s serious medical need for his heart medication"). The circumstances here are even more egregious because Munger is a registered nurse and the visibly compromised patient actually advised her of what specific treatment he needed, and yet she did nothing other than counsel him to eat and tell him to formally request to see the doctor if he felt it necessary.

### ii.  Whether the Right Was Clearly Established

It was clearly established when Stufflebean was incarcerated that a medical provider in a prison violates a prisoner's constitutional rights when the provider is deliberately indifferent to the prisoner's serious medical need. *See Campbell v. Cauthron*, 623 F.2d 503, 508 (8th Circuit 1980) ("It is much too late in the day for states and prison authorities to think that they may withhold from prisoners the basic necessities of life which include….necessary medical attention."); *Foulks v. Cole Cty.,* 991 F.2d 454, 457 (8th Cir. 1993) (holding, in Eighth Amendment case, that "if a reasonable official would have known that observation and treatment was necessary, the refusal to provide access [to] the treatment would constitute deliberate indifference to [the inmate's] constitutional rights"). Therefore, it cannot be seriously debated that Nurse Munger was on notice that deliberate indifference to Stufflebean's need for treatment and continued observation was a violation of his constitutional rights.

Despite Stufflebean's quickly deteriorating condition and several symptoms that even a lay person would know needed to be urgently addressed, Munger did nothing to treat or monitor Stufflebean. Nor did she call anyone for guidance. She simply returned Stufflebean to his cell, unmoved by his falling twice on his way back. Whether Nurse Munger was deliberately indifferent to Stufflebean's serious medical needs is a contested issue of fact that only a jury can decide. The

Court therefore denies Nurse Munger's request for summary judgment on Count IV based on qualified immunity and the merits of the Plaintiffs' claim.

### i. Whether Corizon is entitled to qualified immunity

Corizon argues that it performs a government function because under Missouri law, "the director of the department of corrections or his designee" "shall arrange for necessary health care services for offenders confined in correctional care centers." Doc. 395 (Suggestions in Support of Defendant Corizon, LLC's Motion for Summary Judgment), p. 9. Plaintiffs contend that, as a private entity, Corizon is not entitled to assert the defense of qualified immunity.

Corizon states that it "is essentially a government actor contractually performing the discretionary duties required to provide healthcare through its agents to inmates and other persons being held at the MODOC . . . ." *Id.*, p. 12. However, a government entity is not entitled to qualified immunity. *See Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 535 (8th Cir. 1999) ("Qualified immunity is not a defense available to governmental entities, but only to government employees sued in their individual capacity."); *see also Moore v. MEnD Corr. Care*, No. 15-2848, 2017 U.S. Dist. LEXIS 99595, at **7-8 (D. Minn. Feb. 28, 2017) ("MEnD additionally argues that it is entitled to qualified immunity, but qualified immunity 'is not a defense available to governmental entities.' Therefore by analogy, qualified immunity is not available to a private entity, such as MEnD, that is sued under § 1983 for its actions pursuant to a contract to perform traditional public functions.") (citing, *inter alia*, *Johnson*, 172 F.3d at 535).[13]

_____

[13] Even if Corizon is entitled to assert qualified immunity, given the facts and arguments Plaintiffs presented (*see* Doc. 493 and attachments thereto), the Court would find that Corizon is not entitled to qualified immunity in this case. A reasonable juror could conclude that Corizon was deliberately indifferent to the serious medical needs of Stufflebean based on its knowledge that its employees generally, and Munger and Covillo specifically, were in need of additional training and supervision. On the record before the Court, a reasonable juror could also conclude that Corizon knew that Stufflebean would be placed at a substantial risk of harm as a result of Corizon's

Accordingly, the Court denies Corizon's motion for summary judgment on the basis of qualified immunity.

## IV.    Conclusion

For the reasons set forth above, the motions for summary judgment by Mowry, Bergman, and Williams on the civil rights claim (Doc. 392) are GRANTED.  The motions for summary judgment on the civil rights claim against Corizon (Doc. 394) and its employees Munger (Doc. 399) and Dr. Covillo (Doc. 382) are DENIED except as to the punitive damages issues, which are taken under advisement.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated:  December 23, 2019
Jefferson City, Missouri

---

systematic failure to train and supervise Munger and Covillo.  Further, Corizon disregarded that risk by failing to take any reasonable measures to address the well documented and persistent deficiencies in its training and supervision of medical personnel it placed in the Missouri Department of Corrections and other prisons and jails around the country.

It was well established by the time Stufflebean was transferred to the MDOC that individual medical providers were subject to liability for deliberate indifference to a known medical risk if they failed to take measures to reasonably address the risk, including reasonable supervision and training.  Thus, to the extent that Corizon is an individual entitled to qualified immunity, the fact that it was on notice that its conduct violated the U.S. Constitution renders it ineligible for qualified immunity.

The Court takes no position on whether a business can simultaneously assert qualified immunity and lack of liability for the actions of its employees under *respondeat superior*, given that a corporation acts through its employees and agents.