# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MISSOURI
# ST. JOSEPH DIVISION

| | |
|---|---|
| BRENDA DAVIS, *et al.*, | )<br>) |
| Plaintiffs, | )<br>) |
| v. | ) Case No. 5:17-cv-06058-NKL<br>) |
| BUCHANAN COUNTY MISSOURI, *et al.*, | )<br>)<br>) |
| Defendants. | )<br>) |

## ORDER

Before the Court are motions for summary judgment by defendants April Helsel and Ann Slagle (Doc. 365) and defendant Catherine Van Voorn, M.D. (Doc. 367) on Count II of the amended complaint. For the reasons discussed below, the motions are denied.

**I.  Background**

    **a.  Stufflebean's Medical Conditions**

Justin Stufflebean ("Stufflebean"), the son of plaintiffs Brenda Davis and Frederick Stufflebean, had two endocrine disorders: Addison's disease and hypoparathyroidism.[1] Addison's disease is a disorder that occurs when the adrenal glands fail to produce sufficient amounts of cortisol, an essential hormone that helps the body cope with stress and is critical to maintaining

---

[1] Insofar as any facts are in dispute, the Court views the evidence in the light most favorable to the non-movants, Plaintiffs. *See, e.g., Johnson v. McCarver*, 942 F.3d 405, 2019 U.S. App. LEXIS 32772, at *1 (8th Cir. 2019) ("Because this appeal arises from the denial of a motion for summary judgment, we recite any disputed facts in the light most favorable to the [non-movant].").

The Court incorporates the citations in the Court's order on these defendants' motion for summary judgment on Count IV, Doc. 632.

blood pressure and cardiovascular function. Adrenal insufficiency is life-threatening. Stress can trigger Addisonian crises. However, progression into adrenal crisis is not instantaneous, but gradual.

On October 26, 2015, Stufflebean was sentenced to a term in prison and transferred to the Buchanan County Jail. Although Stufflebean's mother brought several of his prescription drugs—which were to be taken at least once daily—to the jail on the day that he was booked in, Stufflebean did not receive any medications the next day or the day after (October 27 and 28, 2015). On October 29, 2015, Stufflebean was transferred from the Buchanan County Jail to the Western Reception Diagnostic and Correctional Center ("WRDCC"). The nurse performing intake at the prison noted that Stufflebean complained of vomiting, weakness, and tachycardia (elevated heart rate). She observed that Stufflebean appeared "lethargic" and had an "unsteady gait," apparently from "weakness." Stufflebean told a nurse at the prison that he had been having "this flare-up" of his Addison's disease since he was sentenced.

Stufflebean did not receive any medications at the WRDCC from October 29 through 31, 2015.

On October 31, 2015, Stufflebean arrived by ambulance at a medical center, unresponsive and in cardiac and respiratory arrest. On November 16, 2015, he was pronounced dead.

### b. Medical Providers at the Buchanan County Jail

Ann Slagle is a Licensed Practical Nurse employed by defendant Advanced Correctional Healthcare and assigned to the Buchanan County Jail. Slagle was on duty on October 26, 2015 from 2 p.m. until 10:29 p.m.; October 27, 2015 from 12:07 p.m. until 10:28 p.m.; and October 28, 2015 from 1:55 p.m. until 10:24 p.m.

April Helsel (also called April Powers) is a Licensed Practical Nurse employed by ACH as the site manager for the Buchanan County Jail. As site manager, Helsel was responsible for supervising and training the nursing staff at the jail. She was on duty October 26, 2015 from 6:00 a.m. until 2:20 p.m.; October 27, 2015 from 12:14 p.m. until 10:30 p.m.; October 28, 2015 from 6:03 a.m. until 2:01 p.m.; and October 29, 2015 from 6:00 a.m. until 11:15 a.m.

Dr. Catherine Van Voorn was the medical director covering the Buchanan County Jail.

### c. Stufflebean's Medical Treatment at the Buchanan County Jail

#### i. Nurse Slagle's Intake

Sheriff's Deputy Dustin Nauman claims that, on October 26, 2015, the day that Stufflebean was booked into the jail, Nauman contacted a nurse by telephone to let her know that he had "booked in an inmate who needed to be seen due to medical issues." A reasonable juror could find, based on the 14:03PM print time shown on the questionnaire and Slagle's documented arrival time of 2pm on October 26, 2015 that Slagle was the nurse that Nauman contacted. However, during the nearly 11 hours that Stufflebean was in the holding cell in the booking area, no nurse came to see him.

