## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
## ST. JOSEPH DIVISION

| | | |
|---|---|---|
| BRENDA DAVIS, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 5:17-cv-06058-NKL |
| | ) | |
| BUCHANAN COUNTY MISSOURI, *et al.*, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## ORDER

Before the Court are (1) the motion by defendants Amy Mowry, LPN, Alice Bergman, NP, Karen Williams, LPN, and their employer, Corizon, LLC for summary judgment on Count III (Plaintiffs' wrongful-death claim), Docs. 392, 394; (2) the motion by Corizon for summary judgment on the merits of Count IV (Plaintiffs' Section 1983 claim), Doc. 394; and (3) the motions by Mowry, Bergman, Williams, Frederick Covillo, D.O., Michelle Munger, R.N., and Corizon to strike the punitive damages claims asserted against them in Count IV of the complaint, Docs. 392, 382, 399, 394. For the reasons discussed below, the Court denies summary judgment on the wrongful death claims against Mowry, Bergman, Williams, and Corizon as well as the Section 1983 claim against Corizon and grants in part and denies in part the motions to strike the requests for punitive damages.

## I.     Background[1]

On October 26, 2015, Justin Stufflebean, son of plaintiffs Brenda Davis and Frederick Stufflebean, was sentenced for a sex crime. Stufflebean was held at the Buchanan County Jail

---

[1] The Court views the facts based on admissible evidence in the light most favorable to the Plaintiffs. *Johnson v. McCarver*, 942 F.3d 405, 2019 U.S. App. LEXIS 32772, at *1 (8th Cir. 2019).

immediately following his sentencing until he was transferred on October 29, 2017 to the Western Reception Diagnostic and Correctional Center ("WRDCC"), a receiving center in St. Joseph, Missouri, for the Missouri Department of Corrections ("MODOC").

### a. Intake

Amy Mowry, LPN, was working in receiving at the WRDCC on the date of Stufflebean's transfer from the jail. She was the intake LPN responsible for performing the intake assessment for Stufflebean. She received Stufflebean at the WRDCC and completed his Initial Receiving Screening. She was responsible for gathering subjective current medical information. Stufflebean told Mowry that he had Addison's disease and hypoparathyroidism; Doc. 492-22 (Deposition of Amy Mowry), 51:16-18; that he was experiencing vomiting, weakness, and tachycardia (fast heart rate), *id.*, 51:8-15; that he had been hospitalized 16 times in the last year for Addison's complications; and that he was on various medications: fludrocortisone, NATPARA, vitamin D, paroxetine, and prednisone. Doc. 492-1(Complete Medical Record History), p. 1. Prednisone and fludrocortisone are used to treat Addison's disease. Defendant Mowry's "objective" assessment included Stufflebean's being lethargic and having an unsteady gait from weakness. *Id.*, p. 3. Nonetheless, and despite the fact that the records sent from the jail did not indicate when Stufflebean last took his medications, Mowry did not inquire of Stufflebean when he last received his medications. *See, generally, id*. At intake, Stufflebean's blood pressure was 121/89 and his pulse rate was 124. *Id.*, p. 3.

Mowry called Alice Bergman, APRN, the on-call provider, with regard to Stufflebean, and at 2:30 p.m. on October 29, 2015, Mowry obtained a "verbal" order from Bergman for a

promethazine 50 mg injection. Nurses' AF,[2] ¶ 30; Doc. 492-1, p. 5. Promethazine is used for nausea and vomiting. Bergman claims that Mowry did not tell her that Stufflebean was weak and tachycardic, or that Stufflebean had been hospitalized 16 times in the prior year. *Id.*, ¶¶ 33, 35. Bergman could not recall whether Mowry told her that Stufflebean had Addison's disease and hypoparathyroidism. *Id.*, ¶ 34. Bergman ordered that Stufflebean be admitted to the Transitional Care Unit ("TCU") for observation and for evaluation by Dr. Covillo. Doc. 492-1, pp. 5-6.

### b. Initial TCU Visit

Mowry took Stufflebean to the infirmary, known as the Transitional Care Unit ("TCU"). There, still on October 29, 2015, at approximately 4:00 p.m., Stufflebean advised Nurse Sybert that he had Addison's disease. *Id.*, p. 8. Stufflebean informed Sybert that he began vomiting that morning while at the jail. Stufflebean told Sybert, "I have Addison's and when I am stressed out I start throwing up and hurting" (*id.*)—an indication of an "impending Addisonian crisis" (Doc. 492-19 (Report of John P. Bilezikian, MD, PhD), p. 27). Sybert charted that the reason for TCU admission was "Observation for Addison's and Hypoparathyroidism." Doc. 492-1, p. 8. Sybert noted, *"*Offender states that due to stress his Addison's disease is 'acting up' and causing 'abd. pain and vomiting.'" Doc. 492-1, p. 8.

Nurse Sybert took Stufflebean's vitals at 3:19 p.m. on October 29, 2015, charting a blood pressure of 121/89 and a heartrate of 116 beats per minute. *Id.* The Corizon protocol for

[2] "Nurses' AF" refers to Plaintiffs' Additional Facts in Doc. 487 (Plaintiffs Brenda Davis's Suggestions in Opposition to Defendants Amy Mowry, Alice Bergman, and Karen Williams' Motion for Summary Judgment) and the Corizon Nurses' responses in Doc. 577 (Defendants Amy Mowry, Alice Bergman, and Karen Williams' Reply to Plaintiff Brenda Davis's Response to Their Statement of Facts in Support of Motion for Summary Judgment and Response to Plaintiff Brenda Davis's Additional Facts in Opposition to their Motion for Summary Judgment). The Court cites statements of fact only insofar as they were substantively uncontested.

Nausea/Vomiting states in bold, "**Refer to Practitioner Immediately**" in the event of, *inter alia,* "Signs of dehydration-dry mucus membranes, poor skin turgor, skin cool to touch, recent 5% weight loss, BP less than 100 systolic, pulse >90." Doc. 487-4, p. 2. Nonetheless, Stufflebean was "escorted out of TCU" and "sent back to wing . . . ." Doc. 492-1, p. 9.