On October 26, 2015, the day that Stufflebean was brought to the Buchanan County Jail, his mother, Brenda Davis, delivered to the jail what she could find of Justin's medications, including NATPARA, melatonin, hydrocodone, ondansetron, fludrocortisone, paroxetine, Calcitriol, prednisone, and Vitamin D, as well as specialized injection tips for the NATPARA, and Slagle retrieved the medications.[2] Stufflebean was supposed to take his medications daily, and indeed, he was supposed to take some of his medications more than once a day.

---

[2] Dr. Van Voorn later suggested that the medications "didn't wind up with medical with the nurse," and that what happened to the medications was "a mystery."

Once-a-day medications were passed to inmates at 7 a.m. Any once-daily medication that was not entered in the jail's system before 7 a.m. on a given day would not be administered. Thus, for Stufflebean to receive his daily medications on October 27, they needed to be entered in the system before 7 a.m. that day. Yet, despite having picked up at least nine medications as well as specialized injection tips prescribed for Stufflebean, and although she worked for more than eight hours on October 26 after Nauman advised her to evaluate Stufflebean, Slagle did not call a doctor to ask for an order to administer his prescription medications on that day. Slagle knew that meant that Stufflebean would not receive the nine "daily" prescription medications in her custody for more than 24 hours.

Stufflebean told a fellow inmate that he had requested his medications repeatedly, and that inmate witnessed Stufflebean requesting his medications in person at least twice, and also through the speaker. Stufflebean also asked at every mealtime to see a doctor.

On October 27, 2015, Stufflebean filed a formal request for his medications, stating, "I called to have my medicine brought in. I have Addison's and hypoparathyroid disease. Medications brought to jail." Slagle made note of Stufflebean's request, and apparently in response, called Dr. Van Voorn that afternoon and received oral orders for some of the prescriptions. As discussed above, because Slagle entered the order after 7 a.m. on the 27th, the soonest Stufflebean could have received his medication was October 28, 2015.

Thus, despite his formal request on October 27 for the medications that had been brought to the jail, and although Stufflebean told a fellow inmate that he had requested his medications repeatedly, and that fellow inmate witnessed him requesting his medications in person at least twice, there is no dispute that Stufflebean was not given his medications at the jail on either October 26 or 27, 2015.

Slagle claims that she "would have seen" Stufflebean on October 27, 2015 in the infirmary before she called Dr. Van Voorn. However, the jail's inmate activity log, which tracks the movements of inmates within the facility, shows that once Stufflebean was moved from the holding cell (where he was never seen by medical staff) to the cell pod,[3] he did not leave the cell pod (to go to the infirmary or elsewhere) until he was transferred to prison.

To Stufflebean's cellmate's knowledge, Stufflebean never saw a medical provider. *See* Doc. 474-23, 22:16-23. Indeed, while being transferred to the prison, Stufflebean expressed hope to his jail cellmate that he would finally see a doctor. *See id.*, 23:25-24:15.

The only evidence that Slagle points to in arguing that she saw Stufflebean on October 27, 2015 are the progress note and the medication verification form that Slagle created. The Medical Progress Notes contains just two sections. In the section titled "SOA" is Stufflebean's request for his medication, written in the first person, as though transcribing Stufflebean's formal request ("I called to have my medicine brought in. I have Addison's and hypoparathyroid disease."), and on the next line, the statement, "Medications brought to jail." The second section, titled "Plan," states only "10/27/15 1300 Contacted Dr. Van Voorn and received verbal orders." The only indication on the medical verification form that Slagle saw a patient are vital signs (B/P, Temp, Resp, Pulse), which, Plaintiffs point out, could have been fabricated.[4] Neither of the two documents that ACH cites contains any notes from Slagle concerning Stufflebean's appearance, any indication that he

---

[3] Slagle explained that "Custody," usually two guards, would have brought Stufflebean to the medical unit for her examination. She could not recall any situation in which an inmate was permitted to go from the housing unit to the infirmary without a guard escort.

[4] The fact that, as discussed further below, Slagle did not take Stufflebean's vital signs after Dr. Van Voorn ordered that they be taken raises the inference that she did not take Stufflebean's vital signs on the October 27, 2015, and instead just fabricated them on the form.