Bergman, the nurse who prescribed the promethazine, ordered a KUB abdominal film for Stufflebean, noting "upper abdominal pain x 1 day, nausea and vomiting, Addison's disease, hypoparathyroidism." *Id.* The results showed "abundant stool." *Id.* Stufflebean was given a laxative, but none of the medications that his treating physician had prescribed before his incarceration, including those needed for his Addison's disease. *Id.* Bergman did not review Stufflebean's medications before prescribing new medications for him. Nurses' AF, ¶ 49. Bergman ordered Stufflebean's release to the wing, and she never saw him in person. *Id.*, ¶¶ 46, 48.

### c. In the Wing

Trent Millsap, an inmate whose bunk was located in the common area into which Stufflebean's cell opened, could see Stufflebean's cell from his bunk in the days leading up to Stufflebean's cardiac arrest. Millsap testified that Stufflebean was brought into his cell "on a wheelchair" and described his appearance as follows:

> [T]here was, like, a lot of things wrong with him. We could tell he was really shrunk. Like you could see cheekbones real prominent. It looked like he had been, like, either really, like, strung out at one point or he had some sort of, like, condition like he had, like, cancer or AIDS or we didn't know. At first we kind of made fun of him because of his name and then we started to realize something was really wrong with this guy, you know, because he kind of looked weird, you know. . . . [W]e really didn't know how bad it was until we went up to him. He wasn't going out to eat, and we were trying to see if he was okay, and he wasn't.

Doc. 492-17 (Deposition of Trent Millsap), 16:3-25. Stufflebean, according to Millsap, "was really sick"—his hair "looked like it was falling out . . . ." 17:16-24. Stufflebean was "just

slouching over . . . in the wheelchair when they brought him in," and "was really skinny." *Id.*, 18:1-4. Millsap never saw Stufflebean standing or even sitting erect. *Id.*, 36:23-24. Millsap thought perhaps Stufflebean was "deaf or maybe mute or something because he wasn't responding to anything anybody was saying, but he looked like he was trying to, but nothing was making -- he couldn't vocalize anything." *Id.*, 35:20-24; *see also id.*, 35:13-19 (stating that Stufflebean "would open his mouth like he was trying to vocalize – verbalize  something, but he wouldn't -- no words would come out").

During meal times, Millsap and other inmates noticed that Stufflebean would not emerge from his open cell. Millsap said, "And then we looked in the window and he's just laying [*sic*] on his bed. We were like, hey, man. You going to come eat? We kept on knocking on the window. He wouldn't roll over. He looked like he was already gone." *Id.*, 20:21-25; *see also id.*, 19:24-20:6 ("We were -- we were making fun at first and then we're like, okay, why is he not coming out to do anything, eat, shower, nothing. And we would look in there and we were like, oh, my God. Is he -- is he alive? We were joking. Oh, somebody go check his pulse. But then after a while, we're like, no, really. Somebody needs to go in there and probably check on him."). Millsap claimed that he told corrections officers more than once that Stufflebean "was not looking good," and he heard others ask for help for Stufflebean as well. *Id.*, 36:11-22.

Millsap observed nurses checking on Stufflebean occasionally, but "[t]hey weren't in there for more than two minutes. It seems like they took his blood pressure and then just left, and that was it." *Id.*, 23:10-24:4. Millsap also remembered Stufflebean being taken in a wheelchair "to medical, . . . but . . . it didn't take them ten minutes to bring him right back down." *Id.*, 32:25-33:3.

Millsap was "dumbstruck" by how Stufflebean was treated. *Id.*, 21:19-22:4. Millsap

suspected from the way prison guards were treating Stufflebean that he might have been a sex offender. *See id.*, 44:25-45:6 ("When a person comes in, the first thing they do is they want to check their face sheets. . . . And what that will do is it will say whether or not you're a registered sex offender."); *id.*, 46:16-48:9 ("[T]hen there was the ones that didn't do anything and they, like, stayed to themselves all the time, and certain COs would, you know, say degrading things at certain times. And we're like, why did he deserve that? And then we'd start thinking somebody probably should go check that guy's paperwork. Because if he was just minding his own business and the cops do that, you know, then, okay, maybe there's a reason behind it. And that's what would tip us off, and most of the time it was because the person had that -- that charge. And that was one of the things we thought maybe Justin had. We were like, okay, so this guy is getting treated really poorly. He hasn't done anything that we saw to deserve that . . . . We never checked his paperwork. We didn't really care because he was so bad that we didn't -- what were we going to do, you know. There was -- we just knew that, okay, something is off here. Either he's really faking it, he's got one of those charges, or they just really don't care.").

### d. Doctor's Examination

Dr. Covillo alleges that he performed a physical exam of Stufflebean on October 30, 2015 at 9:00 a.m. Doc. 492-16 (Deposition of Frederick V. Covillo, D.O.), 76:5-77:6.

At his deposition, Dr. Covillo claimed that Stufflebean "seemed very stable." *Id.*, 72:16-25. He insisted that Stufflebean's reports of nausea, vomiting, dizziness, and tachycardia (from just the previous day) were from "the past" and did not represent his condition at the time of the examination. *Id.*, 73:1-11. When asked where Stufflebean's condition at the time of the examination was noted, Dr. Covillo stated simply, "I examined him," and then claimed he "would have written it in there if [Stufflebean] had a problem." *Id.*, 73:12-16. Dr. Covillo noted that

Stufflebean's blood pressure was 121 over 89, commenting, "That's pretty stable." *Id.*, 73:20-74:6. Covillo then admitted that the blood pressure listed in the record in connection with his examination of Stufflebean in fact was taken by Nurse Mowry, probably the day before Covillo purportedly examined Stufflebean, and that Covillo did not actually know what Stufflebean's blood pressure was on the day of the examination. *Id.*, 74:15-75:7.