5

complained about symptoms, or even, conversely, that he felt fine. Nor did she tell Dr. Van Voorn about his symptoms or lack thereof.

Slagle testified that her list of medications on the medication verification form was based on the bag of medications Stufflebean's mother brought to the jail. Thus, the list of medications itself does not indicate that Slagle spoke with Stufflebean. In fact, to the contrary, the list of medications suggests that Slagle did not see Stufflebean. During her deposition, Slagle testified as follows about her usual procedure for identifying discrepancies between the medication verification form and other documentation:

> Q. So you would not reconcile back to the intake screening form or the property form that the corrections officer fills out . . . when you were completing the medication verification form?
>
> A. Not usually, unless there was a discrepancy.
>
> Q. Well –
>
> A. And that would be after I spoke to the patient, and then I would compare it to see if maybe it got placed in his property or was, you know, being sent back home.
>
> Q. Okay. Well, I mean what we know in this case is there's medications listed on the intake screening form and the property intake form . . . that don't show up on your medication verification report; and so the question is did you reconcile it in this case or not?
>
> A. No, I didn't.
>
> Q. Is there a reason why not?
>
> MR. HICKS: Object to the form. I feel like she just explained everything.
>
> A. I would talk to the patient, which I would have the medications that were there, and I would ask him at that time if there were other medications that he was taking, and I would go from there. I would then look back and go, "Okay, well, it's got Vitamin D." "Yeah, I took that sometimes." You know, I don't know if that's what he said at that point, but that's what I would go for.

Q. (By Mr. Bird) Are you suggesting that Mr. Stufflebean told you not to include certain medications on his medication verification form?

A. He possibly could, yes.

Q. What is your evidence for that that's in his chart?

A. Nothing in -- in his chart.

Q. Then you're speculating, correct?

A. Yes, sir, I would be speculating.

Q. Okay. And the point being that you rec- -- recognize now that if you had done a reconcilement with the intake screening form and the property form, that you would have seen medications that were identified but not listed in your verification form?

A. Yes, I would have seen that there were medications that were not on my form.

Slagle's list of medications omits at least two of the medications that Stufflebean told Nauman he takes. It is reasonable to infer that, if given the opportunity to speak with a nurse about the medications he had already formally requested, Stufflebean would report to the nurse the same medications he reported to the booking officer of the jail. The fact that Stufflebean did not tell Slagle about at least two of his medications reasonably suggests that Slagle never spoke with Stufflebean.

Slagle also omitted Stufflebean's Calcitriol from her medications list, even though that was among the medications that Davis brought to the jail. In addition, although Davis had brought both NATPARA and the special injection tips needed to administer it, Slagle wrote, "Pt. must supply." Slagle also did not request the magnesium and potassium that were listed in the medical intake questionnaire that Nauman prepared.

### ii. Dr. Van Voorn's Orders

On October 27, 2015, Dr. Van Voorn ordered continuation of some of Stufflebean's medications: NATPARA, Vitamin D Ergo, Paxil, Prednisone and Fludrocortisone. Dr. Van Voorn denied Stufflebean one of the medications from Slagle's list: Zofran/ondansetron, a medication used to control severe nausea and vomiting that Stufflebean had been prescribed during an emergency room visit nine days earlier related to an Addisonian crisis.

Dr. Van Voorn admitted that if a patient with hypoparathyroidism or Addison's disease reported "fatigue or . . . abdominal pain or tingling, those could all be symptoms of a crisis coming on for that condition," and indeed "[c]ertainly" were "red flags." She acknowledged that in such a situation, she would "know that [she] need[s] to take a closer look to make a determination as to their state of health," because otherwise "it could become a crisis" and "could lead to serious injury or death." She stated that she understood in October 2015 that "somebody having Addison's disease and hypoparathyroidism could be at risk if they didn't get their medication; so [she] would take extra actions to make sure [she] had the list correct and [she was] following the right course." She further acknowledged at her deposition that it is critical for a brittle patient with Addison's and hypoparathyroidism to receive medications daily. Yet, when she ordered on October 27, 2015 that some of Stufflebean's prescribed medications be administered, she understood that Stufflebean would not receive the medications until October 28 or 29, 2015.