Dr. Covillo did not try to determine when Stufflebean was last given his medications, even though Dr. Covillo knew that Stufflebean's condition was serious enough that he needed his medication that day. *Id.*, 71:19-72:6; 147:4-17. Dr. Covillo purportedly called his supervisor to request approval of medications from outside the formulary. *Id.*, 27:10-28:5. Dr. Covillo recalled Stufflebean arriving with a bag of medications (although Covillo acknowledged that the documentary evidence does not indicate that Stufflebean arrived with medications), and with the approval of his supervisor, Dr. Covillo ordered that Stufflebean receive some of those medications that day itself. *Id.*, 79:14-82:13. However, Dr. Covillo could not recall to whom he gave the verbal order regarding medications, and there is no record indicating that the medications were dispensed and no documentation of Dr. Covillo's asking for permission to dispense non-formulary medications or ordering that Stufflebean be given the medications that accompanied him. *Id.* Dr. Covillo maintains that he ordered calcium citrate, fludrocortisone and Vitamin D for Stufflebean on October 30, 2015, but the time-stamp in the record shows that the medications were not approved until October 31, 2015 at 5 a.m., after an emergency call had been placed with regard to Stufflebean. Doc. 492-1, p. 6. Dr. Covillo acknowledged that Stufflebean "did not get any medication . . . like he was supposed to," but he claimed that the nurses had "[a]pparently" not followed his order in that regard. Doc. 492-16, 148:7-14.

### e. First Code 16 – October 31, 2015 – 1:15 a.m. – No Documentation

On October 31, 2015, at 1:15 a.m., the medical record shows that somebody called a "Code 16," a medical emergency, with respect to Stufflebean. Doc. 492-1, p. 13 ("10/31/2015 01:15 A ACCIDENT/CODE 16."). However, no one, including the nurses on duty, Munger and Williams, documented why that Code 16 was called or what was done at that time. *Id.*

### f. Second Code 16 – October 31, 2015 – 4:30 a.m. – No Documentation Until Nearly 24 Hours Later

A second Code 16 was called at 4:30 a.m. that same day. *Id.* The medical record entry, created "late," on November 1, 2015, at 1:07 a.m., notes that Nurse Williams found Stufflebean lying on his abdomen on the floor of his cell. *Id.* Stufflebean indicated that he had fallen when he got up to get a drink because he felt weak. *Id.* The notes reflect that "Sgt. Brown mentioned that there was a towel with greenish liquid on it close to his bunk and offender was asked if he was nauseated." *Id.* Stufflebean was placed in a wheelchair and was taken to the TCU. *Id.* Williams noted that, when asked about his diet, Stufflebean stated, "I took a few bites of corn a couple days ago, because I don't like the food." *Id.* Stufflebean was then given a carton of milk, which he "tolerated well," and he "asked for another milk at this time and stated that he was a little nauseated." *Id.*

Defendant Williams charted Stufflebean's blood pressure of 96/62 and heart rate of 96 beats per minute. *Id.* The Corizon protocol for Nausea/Vomiting states in bold, "**Refer to Practitioner Immediately**" in the event of, *inter alia,* "Signs of dehydration-dry mucus membranes, poor skin turgor, skin cool to touch, recent 5% weight loss, BP less than 100 systolic, pulse >90." Doc. 487-4, p. 2.

### g.  Return to TCU – October 31, 2015 –Before 5:30 a.m.

Before 5:30 a.m. on October 31, 2015, Williams delivered Stufflebean into Munger's care in the TCU for further observation.  His blood pressure was 100/64 and his heart rate was 91 beats per minute.  Doc. 492-1, p. 14.  As soon as he was brought to the TCU, Stufflebean stated that he needed to lie down.  *Id.*  He advised Munger that he had "not eaten in 3 days."  *Id.*  Munger provided Stufflebean with Promethazine at 5:30 a.m., after he had been given milk.  *Id.*  Stufflebean advised Munger that he had Addison's disease and had "been having this flare up since he was sentenced to prison."  *Id*.  He also stated that "when this has happened before he would just go to the hospital and he would receive IV fluids."  *Id.*  In her note, which was written after Stufflebean was taken to the hospital, Munger wrote, "He fully understands how and what is causing his condition to flare up and gets worse by not eating. . . .  Encouraged offender that he needed to drink and eat, put an MSR [(medical service request)] into mental health to help with his stress, and if he felt he needed to see Dr. Covillo again to put in an MSR for the doctor."  *Id.*  Munger released Stufflebean to his cell without ever contacting a doctor.  *See id.*

### h.  Stufflebean Returned to His Cell – October 31, 2015 – Approximately 7 a.m.

Munger's "Late Entry"[3] in Stufflebean's chart says the following about Stufflebean's return to his cell on the morning of October 31, 2015:

> When offender was released from TCU at 7AM with CO1 Huddleston, offender got as far as the telephone and the offender became wobbly and layed [*sic*] on to the floor.  This was during shift change and witnessed by several of the day shift nurses as well as the night shift nurses and CO1 Huddleston and CO1 Williams. My self and CO1 Huddleston helped offender walk back to his room and he

---

[3] This note was not created at the time of the incident described.  Rather, it was created on November 1, 2015 at 1:36 a.m., after Stufflebean had been transported by ambulance from the prison to the hospital.  *Id.*

walked fine with assistance. SGT Brown was called and notified. SGT Brown, CO1 Huddleston, and CO1 Green came to TCU to escort offender back to cell.

*Id.*, pp. 14-15.

However, CO Huddleston described Stufflebean during this incident as "weak and incoherent." Munger AF,[4] ¶ 91. He looked "dazed like he was sick." *Id.* Huddleston recalled Stufflebean "stumbling" and then falling down after ten to twenty steps. *Id.* He described Stufflebean's falling as "kind of slow. He fell down on his knees, and then he just kind of fell over. I mean it wasn't -- it didn't seem like it was that hard. He fell really slow to the ground." Stufflebean fell on his face. *Id.* Huddleston said Stufflebean did not say anything, instead, "[h]e just made grunting noises . . . ." *Id.* Huddleston believes he then got a wheelchair and they placed Stufflebean in it. *Id.* Stufflebean was slumped over. *Id.* Huddleston wheeled Stufflebean to his cell and helped him to his bunk. *Id.*[5]

After reading Munger's description of Stufflebean's becoming "wobbly" and lying down on the floor, Dr. Covillo said, "Now that's a true Addison crisis," and he agreed that proper procedure would "definitely" have been for the nurse to immediately call the on-call physician. Doc. 492-16, 125:7-128:8. Dr. Covillo also thought Stufflebean should have remained in the TCU for monitoring. He said, "I don't know why they're in such a rush to kick him out of TCU. It doesn't make any sense." *Id.*, 127:4-10. He thought sending Stufflebean to his cell after his collapse on his way out of the TCU was "crazy." *Id.*, 127:11-15.