Dr. Van Voorn visited the Buchanan County Jail once a week. Despite knowing that Stufflebean had Addison's Disease and hypoparathyroidism, Slagle did not put Stufflebean on the list of patients that Dr. Van Voorn would see on her October 28, 2015 visit. Helsel, too, did not put Stufflebean on the list of patients that Dr. Van Voorn would see on October 28, 2015. Helsel testified that the responsibility for first identifying a prisoner with a chronic condition who warranted being placed on the doctor's "list" belonged to the doctor herself. Dr. Van Voorn

admitted that, as a patient with Addison's disease and hypoparathyroidism and a long list of medications to treat those conditions, Stufflebean should have been "on her list" for proper evaluation. Because neither the nurses nor Dr. Van Voorn took steps to place Stufflebean on the doctor's list for evaluation, although Dr. Van Voorn was on site at the jail on October 28, 2015, she did not see Stufflebean.

### iii. Helsel's Failure to Administer Medication

There is no evidence that anyone gave Stufflebean his medications on October 28, 2015. Helsel was on duty the morning of October 28, 2015—during the time when once-a-day medications were supposed to be administered. Helsel, like Slagle, was aware at that time that Stufflebean needed medications daily. Helsel testified that, on that day, she gave Stufflebean the medication that Dr. Van Voorn had ordered. However, when pressed, she admitted that she had no recollection of having given Stufflebean his medications, and she could point to no records supporting her statement that she had given him medications: her statement that she had administered his medications was mere conjecture based on the fact that there was no notation in the record indicating that Stufflebean had refused his medications. Helsel theorized that the lack of any indication that she gave Stufflebean his medications was just a computer error, but she could point to no evidence supporting this theory.[5]

### iv. Failure to Take Vitals

There is no evidence that Slagle, Helsel, or anyone else checked Stufflebean's vital signs on October 28 or 29, 2015, despite the fact that Dr. Van Voorn had ordered that his vitals be taken

---

[5] There is no dispute that Slagle did not give Stufflebean any medications on October 28, 2015. *Id.*, ¶¶ 53, 57.

9

for three consecutive days. Plaintiffs' counsel represented that the vitals that Dr. Van Voorn ordered were supposed to be taken in the afternoons, and Slagle was on duty the afternoon of October 28, 2015. Helsel admitted that nothing in Stufflebean's record indicates that she provided any care to him at all.

### v. Stufflebean's Deteriorating Condition

During his incarceration at the Buchanan County Jail, Stufflebean was not eating, and he was getting noticeably weaker. He had difficulty getting down stairs such that he had to lean on the rail for assistance. He also vomited at least one time at the jail—a sign of Addisonian crisis.

### d. Transfer to Prison

On October 29, 2015, at 12:35 p.m., Stufflebean was transferred from the Buchanan County Jail to the Western Reception Diagnostic and Correctional Center ("WRDCC"). During the transfer, Stufflebean "struggl[ed]" to walk in his shackles.

The transfer from the Buchanan County Jail to the prison was effectuated in just nine minutes. Stufflebean did not arrive with any transfer summary from the jail. The nurse performing intake at the prison noted that Stufflebean complained of vomiting, weakness, and tachycardia (elevated heart rate), and that Stufflebean appeared "lethargic" and had an "unsteady gait," apparently from "weakness." Stufflebean told a nurse at the prison that he had been having "this flare-up" of his Addison's disease since he was sentenced.

Stufflebean did not receive any medications at the WRDCC from October 29 through 31, 2015.

On October 31, 2015, Stufflebean arrived by ambulance at a medical center, unresponsive and in cardiac and respiratory arrest. On November 16, 2015, Stufflebean was pronounced dead. Dr. Marius C. Tarau, M.D., from the Jackson County Medical Examiner's office, declared the

cause of Stufflebean's death to be "[c]omplications of polyglandular endocrinopathy." Plaintiffs' expert, Dr. Bilezikian, opined that, had Justin received proper care for his Addison's disease, he would not have died.

## II. Legal Standards

"Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Anderson v. Durham D &M, LLC*, 606 F.3d 513, 518 (8th Cir. 2010) (citing *Johnson v. Ready Mixed Concrete Co.*, 424 F.3d 806, 810 (8th Cir. 2005)); Fed. R. Civ. P. 56(a). The Court must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Robert Johnson Grain Co. v. Chemical Interchange Co.*, 541 F.2d 207, 210 (8th Cir. 1976); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). While the moving party bears the burden of establishing a lack of any genuine issues of material fact, *Brunsting v. Lutsen Mountains Corp.*, 601 F.3d 813, 820 (8th Cir. 2010), the party opposing summary judgment "must set forth specific facts showing that there is a genuine issue of material fact for trial." *Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007). "Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment." *Id*. "Summary judgment is proper if, after viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmovant, no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law." *Higgins v. Union Pac. R.R. Co.*, 931 F.3d 664, 669 (8th Cir. 2019) (quotation marks and citation omitted).