---

[4] "Munger AF" refers to Munger's response in Doc. 579 (Reply Suggestions in Support of Michelle Munger, R.N.'s Motion for Partial Summary Judgment) to Plaintiffs' Additional Facts.

[5] Although Munger noted that Stufflebean fell once, TCU guard CO Jacqueline Williams contemporaneously noted that Stufflebean fell twice on his way back to his cell. *Id.*, ¶ 94 (noting at 7:00 a.m. that Stufflebean "g[o]t as far as the telephone and the offender sat down on the floor," and noting at 7:11 a.m. that "Stufflebean got as far as the telephone again and layed [*sic*] on the floor").

Munger did not report Stufflebean's condition to the oncoming nurse, Nurse Euler, or call for a doctor. 493-13 (Deposition of Michelle L. Munger), 36:9-21.

### i. Third Code 16 – October 31, 2015 – 10:45 a.m.

At 10:45 a.m. on October 31, 2015, less than three hours after Munger sent Stufflebean back to his cell, a third Code 16 was called. Doc. 492-1, p. 16. Stufflebean's fellow inmate Millsap testified that when officers came to Stufflebean's cell, they found Stufflebean on the ground, unmoving. Doc. 492-17, 25:1-3. Stufflebean was wrapped in his sheets, as though he had fallen out of bed. *Id.*, 25:16-23. Millsap, who later moved into the cell Stufflebean was in, testified that, after Stufflebean was removed, roughly 16 ounces of green vomit was on the floor and sheets. *Id.*, 91:11-92:16.

Nurse Baker Smith[6] was the medical nurse working in the area next to the TCU at the time of the third Code 16. Baker Smith went to Stufflebean's cell. She noted later that Stufflebean's skin was "warm and dry" and "a little greenish in color" at that time. Doc. 492-1, p. 16. Although she did not make note of it in the medical record, at her deposition, Smith testified that Stufflebean vomited green liquid when they started CPR. Doc. 493-31 (Deposition of Janet Baker Smith), 17:8-19. Despite Stufflebean's condition, during the eight or ten minutes it took for a wheelchair to arrive, Baker Smith did not attempt to take Stufflebean's vitals. *Id.*, 35:4-5.

Millsap testified that when Baker Smith and a correctional officer took Stufflebean out, they dragged him out instead of bringing a wheelchair to him, despite the fact that the cell was meant for handicapped inmates and therefore wide enough to accommodate a wheelchair. Doc. 492-17, 25:24-26:13; *see also id.*, 29:9-14 (identifying the nurse at issue as Baker Smith).

---

[6] Baker Smith is not named as a defendant in this lawsuit.

Outside of the cell, the corrections officer put Stufflebean into the wheelchair roughly, and Baker Smith walked with him to the TCU at a "[l]eisurely" pace. *Id.*, 30:4-32:23. According to Baker Smith, "on the way to TCU, offender had his head back, went limp." Doc. 492-1, p. 16.

Baker Smith could not recall receiving any report from Nurse Williams, and she testified that, had she been told to monitor Stufflebean, she would have included that direction in her chart documentation. Doc. 493-31, Doc. 15:6-18:16. Baker Smith could not recall—and she did not document—anyone telling her that Stufflebean was having an Addison's flare-up, or that he had two serious medical issues. *Id.*, 20:1-9.

### j. Fourth Code 16 – October 31, 2015 – 11:30 p.m.

At the TCU, Stufflebean's pulse was 67 and Baker Smith was unable to get his blood pressure. Doc. 492-1, p. 16. Stufflebean became "unresponsive." *Id.* A fourth Code 16 was called in relation to Stufflebean. *Id.* Baker Smith wrote that "CRP [*sic*] was performed till the ambulance crew arrived." *Id.* Corizon noted an assessment of widespread anoxic injury with a poor outcome predicted. *Id.*, p. 15.

### k. Stufflebean's Death – November 16, 2015 – 12:43 p.m.

On November 16, 2015, at 12:43 p.m., Stufflebean died. Doc. 493-34 (Report of the Medical Examiner), p. 3. Dr. Marius C. Tarau, M.D., Deputy Medical Examiner from the Jackson County Medical Examiner's office, declared Stufflebean's cause of death as "Complications of polyglandular endocrinopathy." *Id.*, pp. 1-2.

Plaintiffs' expert, Dr. John Bilezikian, opined that, had Stufflebean received proper care for his Addison's disease, he would not have died. Doc. 492-19, p. 7. Dr. Bilezikian opined that Stufflebean was symptomatic from the outset of his incarceration, and he stated that "[e]nsuring continuity of care by getting a proper history and verification of medications is one of the most

basic actions in the field of medicine. The failure, on the part of all the defendants, was a serious breach of such standards [of care] and caused, or at the very least, contributed in a major way to[,] Mr. Stufflebean's death." *Id.*, p. 22. In light of Stufflebean's Addison's disease and his complaints and symptoms, the "standard of care," according to Dr. Bilezikian, would have been to administer "stress intravenous doses of cortisol or equivalent steroid medication . . . ." *Id.*, p. 28. Lack of steroids in such a situation results in death. *Id.* Dr. Bilezikian testified that:

> a. a man with Addison's disease does not get his life-sustaining adrenal medications and even had he received them orally, they more likely than not would not have absorbed due to upper gastrointestinal symptoms;

> b. a man with Addison's disease does not eat for three days and thus is dehydrated;

> c. a man with Addison's disease has ominous blood test results that if ordered STAT would have provided Dr. Covillo with objective data for developing an appropriate plan of care;

> d. a man with Addison's disease who tells the staff that when such a thing happens, he typically goes to the hospital for intravenous fluids. It is more likely than not that had staff not disregarded Mr. Stufflebean's experiences he would have responded to emergency treatment;

> e. a man with Addison's disease presenting with a very low blood pressure is not recognized as symptomatic.

> f. a man with Addison's disease who was likely hypoglycemic and had a blood sugar of 70 mg/dL only after consuming two servings of milk.

> g. a man with Addison's disease in crisis is not given stress parenteral doses of life-saving glucocorticoids.

*Id.*, pp. 47-48. Dr. Bilezikian opined that the cause of Stufflebean's death was the "[a]bject failure of the system and the caregivers . . . ." *Id.*

### l. Corizon

At all relevant times, Corizon was the healthcare provider for MODOC.