To prevail on a wrongful-death claim, "a plaintiff must show that the negligence of the defendant 'directly caused' or 'directly contributed to cause' the patient's death." *Sanders v.*

11

*Ahmed*, 364 S.W.3d 195, 208 (Mo. 2012). "Under Missouri law, a plaintiff in a medical malpractice suit must prove that, by act or omission, the defendant failed to use that degree of skill and learning ordinarily used under the same or similar circumstances by members of his profession and that this negligent act or omission in fact caused the plaintiff's injury." *Sosna v. Binnington*, 321 F.3d 742, 744 (8th Cir. 2003) (citing *Washington by Washington v. Barnes Hosp.*, 897 S.W.2d 611, 615 (Mo. 1995)). Thus, to survive this summary-judgment motion, Plaintiffs must establish that there are genuine issues of material fact as to whether Defendants' negligent failure to meet the medical standard of care caused or contributed to Stufflebean's death. Importantly, "[i]n a medical malpractice case, where proof of causation requires a certain degree of expertise, the plaintiff must present expert testimony to establish causation." *Sundermeyer v. SSM Reg'l Health Servs.*, 271 S.W.3d 552, 554 (Mo. Banc 2008). There must be evidence showing both "but-for" and "proximate" causation. *Sanders*, 364 S.W.3d at 208.

## III. Discussion

The defendants argue that Plaintiffs have not adduced expert testimony showing causation. Defendants' argument turns on the fact that Dr. Bilezikian testified that (1) Stufflebean's Addisonian crisis could have occurred even if he had been getting his daily medications; (2) Dr. Bilezikian could not say if Stufflebean was exhibiting symptoms that would have justified a stress dose of steroids during his incarceration at the Buchanan County Jail on October 26, 27, or 28, 2015; (3) (an issue raised by Slagle and Helsel alone) a doctor would bear the responsibility for making a decision as to whether to give stress doses of medication to Stufflebean to address his Addisonian crisis. As discussed further below, each of these arguments fails.

12

### a. Dr. Bilezikian's Testimony that Stufflebean's Addisonian Crisis Could Have Occurred Even If He Had Been Receiving His Daily Medications

Dr. Bilezikian acknowledged that Stufflebean could have slipped into Addisonian crisis even if he had been taking his daily medications. Bilezikian Dep. 63:11-64:10. Defendants appear to suggest that this statement is inconsistent with Dr. Bilezikian's opinions that the failure to give Stufflebean medications during his incarceration contributed to Stufflebean's condition. However, the fact that Dr. Bilezikian testified that a patient taking maintenance doses of medications can still slip into Addisonian crisis when under inordinate stress does not negate his opinion that the ACH employees' failure to provide Stufflebean with maintenance doses of his medications contributed to his death. *See* Bilezikian Report, p. 28 ("The point here is that without documentation that he had received his regular dosage, the lack of coverage for the stress he was encountering *compounded a dire situation* that was not recognized or dealt with properly.") (emphasis added); *see also id.*, pp. 47-48 (listing, among the "elements' that "constituted a perfect storm" that resulted in "cardiovascular collapse and death" the fact that "a man with Addison's disease does not get his life-sustaining adrenal medications")).

Moreover, Dr. Bilezikian did not testify that Stufflebean *would* have descended into Addisonian crisis regardless of whether he had been given maintenance doses of his medications, only that he *could* have. A reasonable factfinder might conclude on this record that Stufflebean would have died even if he had been given his maintenance doses, but a reasonable factfinder could also conclude based on Dr. Bilezikian's opinions that the ACH employees' failure to administer Stufflebean's medications contributed to his Addisonian crisis and death.

A reasonable factfinder could conclude that Slagle was responsible for the failure to administer medications to Stufflebean between October 26 and the morning of October 28. She had the intake form that Nauman completed for Stufflebean, may have fielded Nauman's call to

request that medical staff see Stufflebean, and admits that she picked up Stufflebean's medication—all on October 26. Yet, she did not call Dr. Van Voorn to request an order for Stufflebean's medications until October 27. She knew that meant that Stufflebean would not receive his daily medications until October 28, 2015, at the earliest.