One of Plaintiffs' experts, Dr. Lori Roscoe, opined, on the basis of irregularities in and lack of documentation of training, evaluation, and peer review, that "Corizon failed to monitor the care

provided by its staff at the WRDCC" and that "the training program conducted by Corizon for staff at the WRDCC fell below the administrative standard of care, due, in part, to the programmatic lack of supervision and monitoring." Doc. 493-20 (Lori E. Roscoe letter), p. 5; *see also* Doc. 493-21 (Expert Witness Report of Lori E. Roscoe), p. 20. Dr. Roscoe states that Munger's file is devoid of the training certifications that Corizon policies purport to require, suggesting that Corizon willfully disregarded its obligation to ensure that her training was complete and up to date.

Dr. Roscoe further opines, on the basis of "a multitude of lawsuits," that Corizon knowingly disregarded the fact that its "provider staff were not evaluating patients before ordering tests and medication; nursing staff were not calling providers appropriately to discuss patient conditions and treatment plans; nursing staff were not properly evaluating patients presenting with medical complaints; and patients were not being sent to the hospital appropriately."

CO Jacqueline Williams observed Corizon nurses frequently having to work two shifts, 20 hours together, with no help. Doc. 493-23 (Deposition of Jacqueline Williams), 18:25-20:22. Dr. Covillo, too, was "really busy," seeing approximately 50 to 70 patients a day around October 2015. Doc. 492-16, 15:2-21. He described himself as being "almost overbook[ed] . . . ." *Id.*

## II.    Standard

"Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Anderson v. Durham D & M, LLC*, 606 F.3d 513, 518 (8th Cir. 2010) (citing *Johnson v. Ready Mixed Concrete Co.*, 424 F.3d 806, 810 (8th Cir. 2005)); Fed. R. Civ. P. 56(a). The Court must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Robert Johnson Grain*

*Co. v. Chemical Interchange Co.*, 541 F.2d 207, 210 (8th Cir. 1976); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). While the moving party bears the burden of establishing a lack of any genuine issues of material fact, *Brunsting v. Lutsen Mountains Corp.*, 601 F.3d 813, 820 (8th Cir. 2010), the party opposing summary judgment "must set forth specific facts showing that there is a genuine issue of material fact for trial," *Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007). "Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment." *Id.*

"Summary judgment is proper if, after viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmovant, no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law." *Higgins v. Union Pac. R.R. Co.*, 931 F.3d 664, 669 (8th Cir. 2019) (quotation marks and citation omitted).

## III. Discussion

### a. Wrongful Death Claim

Nurses Mowry, Bergman, and Williams and Corizon each move for summary judgment as to Plaintiffs' wrongful death claims on the basis of qualified immunity alone. Doc. 393, pp. 8 ("Defendants Mowry, Bergman, and Williams are entitled to summary judgment on Counts III and IV of Plaintiffs' Amended Complaint because they are entitled to qualified immunity."), 14 ("[T]here is no genuine issue of material fact concerning Corizon Nurses' qualified immunity, and this Court should grant summary judgment in favor of defendants Corizon Nurses on Count III of Plaintiffs' Amended Complaint (wrongful death)."); Doc. 394, pp. 8 ("Defendant Corizon is entitled to summary judgment on Count III of Plaintiffs' Amended Complaint (Wrongful Death) because Corizon is entitled to qualified immunity."), 14 (""[T]here is no genuine issue of material fact concerning Corizon's qualified immunity, and this Court should grant summary judgment in

favor of defendant Corizon on Count III of Plaintiffs' Amended Complaint (wrongful death)."). However, "the doctrine of qualified immunity does not shield defendants from state law claims." *Johnson v. Bay Area Rapid Transit Dist.*, 724 F.3d 1159, 1171 (9th Cir. 2013); *see also Correia v. Jones*, 943 F.3d 845, 847 (8th Cir. 2019) ("Qualified immunity shields officials from civil liability in § 1983 actions . . . ."); *D'Aguanno v. Gallagher*, 50 F.3d 877, 879 (11th Cir. 1995) ("Because qualified immunity is a defense only to federal claims, we hold that the district court erred in concluding that defendants were entitled to qualified immunity on the claims for violations of state law."). Therefore, the motions by Mowry, Bergman, Williams, and Corizon for summary judgment on the wrongful death claims based on the qualified-immunity defense are denied.

### b. Section 1983 Claim

Corizon raises two arguments in support of its motion for summary judgment on the Section 1983 claims against it. First, Corizon argues that the Eleventh Amendment bars Plaintiffs' Section 1983 claims. Second, it argues that Plaintiffs cannot establish Corizon's liability under *Monell*.

### i. Eleventh Amendment Immunity

Corizon asserts that the Eleventh Amendment bars Plaintiffs' Section 1983 claims. However, as the Court stated in a prior order in this case, a private entity like Corizon "do[es] not have an 'official capacity' as that term is used under [the] Eleventh Amendment." Doc. 635, p.10. Eleventh Amendment immunity is available only to states and state agencies and officials sued in their official capacity. *See Hafer v. Melo*, 502 U.S. 21, 30–31 (1991) ("[T]he Eleventh Amendment does not erect a barrier against suits to impose 'individual and personal liability' on state officials under § 1983."). Corizon therefore is not entitled to summary judgment on Count IV under the Eleventh Amendment.

### ii. *Monell* Liability

Corizon also argues that it is entitled to summary judgment on the Section 1983 claim because it "is essentially a government actor contractually performing the discretionary duties required to provide healthcare through its agents to inmates" and Plaintiffs have failed to adduce evidence showing that a Corizon policy, custom or action was a moving force in Stufflebean's deterioration and death. Doc. 395, p. 12.

A private corporation acting under color of state law may be held liable under Section 1983 only where "there exists a policy, custom or action by those who represent official policy which inflicts an injury actionable under § 1983." *Crumpley-Patterson v. Trinity Lutheran Hosp.*, 388 F.3d 588, 590-91 (8th Cir. 2004) (citing *Monell v. Department of Social Services,* 436 U.S. 658, 690 (1978)).[7] Thus, Plaintiffs cannot hold Corizon liable without showing "a continuing, widespread, persistent pattern of unconstitutional misconduct by [Corizon's] employees; deliberate indifference to or tacit authorization of such conduct by [Corizon's] policymaking officials after notice to the officials of that misconduct; and [that Stufflebean] was injured by acts pursuant to [Corizon's] custom, i.e., that the custom was the moving force behind the constitutional violation." *Id.* (quotation marks and citations omitted).