A reasonable factfinder could conclude that Dr. Van Voorn was responsible for the failure to administer medications to Stufflebean on October 27. Dr. Van Voorn acknowledged that it is critical for a brittle patient with Addison's and hypoparathyroidism to receive medications daily, yet, when she ordered on October 27, 2015 that some of Stufflebean's prescribed medications be administered, she understood that Stufflebean would not receive the medications until October 28 or 29, 2015.

A reasonable factfinder could conclude that Helsel was responsible for the failure to administer Stufflebean's medications from the morning of October 28 to the morning of October 29, 2015. Administering Stufflebean's medications on October 28, 2015 in accordance with Dr. Van Voorn's order was the responsibility of Helsel alone, and she knew that Stufflebean was supposed to receive his medications daily, yet the evidence indicates that she simply did not give him his medications.

### b. Dr. Bilezikian's Inability to Opine as to Whether Stufflebean Was Exhibiting Symptoms of Addisonian Crisis at the Jail Through October 28

Defendants next argue that Plaintiffs cannot establish causation because Dr. Bilezikian could not say whether Stufflebean was exhibiting symptoms justifying a stress dose of steroids on October 26, 27, or 28, 2015. Bilezikian Dep. 103:10-105:2. Dr. Bilezikian explained, "Without a doctor having seen him, there's no way I can answer that question." *Id.*, 104:6-13.

As a preliminary matter, as Dr. Bilezikian's response implies, the paucity of information concerning Stufflebean's condition during incarceration is the product of the jail medical staff's

failure to examine and monitor Stufflebean during his incarceration. Dr. Bilezikian opined that a doctor should have seen Stufflebean. Bilezikian Report, Doc. 473-6, p. 42. The fact that Dr. Bilezikian could not say when Stufflebean began exhibiting symptoms of an Addisonian crisis because Dr. Van Voorn did not examine Stufflebean as he opined she should have does not warrant summary judgment in Dr. Van Voorn's favor.

Dr. Van Voorn's failure to see Stufflebean also was caused and compounded by the failures of the other ACH employees. Although Deputy Nauman requested that a nurse see Stufflebean, and Dr. Van Voorn ordered that Stufflebean be administered some of his medications and that Stufflebean's vital signs be taken daily throughout the time of his incarceration, a reasonable factfinder could conclude that neither Slagle nor Helsel ever saw Stufflebean. There is evidence—a jail log—suggesting that Stufflebean never left his cell to go to the infirmary, where Slagle claims she saw him, and there are no notes by Slagle concerning Stufflebean's condition; there is no dispute that Stufflebean received no medication between his incarceration in the afternoon of October 26 and the morning of October 28; jail medical records suggest that no one administered Stufflebean's medications on October 28 either; and no one took Stufflebean's vital signs after Dr. Van Voorn ordered that they be taken. The lack of medical records reflecting Stufflebean's conditions and symptoms (or lack thereof) itself is evidence of negligence and certainly does not warrant summary judgment in favor of Slagle or Helsel.

If Stufflebean had been exhibiting symptoms of Addisonian crisis, Defendants may be held to have contributed to his death by negligently failing to examine and monitor him. What evidence there is of Stufflebean's condition—his reports to Deputy Nauman at intake of abdominal pain and loss of appetite, his fellow inmate's testimony that Stufflebean vomited at least once at the jail, Stufflebean's not eating, his complaints to the nurse at the prison during intake of vomiting and

15

weakness, his statement that he had been suffering a "flare up" since he was sentenced, and the prison nurse's notes that Stufflebean had an elevated heart rate and appeared "lethargic," with an "unsteady gait" from "weakness"—could lead a reasonable factfinder to conclude that, had the medical staff at the jail in fact examined and monitored Stufflebean, as Dr. Bilezikian states they should have, there would have been evidence that Stufflebean was exhibiting symptoms of Addisonian crisis throughout his incarceration at the jail.