Here, there is evidence of a "related system[-]wide deficiency," *Dulany v. Carnahan*, 132 F.3d 1234, 1245 (8th Cir. 1997), sufficient to show that Corizon's customs and policies contributed to Stufflebean's injuries and death and that Corizon was deliberately indifferent to a known serious risk of harm arising from those customs and policies. Plaintiffs' expert Dr. Roscoe opines, on the basis of "a multitude of lawsuits," that Corizon knowingly disregarded the fact that its "nursing

---

[7] Courts have recently called into question whether private corporations are entitled to the protections of *Monell*. *See Shields v. Illinois Dep't of Corrections*, 746 F.3d 782 (7th Cir. 2014). However, *Crumply-Patterson* is binding precedent on the issue in the Eighth Circuit at this time.

staff were not calling providers appropriately to discuss patient conditions and treatment plans; nursing staff were not properly evaluating patients presenting with medical complaints; and patients were not being sent to the hospital appropriately." In other words, there is evidence that Corizon has been on notice as to the very conduct for which Dr. Covillo and Nurse Munger might be held liable under Section 1983[8]—and yet Corizon did nothing to remedy it. *See Dixon v. Cty. of Cook*, 819 F.3d 343, 348-49 (7th Cir. 2016) (stating that a *Monell* claim can prevail only if a policy-making official knows about and fails to correct "systemic and gross deficiencies in staffing, facilities, equipment, or procedures in a detention center's medical care system" and concluding that "a reasonable jury could find that pervasive systemic deficiencies in the detention center's healthcare system were the moving force behind [plaintiff]'s injury"); *cf. Dulany*, 132 F.3d at 1245 (holding that "[a] number of individual and isolated incidences of medical malpractice or negligence do not amount to deliberate indifference without some specific threat of harm from a related system wide deficiency" where the court was "unable to find a single plaintiff who has been injured or is threatened with an imminent threat of harm by a negligent medical policy, procedure, or treatment recklessly offered or omitted by the defendants"). Dr. Roscoe also opines that Munger's file is devoid of the training certifications that Corizon policies purport to require, suggesting that Corizon willfully disregarded its obligation to ensure that her training was complete and up to date.

Construing the evidence in the light most favorable to Plaintiffs, the Court concludes that a reasonable factfinder could find that Corizon's policies or customs demonstrated deliberate indifference to inmates' serious medical needs. Accordingly, summary judgment in Corizon's

---

[8] Insofar as Corizon wishes to challenge the basis for Roscoe's statements, it may do so on cross-examination, but there is evidence to support a finding that Corizon willfully turned a blind eye to systemic deficiencies in its provision of medical treatment to critically ill patients.

favor on the civil rights claim is not appropriate. *See Burke v. N.D. Dep't of Corr. & Rehab.*, 294 F.3d 1043, 1044 (8th Cir. 2002) (holding that plaintiff stated claim against state's medical-services contractor where "he alleged that its hepatitis C treatment protocol and its doctors' complicity with the actions of [state department of corrections]'s medical director were damaging his health in violation of his Eighth Amendment rights" because "proper test is whether there is policy, custom, or action by those who represent official policy that inflicts injury actionable under § 1983") (citation omitted); *Zikianda v. Cty. of Albany*, No. 12-CV-1194, 2015 WL 5510956, at *59 (N.D.N.Y. Sept. 15, 2015) (finding sufficient evidence to support claim against Corizon entity under *Monell* where expert blamed inmate's death "on the blatant deficiencies in the health care system created and operated by Corizon, Inc.").

### c. Punitive Damages

#### i. Nurses Mowry, Bergman, and Williams

Because Plaintiffs seek punitive damages only in connection with their civil rights claims (Doc. 414, ¶ 93 and p. 25), and the Court has granted Nurses Mowry, Bergman, and Williams summary judgment on the civil rights claims against them (Doc. 633), they are entitled to summary judgment as to Plaintiffs' request for punitive damages as well. *See Fletcher v. Tomlinson*, 895 F.3d 1010, 1023 (8th Cir. 2018) ("If a plaintiff's underlying claim fails, then a plaintiff's claim for punitive damages necessarily fails.") (quotation marks and citation omitted).

#### ii. Dr. Covillo

Construing the evidence in the light most favorable to Plaintiffs, two possible factual scenarios involving Dr. Covillo arise from the record before the Court. One possibility is that Dr. Covillo did not see Stufflebean at all. Dr. Covillo was seeing 50 to 70 patients per day and felt overbooked (Doc. 492-16, 15:2-21). The Physical Examination Report that Dr. Covillo claims

documented his examination of Stufflebean is dated October 29, 2015, one day *before* Dr. Covillo allegedly conducted the physical examination. *Id.* In contrast with Stufflebean's fellow inmate's testimony that Stufflebean appeared from the outset of his incarceration at the prison to be in dire condition, unable to sit up in his wheelchair, Dr. Covillo testified that Stufflebean "seemed very stable," Doc. 492-16, 72:16-25, and was erect, Doc. 383-6, p. 2. Dr. Covillo volunteered in his deposition that Stufflebean's blood pressure was 121 over 89, commenting, "That's pretty stable." *Id.*, 73:20-74:6. However, Covillo then admitted that the blood pressure shown on the date of his purported examination in fact was taken by Nurse Mowry the day before, and that Covillo did not actually know what Stufflebean's blood pressure was on the day of his examination. *Id.*, 74:15-75:7. When asked where Stufflebean's condition at the time of the examination was reflected in the medical record, Dr. Covillo stated simply, "I examined him," and then claimed that he "would have written it in there if [Stufflebean] had a problem." *Id.*, 73:12-16. However, a reasonable juror could find that, if Dr. Covillo had examined Stufflebean, Stufflebean at a minimum would have mentioned his immediate need for medication, as well as his abdominal pain, weakness, fatigue and nausea. Stufflebean had heard his treating physician's testimony at his sentencing; he knew that he had not gotten his medication for several days; he knew the risk of not taking his medicine; and he knew what an Addisonian flare-up felt like, having been hospitalized 16 times in the previous year. Stufflebean consistently reported, at a minimum, his physical symptoms, both at the Buchanan County Jail and upon admission to the prison. If Dr. Covillo actually examined Stufflebean, he was the first doctor to see Stufflebean after his incarceration. A reasonable juror could conclude that, when he finally was seen by a doctor, Stufflebean would not have remained mute about his urgent need for medication. The lack of any documentation of any such complaint by Dr. Covillo is evidence that Dr. Covillo, despite knowing that Stufflebean had

multiple potentially life-threatening medical conditions that required prompt medication, never examined Stufflebean.