Had Slagle or Dr. Van Voorn examined Stufflebean, or had either Slagle or Helsel taken his vital signs, it is reasonable to infer that he would have told her that he was experiencing weakness, nausea and vomiting, that he urgently needed his medications, and that he had been hospitalized frequently in the prior year, including once in just the past week, because of his medical conditions. *See* October 29, 2015 intake form from prison (showing that Stufflebean mentioned "vomiting, weakness, tachycardia" as "medical problems [they] need to know about" and noting that he had been hospitalized 16 times in the last year for Addison's complications). It would have been obvious to even a lay person under the circumstances that it was necessary to contact a doctor. A reasonable fact finder could conclude that Dr. Van Voorn would have ensured that Stufflebean would receive stress doses of appropriate medications had she been told about his condition and medical history.

Even if Stufflebean was not displaying symptoms of Addisonian crisis between October 26 and 28, that does not change or undercut Dr. Bilezikian's opinion that the failure to administer Justin's "life-sustaining adrenal medications" contributed to "a perfect storm for disaster," resulting in his cardiovascular collapse and death. Regardless of when Stufflebean first began outwardly exhibiting symptoms of Addisonian crisis, Dr. Bilezikian's opinion is that that the ACH employees' conduct contributed to the crisis. Dr. Bilezikian's inability to specify when

Stufflebean first began exhibiting symptoms of Addisonian crisis thus does not mean that Plaintiffs cannot establish causation.

### c. Dr. Bilezikian's Opinion that a Doctor Was Responsible for Giving Stress Doses of Medication to Stufflebean

Slagle's and Helsel's argument that Dr. Bilezikian's opinion that a doctor would bear the responsibility for deciding whether to give stress doses of medication to Stufflebean to address his Addisonian crisis prevents a finding against Slagle or Helsel on Count II fares no better than their first two arguments. Again, there is evidence sufficient for a reasonable factfinder to conclude that Slagle's and Helsel's own negligent conduct prevented Dr. Van Voorn from having information indicating that Stufflebean was in need of stress doses of medication. There is evidence indicating that Slagle did not see Stufflebean at all, and there is no evidence of Helsel having any contact with Stufflebean. Had either nurse had the contact with Stufflebean that they were supposed to have had—had Slagle seen Stufflebean on October 26 or 27, or had either nurse monitored Stufflebean's vitals as Dr. Van Voorn ordered—Stufflebean likely would have communicated to the nurse his condition, including loss of appetite, abdominal pain, nausea and vomiting, and his history of recent hospitalizations, just as he did on October 29 at the prison, and the nurses then would have been responsible for reporting his complaints and history to a physician.

Moreover, Slagle knew from Stufflebean's formal request for his medications on October 26 that Stufflebean had Addison's Disease and hypoparathyroidism and (from the medical questionnaire Nauman completed) that Stufflebean had reported abdominal pain, fatigue, unexplained weight loss, loss of appetite, and night sweats, and from the bag of medications she picked up, that Stufflebean was taking at least nine different prescription medications, Slagle did not put Stufflebean on the list of patients that Dr. Van Voorn would see—a responsibility that Dr.

17

Van Voorn testified belonged to the nurses. Had Slagle put Stufflebean on Dr. Van Voorn's list, Dr. Van Voorn would have seen him while she was on site on October 28, 2015.

At her deposition, Dr. Van Voorn admitted that if a patient with hypoparathyroidism or Addison's disease reported "fatigue or . . . abdominal pain or tingling, those could all be symptoms of a crisis coming on for that condition," and indeed "[c]ertainly" were "red flags." She acknowledged that in such a situation, she would "know that [she] need[s] to take a closer look to make a determination as to their state of health," because otherwise "it could become a crisis" and "could lead to serious injury or death." She stated that she understood that "somebody having Addison's disease and hypoparathyroidism could be at risk if they didn't get their medication; so [she] would take extra actions to make sure [she] had the list correct and [she was] following the right course."

Thus, viewing the facts in the light most favorable to Plaintiffs, Slagle's and Helsel's own negligent conduct prevented the doctor from prescribing stress doses of medication for Stufflebean's condition, contributing to his death.

\* \* \*

Dr. Bilezikian's report constitutes evidence that the failure of Slagle, Helsel, and Dr. Van Voorn to monitor and administer medications to Stufflebean was negligent and that those negligent omissions were but-for and proximate causes of Stufflebean's death. Plaintiffs thus have adduced sufficient evidence of causation to withstand summary judgment.

## IV. Conclusion

For the reasons set forth above, the motions by Slagle and Helsel (Doc. 365) and by Dr. Van Voorn (Doc. 367) for summary judgment on Count II are denied.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated: February 4, 2019
Jefferson City, Missouri