The evidence in the record also raises the possibility that Dr. Covillo saw Stufflebean on October 30, 2015 at 9:00 a.m., when Stufflebean was already noticeably deteriorating. Millsap, one of Stufflebean's fellow inmates, testified that when Stufflebean was first brought into his cell (before Dr. Covillo's purported examination), he was "on a wheelchair," "just slouching over," and "there was, like, a lot of things wrong with him. We could tell he was really shrunk. Like you could see cheekbones real prominent. It looked like he had been, like, either really, like, strung out at one point or he had some sort of, like, condition like he had, like, cancer or AIDS or we didn't know." Doc. 492-17, 16:3-25, 18:1-4. Millsap thought perhaps Stufflebean was "deaf or maybe mute or something because he wasn't responding to anything anybody was saying, but he looked like he was trying to, but nothing was making -- he couldn't vocalize anything." *Id.*, 35:20-24.

Prior to Dr. Covillo's purported physical examination of Stufflebean, other medical staff had observed that Stufflebean was experiencing nausea and vomiting, tachycardia, and weakness, and that he appeared lethargic and weak. Doc. 492-1, pp. 1, 3. Despite these signs of Addisonian crisis that would have been obvious to a knowledgeable physician like Dr. Covillo, Dr. Covillo made no documented effort to timely secure Stufflebean any doses of his life-saving medications. Dr. Covillo admits that he knew Stufflebean had both Addison's disease and hypoparathyroidism, and that Stufflebean's condition was serious enough that he needed his medication on a daily basis. *Id.*, 147:4-17. Dr. Covillo testified that he called his supervisor to request approval of medications from outside the formulary and that he ordered that Stufflebean receive some of his medications that day itself. *Id.*, 27:10-28:5; 79:14-82:13. However, Dr. Covillo could identify no records

documenting his asking for permission to dispense non-formulary medications or ordering that Stufflebean be given the medications that purportedly accompanied him. *Id.* Dr. Covillo could not recall to whom he purportedly gave the verbal order regarding medications, and no one has said that they received such an order. *Id.* Dr. Covillo maintains that he ordered calcium citrate, fludrocortisone and Vitamin D for Stufflebean on October 30, 2015, but the only documentary evidence of these prescriptions is a time-stamp that shows the medications were approved at 5 a.m. on October 31, 2015, after an emergency call had been placed with regard to Stufflebean. Doc. 492-1, p. 6. There is no evidence that would explain the delay—if in fact Dr. Covillo tried to rush Stufflebean's medication. It is also undisputed that no medication for Stufflebean's Addison's disease or hypoparathyroidism was dispensed at the prison. Dr. Covillo acknowledged that Stufflebean "did not get any medication . . . like he was supposed to," but he attributed the failure to an unidentified nurse's "[a]pparently" not following his order in that regard. Doc. 492-16, 148:7-14.

In short, Dr. Covillo, who understood the signs and ramifications of Addisonian crisis, had medical records showing that Stufflebean had reported syncope (passing out or fainting), chest pain, nausea, vomiting, low blood pressure and dizziness—all symptoms of Addison's disease and potential crisis—and knew that Stufflebean urgently needed medication, who saw Stufflebean when he was in a wheelchair, unable to sit upright, and unable to speak properly, nonetheless did not ensure the prompt administration of life-saving drugs to Stufflebean.

In a case asserting deliberate indifference, punitive damages may be awarded "[w]hen the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Washington v. Denney*, 900 F.3d 549, 564 (8th Cir. 2018) (quotation marks and citation omitted). The actions at issue must be

"outrageous, intentional, or malicious" to justify imposition of a punitive damages award. *Id.* at 565. Dr. Covillo's knowledge of the severe consequences attending Stufflebean's descent into Addisonian crisis in the absence of prompt medication, the fact that he saw Stufflebean when he was visibly compromised, and the fact that there is no evidence, outside of Dr. Covillo's own testimony, that Dr. Covillo took any action to get Stufflebean the treatment he needed brings his case in line with those cases in which the Eighth Circuit has upheld an award of punitive damages. *See Fletcher*, 895 F.3d 1024 (holding, in excessive-force case, that "the extensive injuries suffered" by the plaintiff, when combined with "his testimony that he was beaten after he complied with the officers and after he was handcuffed" supported an award of punitive damages); *Schaub v. VonWald*, 638 F.3d 905, 924 (8th Cir. 2011) (upholding award of punitive damages where an official knew that his correctional institution could not accommodate a prisoner's serious medical needs, but lied in response to a judicial inquiry concerning the institution's ability to prevent further injury to the prisoner, and the official thereafter failed to take sufficient steps to provide the prisoner with the necessary care or to remove him from the institution). The Court therefore finds that there is sufficient evidence of reckless and outrageous conduct in the record to support a claim for punitive damages against Dr. Covillo.

### iii. Nurse Munger

Although the medical record shows that somebody called a "Code 16" for Stufflebean at 1:15 a.m. on October 31, 2015, neither Nurse Munger nor the other nurse then working at the prison documented why the Code 16 was called or what happened. Doc. 492-1, p. 13.

After the second documented Code 16, Nurse Williams, having given Stufflebean two cartons of milk, delivered Stufflebean into Munger's care in the TCU for further observation. *Id.* Stufflebean's blood pressure then was 100/64 and his heart rate was 91 beats per minute. *Id.*, p. 14.

"As soon as he was brought to TCU," Stufflebean stated that he needed to lie down.  *Id.*

He advised Munger that he had "not eaten in three days" and that he had Addison's disease and

had "been having this flare up since he was sentenced to prison."  *Id.*  He also explained that "when

this has happened before he would just go to the hospital and he would receive IV fluids."  *Id.*

Munger wrote, "He fully understands how and what is causing his condition to flare up and get

worse by not eating.  . . .  Encouraged offender that he needed to drink and eat, put an MSR

[(medical service request)] into mental health to help with his stress, and if he felt he needed to see

Dr. Covillo again to put in an MSR for the doctor."  *Id.*  Munger provided Stufflebean with

Promethazine at 5:30 a.m., after he had been given milk.  *Id.*  Munger then released Stufflebean to

his cell.  *Id.*

On November 1, 2015 at 1:36 a.m., after Stufflebean had been taken from the prison to the

hospital, Defendant Munger made a "Late Entry" in Stufflebean's chart as follows:

> When offender was released from TCU at 7AM with CO1 Huddleston, offender
> got as far as the telephone and the offender became wobbly and layed [*sic*] on to
> the floor.  This was during shift change and witnessed by several of the day shift
> nurses as well as the night shift nurses and CO1 Huddleston and CO1 Williams.
> My self and CO1 Huddleston helped offender walk back to his room and he
> walked fine with assistance.  SGT Brown was called and notified.  SGT Brown,
> CO1 Huddleston, and CO1 Green came to TCU to escort offender back to cell.

*Id*., pp. 14-15.

CO Huddleston described Stufflebean during this incident as "dazed like he was sick" and

"weak and incoherent."  Munger AF, ¶ 91.  Huddleston recalled Stufflebean "stumbling" and then

falling down after ten to twenty steps.  *Id.*  He described Stufflebean's falling as "kind of slow.

He fell down on his knees, and then he just kind of fell over. I mean it wasn't -- it didn't seem like

it was that hard. He fell really slow to the ground."  *Id.*  Stufflebean fell on his face.  *Id.*  Huddleston

said Stufflebean did not say anything, instead, "[h]e just made grunting noises . . . ."  *Id.*

Huddleston believes that he then got a wheelchair, and they placed Stufflebean in it.  *Id.*

Stufflebean was slumped over. *Id.* Huddleston wheeled Stufflebean to his cell and helped him to his bunk. *Id.*[9]

After reading Munger's description of Stufflebean's becoming "wobbly" and lying down on the floor, Dr. Covillo said, "Now that's a true Addison crisis," and he agreed that proper procedure would "definitely" have been for the nurse to immediately call the on-call physician. Doc. 492-16, 125:7-128:8. Dr. Covillo also thought that Stufflebean should have remained in the TCU for monitoring, and he thought the nurse's "rush to kick him out of TCU . . . d[id]n't make any sense." *Id.*, 127:4-10. He characterized sending Stufflebean to his cell after his collapse on his way out of the TCU as "crazy." *Id.*, 127:11-15.

There is no evidence that Munger reported Stufflebean's condition to the incoming nurse and she did not contact a physician for advice.

Three hours after Munger returned Stufflebean to his cell, a third Code 16 was called for Stufflebean. Doc. 492-1, p. 15. Soon after, an ambulance was called to rush Stufflebean to the hospital. *Id.*, p. 16.

In short, Munger knew that Stufflebean was experiencing an Addison's flare-up, that he was supposed to receive intravenous fluids when in such a state, that he had been nauseated, that his blood sugar was very low, that he was incoherent and weak, that he could not walk without assistance, and yet she did not contact the on-call physician for guidance or even keep Stufflebean in the TCU. Instead, Munger released Stufflebean back to his cell, even as he collapsed twice on his way back while being assisted by two individuals. Munger, a registered nurse, responded to a

---

[9] Although Munger noted the next day that Stufflebean fell once, TCU guard CO Jacqueline Williams contemporaneously noted that Stufflebean fell twice on his way back to his phone. *Id.*, ¶ 94 (noting at 7:00 a.m. that Stufflebean "g[o]t as far as the telephone and the offender sat down on the floor," and noting at 7:11 a.m. that "Stufflebean got as far as the telephone again and layed [*sic*] on the floor").

visibly compromised patient who expressly advised her as to what specific treatment he needed by simply sending him back to his cell—a decision that Corizon physician Dr. Covillo described as "crazy."

Construing the facts in the light most favorable to Plaintiffs, the Court finds that Munger's conduct meets "the callousness threshold" *Coleman v. Rahija*, 114 F.3d 778, 787 (8th Cir. 1997), and there is evidence sufficient to suggest that her conduct was "motivated by evil motive or intent," *Washington*, 900 F.3d at 564. *See Scalia v. Cty. of Kern*, No. 117CV01097LJOSKO, 2019 WL 4243225, at *6 (E.D. Cal. Sept. 6, 2019) (denying defendants' motion for summary judgment on punitive damages claim where nurse did not keep inmate who had sustained head injury for observation and did not call physician despite inmate's being unable to walk on her own).

### iv. Corizon

The Court previously stated that a reasonable juror could conclude that "Corizon was deliberately indifferent to the serious medical needs of Stufflebean based on its knowledge that its employees generally, and Munger and Covillo specifically, were in need of additional training and supervision," and that "Corizon knew that Stufflebean would be placed at a substantial risk of harm as a result of Corizon's systematic failure to train and supervise Munger and Covillo." Doc. 633, p. 32-33 n.13. However, Plaintiffs have not presented evidence suggesting that "Corizon acted with an evil motive or reckless indifference to [Stufflebean]'s rights or acted willfully, wantonly or maliciously." *Cf. Estate of Davis by Ostenfeld v. Delo*, 115 F.3d 1388, 1396–97 (8th Cir. 1997) (permitting imposition of punitive damages where a supervisor "refus[ed] to investigate

or take remedial action after numerous complaints were made regarding" an officer's use of excessive force).

## IV.    Conclusion

For the reasons set forth above, the Court (1) DENIES the motions by Defendants Mowry, Bergman, Williams, and Corizon for summary judgment on the wrongful death claims; (2) DENIES Corizon's motion for summary judgment on Count IV on the basis of the Eleventh Amendment and on the merits; (3) GRANTS the motions by Defendants Mowry, Bergman, Williams, and Corizon to strike the punitive damages claims against them; and (4) DENIES the motions by Covillo and Munger to strike the punitive damages claims against them.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated:  April 14, 2020
Jefferson City, Missouri